**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
                                                          :
In re:                                                    :        Chapter 11
                                                          :
AGT CRUNCH ACQUISITION LLC, et al.,                       :        Case No. 09 -12889 (REG)
                                                          :
                              Debtors.[1]                 :        Jointly Administered
------------------------------------------------------------X

## ORDER (A) AUTHORIZING AND APPROVING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (B) AUTHORIZING AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF

Upon the Motion for Orders (a) Establishing Bidding Procedures in Connection

With a Sale of Substantially All Assets of Certain Debtors, (b) Approving the Form and Manner

of Notices, (c) Setting a Sale Hearing, (d) Authorizing the Sale of the Assets Free and Clear of

All Liens, Claims, and Encumbrances, (e) Authorizing the Assumption and Assignment of

Certain Executory Contracts and Unexpired Leases, and (f) Granting Related Relief, dated May

6, 2009 (the "**Sale Motion**") [Doc. No. 13], filed by the above-captioned debtors and debtors in

possession (collectively, the "**Debtors**") seeking, among other things, entry of an order (the

"**Sale Order**"), pursuant to sections 105, 363, and 365 of title 11 of the United States Code (the

"**Bankruptcy Code**"), and Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**"), authorizing, among other things, the Debtors

---

[1]     The Debtors in these cases are: AGT Crunch Acquisition LLC, Sports & Fitness Ventures LLC, AGT
        Crunch Services LLC, Crunch CFI LLC, AGT Crunch Atlanta LLC, Crunch CFI Georgia, LLC,
        Crunch CFI Atlanta, LLC, AGT Crunch Chicago LLC, Crunch CFI GW, LLC, AGT Crunch Los
        Angeles LLC, AGT Union Street LLC, AGT Crunch Miami LLC, AGT Crunch New York LLC, Fort
        Greene Sports Club, LLC, Hauppauge Sports Club, LLC, Crunch CFI New York, LLC, Park Slope
        Sports Club, LLC, 113 4th Sports Club, LLC, AGT Crunch San Francisco LLC, Crunch CFI San
        Francisco, LLC, AGT Crunch Washington DC LLC, and The Silver Springs Sports Club, L.L.C.

to (i) sell the Assets[2] free and clear of all liens, claims, and encumbrances, other than the Assumed Liabilities, (ii) enter into an asset purchase agreement, dated May 5, 2009 (the "**Agreement**"), a copy of which is annexed hereto as Exhibit A, with CH Fitness Investors, LLC (together with any designee(s) or Affiliates thereof, "**CH Fitness**" or the "**Buyer**"), and (iii) assume and assign to the Buyer certain executory contracts and unexpired leases in connection with such sale; and, pursuant to the Agreement and as described in the Motion, the Debtors and the Buyer have agreed that the Buyer has the right to elect by written notice to the Debtors (the "**G Reorganization Notice**"), at any time prior to Closing, to direct that the Asset Acquisition shall be effected pursuant to the following transactions which are intended to qualify as a reorganization pursuant to Section 368(a)(1)(G) of the Internal Revenue Code: (i) Sellers shall contribute the Assets (other than Excluded Assets) (the "**Asset Contribution**") to a newly formed Subsidiary of the Debtors which is treated as a corporation for U.S. tax purposes ("**Newco**") or one or more wholly owned Subsidiaries of Newco which are treated as disregarded entities for U.S. income tax purposes in consideration for equity interests of Newco (with allocation of the equity interests to each Seller to be reasonably determined by Buyer) and Newco shall accept the Assets and assume only the Assumed Liabilities pursuant to Article II of the Agreement, as if Newco was substituted for Buyer; (ii) immediately following the Asset Contribution, Sellers shall exchange and deliver to Buyer, free and clear of any and all Encumbrances and with all rights attached thereto, and Buyer shall acquire, 100% of the equity interests of Newco (the "**Equity Exchange**") from the Sellers, and (iii) in consideration of the equity interests, Buyer shall exchange the Purchase Price in the same manner as set forth in the

---

[2]  Unless otherwise stated, all capitalized terms not defined herein shall have the same meaning as set forth in the Sale Motion.

Agreement; and the G Reorganization Notice having been given and filed with the Court on July 20, 2009; and the Court having (x) reviewed and considered the Sale Motion, the G Reorganization Notice, all relief related thereto, the objections thereto and statements of counsel and the evidence presented in support of the relief requested by the Debtors in the Sale Motion at a hearing before the Court on August 10, 2009 (the "**Sale Hearing**"); (y) entered an order on June 2, 2009 [Doc. No. 116] (the "**Bid Procedures Order**") approving, among other things, the proposed Bidding Procedures, the Expense Reimbursement for CH Fitness, the Sale Notice, and the procedures for determining and fixing cure costs to be paid in respect of Assumed Contracts; (z) found that, after an extensive marketing process by the Debtors, the Buyer has submitted the highest and best bid for the Assets; and adequate and sufficient notice of the Bidding Procedures, the Agreement, and all transactions contemplated thereunder and in this Order were given in the manner directed by the Court in the Bid Procedures Order; and all interested parties having been afforded an opportunity to be heard with respect to the Sale Motion and all relief related thereto; and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation thereon; and good and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS AND DETERMINES THAT**:[3]

**Jurisdiction, Final Order and Statutory Predicates**

A.       This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157(b)(l) and 1334(a).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).  Venue is proper in this District and in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.       The statutory predicates for the relief requested in the Sale Motion are Bankruptcy Code sections 105(a), 363 and 365 and Bankruptcy Rules 2002(a)(2), 6004, 6006, 9007 and 9014.

C.       This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

**Notice of the Sale and Auction**

D.       Actual written notice of the Sale Motion was provided to the following parties (the "**Notice Parties**"): (i) counsel to the official committee of unsecured creditors appointed in these chapter 11 cases; (ii) counsel to CH Fitness Investors, LLC; (iii) the Office of

---

[3]  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Sale Motion are hereby incorporated herein to the extent not inconsistent herewith.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

the United States Trustee for Region 2 for the Southern District of New York, (iv) the Internal Revenue Service; (v) the Securities and Exchange Commission; (vi) all other applicable state and federal taxing authorities having jurisdiction over the Assets; (vii) the United States Department of Justice and the United States Attorney; (viii) all applicable state attorneys general and local regulatory authorities; (ix) the counterparties to each of the Assumed Contracts; (x) all other parties known to the Debtors who have or may have asserted liens or claims against any of the Assets; (xi) all parties that have requested notice pursuant to Bankruptcy Rule 2002; and (xii) all other entities known to have expressed an interest in a transaction with respect to all or part of the Assets [docket nos. 80, 407, 421, 423, 428, 431, 440, and 442].

E.     The Debtors published notice of the Sale Motion, the Sale, the time and place of the proposed Auction, the time and place of the Sale Hearing (as scheduled in the Bid Procedures Order), and the time for filing objections to the Sale Motion in the <u>New York Times</u> (National Edition) on June 17, 2009 [docket no. 417].

F.     The Sale Notice was reasonably calculated to provide all interested parties with timely and proper notice of the Sale and the Sale Hearing.

G.     As evidenced by the affidavits of service previously filed with the Court, proper, timely, adequate, and sufficient notice of the Sale Motion, the Sale Hearing, the Sale and the transactions contemplated thereby, including without limitation, the Asset Contribution and Equity Exchange, has been provided in accordance with the Bid Procedures Order, Bankruptcy Code sections 105(a), 363 and 365, and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9008. The notices described above were good, sufficient, and appropriate under the circumstances, and no other or further notice of the Sale Motion, the Sale Hearing, the Sale or the Asset Contribution and Equity Exchange is or shall be required.

H.       The disclosures made by the Debtors concerning the Sale Motion, the Agreement, the Sale, the Asset Contribution and Equity Exchange and the Sale Hearing were good, complete, and adequate.

I.       A reasonable opportunity to object and be heard with respect to the Sale and the Sale Motion and the relief requested therein (including the assumption and assignment of Assumed Contracts to Newco or its Subsidiaries and any Cure Costs related thereto), has been afforded to all interested persons and entities, including the Notice Parties.

**Good Faith of Buyer**

J.       The Agreement was negotiated, proposed and entered into by the Sellers and the Buyer without collusion, in good faith and from arms' length bargaining positions.

K.       Neither the Debtors nor the Buyer have engaged in any conduct that would cause or permit the Agreement to be avoided under Bankruptcy Code section 363(n). Specifically, the Buyer has not acted in a collusive manner with any person.

L.       The Buyer is purchasing the Assets, in accordance with the Agreement and pursuant to the G Reorganization Notice, in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to all of the protections afforded by such provision, and otherwise has proceeded in good faith in all respects in connection with the Debtors' chapter 11 cases in that, among other things: (a) except as set forth in the Bid Procedures Order, the Buyer recognized that the Debtors were free to deal with any other party interested in acquiring the Assets; (b) the Debtors and the Buyer complied with the provisions in the Bid Procedures Order; (c) the Buyer agreed to subject its bid to the competitive bidding procedures set forth in the Bid Procedures Order; (d) the Buyer in no way induced or caused the chapter 11 filings by the Debtors; and (e) all payments to be made by the Buyer in connection with the Sale have been disclosed.

**Highest and Best Offer**

M.     The Agreement constitutes the highest and best offer for the Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  The Debtors' determination that the Agreement constitutes the highest and best offer for the Assets constitutes a valid and sound exercise of the Debtors' business judgment.  Approval of the Sale Motion and the Agreement and the consummation of the transactions contemplated thereby is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.

**No Fraudulent Transfer**

N.     The consideration provided by the Buyer pursuant to the Agreement (a) is fair and reasonable, (b) is the highest or best offer for the Assets and (c) constitutes reasonably equivalent value and fair consideration (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code) under the laws of the United States, any state, territory, possession or the District of Columbia.  No other person or entity or group of entities has offered to purchase the Assets for greater economic value to the Debtors' estates than the Buyer.  Approval of the Sale Motion and the Agreement and the consummation of the transactions contemplated thereby is in the best interests of the Debtors, their estates, their creditors and other parties in interest.

O.     The Buyer is not a mere continuation of the Debtors or their estates and there is no continuity of enterprise between the Buyer and the Debtors.  The Buyer is not holding itself out to the public as a continuation of the Debtors.  The Buyer is not a successor to the Debtors or their estates and the Sale does not amount to a consolidation, merger, or de facto merger of Buyer and the Debtors.

**Validity of Transfer**

P.        Each Debtor (a) has full corporate power and authority to execute and deliver the Agreement and all other documents contemplated thereby, (b) has all corporate authority necessary to consummate the transactions contemplated by the Agreement, including without limitation, those transactions contemplated by the Asset Contribution and Equity Exchange, and (c) has taken all corporate action necessary to authorize and approve the Agreement and the consummation of the transactions contemplated thereby.  The Sale has been duly and validly authorized by all necessary corporate action.  No consents or approvals, other than those expressly provided for in the Agreement, are required for the Debtors to consummate the Sale and the Agreement and the transactions contemplated thereby.

Q.        The Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession or the District of Columbia.  None of the Debtors nor the Buyer is entering into the transactions contemplated by the Agreement fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims.

R.        The Debtors are the sole and lawful owners of the Assets.  Subject to Bankruptcy Code sections 363(f) and 365(a), the transfer of each of the Assets to the Buyer, in accordance with the Agreement and pursuant to the G Reorganization Notice will be, as of the Closing Date, a legal, valid, and effective transfer of the Assets, which transfer vests or will vest the Buyer with all right, title, and interest of the Debtors to the Assets free and clear of (a) all liens and encumbrances relating to, accruing or arising any time prior to the Closing Date (collectively, "**Liens**") and (b) all debts arising under, relating to, or in connection with any act of the Debtors or claims (as that term is defined in Bankruptcy Code section 101(5)), liabilities, obligations, demands, guaranties, options, rights, contractual commitments, restrictions, interests

and matters of any kind and nature, whether arising prior to or subsequent to the commencement of these cases, and whether imposed by agreement, understanding, law, equity or otherwise (including, without limitation, rights with respect to Claims (as defined below) and Liens (i) that purport to give to any party a right of setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, any of the Debtors' or the Buyer's interests in the Assets, or any similar rights, or (ii) in respect of taxes, restrictions, rights of first refusal, charges of interests of any kind or nature, if any, including, without limitation, any restriction of use, voting, transfer, receipt of income or other exercise of any attributes of ownership) (collectively, as defined in this clause (b), "**Claims**"), relating to, accruing or arising any time prior to the Closing Date, with the exception of the Assumed Liabilities.

### Section 363(f) is Satisfied

S.      The conditions of Bankruptcy Code section 363(f) have been satisfied in full; therefore, the Debtors may sell the Assets free and clear of any interest in the property.

T.      The Buyer would not have entered into the Agreement and would not consummate the transactions contemplated thereby if the Sale to the Buyer and the assumption of any Assumed Liabilities by the Buyer were not free and clear of all Liens and Claims, other than the Assumed Liabilities.  Unless otherwise expressly included in the definitions of "Assumed Liabilities" in the Agreement, the Buyer shall not be responsible for any Liens or Claims, including in respect of the following:  (a) any labor or employment agreements; (b) any mortgages, deeds of trust and security interests; (c) intercompany loans and receivables between the Debtors; (d) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of any Debtor; (e) any other employee, worker's compensation, occupational disease or unemployment

or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (i) the Employee Retirement Income Security Act of 1974, as amended, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the Worker Adjustment and Retraining Act of 1988, (vii) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (viii) the Americans with Disabilities Act of 1990, (ix) the Consolidated Omnibus Budget Reconciliation Act of 1985, (x) state discrimination laws, (xi) state unemployment compensation laws or any other similar state laws, or (xii) any other state or federal benefits or claims relating to any employment with any of the Debtors or any of their respective predecessors; (f) any bulk sales or similar law; (g) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (h) any theories of successor liability.

U.     The Debtors may sell the Assets in accordance with the Agreement and the G Reorganization Notice free and clear of all Liens and Claims against the Debtors, their estates or any of the Assets (except the Assumed Liabilities) because, in each case, one or more of the standards set forth in Bankruptcy Code section 363(f)(l)-(5) has been satisfied.  Those holders of Liens or Claims against the Debtors, their estates or any of the Assets who did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented to the Sale pursuant to Bankruptcy Code section 363(f)(2).

### Cure/Adequate Protection

V.     The assumption and assignment of the Assumed Contracts pursuant to the terms of this Order are integral to the Agreement and are in the best interests of the Debtors and their estates, creditors, and all other parties in interest, and constitute the reasonable exercise of

sound and prudent business judgment by the Debtors.  The Buyer shall: (i) to the extent necessary, cure or provide adequate assurance of cure, of any default existing prior to the date hereof with respect to the Assumed Contracts, within the meaning of Bankruptcy Code sections 365(b)(1)(A) and 365(f)(2)(A), and (ii) to the extent necessary, provide compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof with respect to the Assumed Contracts, within the meaning of Bankruptcy Code sections 365(b)(1)(B) and 365(f)(2)(A).  The Buyer's obligation to pay any Cure Amounts and to perform the obligations under the Assumed Contracts after the Closing Date shall constitute adequate assurance of future performance within the meaning of Bankruptcy Code sections 365(b)(1)(C) and 365(f)(2)(B).

W.    Any objections to the assumption and assignment of any of the Assumed Contracts by the Buyer in accordance with the Agreement and the G Reorganization Notice are hereby overruled.  To the extent that any counterparty failed to object to the proposed Cure Amount timely, such counterparty is deemed to have consented to such Cure Amount and the assignments of its respective Assumed Contract(s) to the Buyer in accordance with the Agreement and the G Reorganization Notice.

### Compelling Circumstances for an Immediate Sale

X.    Good and sufficient reasons for approval of the Agreement and the Sale have been articulated.  The relief requested in the Sale Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest.  The Debtors have demonstrated both (a) good, sufficient and sound business purposes and justifications and (b) compelling circumstances for the Sale other than in the ordinary course of business, pursuant to Bankruptcy Code section 363(b) before, and outside of a plan of reorganization, in that, among other things, the immediate consummation of the Sale to the Buyer is necessary and

appropriate to maximize the value of the Debtors' estates and the Sale will provide the means for the Debtors to maximize creditor recoveries.

Y.      To maximize the value of the Assets and preserve the viability of the business to which the Assets relate, it is essential that the Sale occur within the time constraints set forth in the Agreement.  Time is of the essence in consummating the Sale.

Z.      Given all of the circumstances of these chapter 11 cases and the adequacy and fair value of the Purchase Price, the proposed Sale constitutes a reasonable and sound exercise of the Debtors' business judgment and should be approved.

AA.     The consummation of the Sale and the assumption and assignment of the Assumed Contracts are legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, Bankruptcy Code sections 105(a), 363(b), 363(f), 363(m), and 365, and all of the applicable requirements of such sections have been complied with in respect of the transaction.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

**<u>General Provisions</u>**

1.      The relief requested in the Sale Motion is granted and approved, and the Sale contemplated thereby is approved as modified herein.

2.      All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled as announced to the Court at the Sale Hearing (the full record of which is incorporated herein by reference), by stipulation filed with the Court, or by representation by the Debtors in a separate pleading, and all reservations of rights included therein, are hereby denied and overruled with prejudice.

3.      Notwithstanding anything in the Sale Motion, the Agreement, or this Order to the contrary, the following shall be deemed "Excluded Assets" under the Agreement

and this Order:  all of the Sellers' rights in or with respect to all actions, proceedings, claims or litigation, including any avoidance or preference actions for the benefit of any Seller under the Bankruptcy Code (a) against the AG Parties, (b) against CH Fitness; provided, however, any such actions, proceedings, claims or litigation against CH Fitness shall be subject to the Court's final Order authorizing the use of postpetition financing [docket no. 120] (the "**Final DIP Order**"); (c) relating to the  "Payments Subject to Retained Claims" that are identified on Exhibit B attached hereto; provided, however, that any actions, proceedings, claims or litigation against CH Fitness with respect to such payments shall be subject to the Final DIP Order; (d) relating to the "Payments on Rejected Leases" that are indentified on Exhibit C attached hereto; (e) relating to the "Payments to Vendors to Rejected Clubs" that are indentified on Exhibit C attached hereto, and (f) .any other avoidance or preference actions for the benefit of any Seller under the Bankruptcy Code that do not relate to a creditor whose claim is being paid or assumed by CH Fitness under the Agreement and this Order.

4.       Notwithstanding anything in the Sale Motion, the Agreement, or this Order to the contrary, the following shall be included in the definition of "Assets" for purposes of this Order and the Agreement:  all of the Sellers' rights in or with respect to all actions, proceedings, claims or litigation, including any avoidance or preference actions for the benefit of any Seller under the Bankruptcy Code, regarding (a) the "Payments not Subject to Retained Claims" that are identified on Exhibit B attached hereto; (b) the "Payments made to Parties on Assumed Contracts and Assumed Leases" that are identified on Exhibit C attached hereto; (c) the "Payments made to Continuing Vendors" that are indentified on Exhibit C attached hereto; and (d) the "Member Refunds" that are indentified on Exhibit C attached hereto.

5.     The following modifications to the Agreement are hereby approved and deemed to be made part of the Agreement as if set forth therein.

(a)     Section 2.01(a)(xi) is hereby amended to read as follows:

(xi)     all cash and cash equivalents, security and like deposits, securities, instruments and other investments of Sellers which relate to the Business, and all bank accounts; provided, however, that Buyer shall leave $150,000 in cash with the Sellers for funding of a litigation trust (or similar vehicle) under a plan of liquidation for the benefit of Sellers' general unsecured creditors pursuant to the record of the Sale Hearing;

(b)     Section 2.01(b)(viii) is deleted in its entirety; and

(c)     Section 2.01(a) is hereby amended to include the following new subsection (xv):

(xv)     all of Sellers' rights in or with respect to all actions, proceedings, claims or litigation against Bally Total Fitness Corporation, Bally Total Fitness Holding Corporation, Health & Tennis Corporation of New York, Inc., Bally Total Fitness of Greater New York, Inc. and BTF/CFI, Inc.

## Approval of the Agreement

6.     The Agreement and all other ancillary documents, and all of the terms and conditions thereof, are hereby approved as modified herein.

7.     Pursuant to Bankruptcy Code sections 363(b) and 363(f), the Debtors are authorized and empowered to take any and all actions necessary or appropriate to (a) consummate the Sale pursuant to and in accordance with the terms and conditions of the Agreement, including without limitation, the Asset Contribution and Equity Exchange, (b) close the Sale as contemplated in the Agreement and this Order, and (c) execute and deliver, perform under, consummate, implement, and close fully the transactions contemplated by the Agreement, including the assumption and assignment to the Buyer (in accordance with the Agreement and the G Reorganization Notice) of the Assumed Contracts, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Agreement and the Sale.  The Buyer shall not be required to seek or obtain relief from the automatic stay under

Bankruptcy Code section 362 to enforce any of its remedies under the Agreement or any other Sale related document. The automatic stay imposed by Bankruptcy Code section 362 is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Order.

8. This Order shall be binding in all respects upon the Debtors, their estates, all creditors of, and holders of equity interests in, any Debtor, any holders of Liens, Claims or other interests in, against or on all or any portion of the Assets (whether known or unknown), the Buyer and all successors and assigns of the Buyer, the Assets and any trustees, if any, subsequently appointed in any of the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code of any of the Debtors' cases. This Order and the Agreement shall inure to the benefit of the Debtors, their estates and creditors, the Buyer and the respective successors and assigns of each of the foregoing.

## Transfer of the Assets

9. Pursuant to Bankruptcy Code sections 105(a), 363(b), and 363(f), the Debtors are authorized to transfer the Assets to the Buyer on the Closing Date in accordance with the Agreement and pursuant to the G Reorganization Notice, and such transfer shall constitute a legal, valid, binding, and effective transfer of such Assets and shall vest Buyer with title to the Assets and, other than the Assumed Liabilities, shall be free and clear of all Liens, Claims and other interests of any kind or nature whatsoever, including but not limited to, successor or successor-in-interest liability and Claims in respect of the Excluded Liabilities, with all such Liens, Claims or other interests to attach to the net cash proceeds, if any, ultimately attributable to the property against or in which such Liens, Claims or interests are asserted, subject to the terms thereof, with the same validity, force and effect, and in the same order of priority, which such Liens, Claims or interests now have against the Assets, subject to any rights, claims and

defenses the Debtors or their estates, as applicable, may possess with respect thereto. Upon the

Closing, the Buyer shall take title to and possession of the Assets in accordance with the

Agreement and pursuant to the G Reorganization Notice subject only to the Assumed Liabilities.

10. All persons and entities that are in possession of some or all of the Assets

on the Closing Date are directed to surrender possession of such Assets to the Buyer in

accordance with the Agreement and pursuant to the G Reorganization Notice at the Closing. On

the Closing Date, each of the Debtors' creditors is authorized and directed to execute such

documents and take all other actions as may be reasonably necessary to release its Liens, Claims,

or other interests in the Assets, if any, as such Liens, Claims, or interests may have been

recorded or may otherwise exist.

11. On the Closing Date, this Order shall be construed and shall constitute for

any and all purposes a full and complete general assignment, conveyance and transfer of the

Sellers' interests in the Assets. Each and every federal, state, and local governmental agency or

department is hereby directed to accept any and all documents and instruments necessary and

appropriate to consummate the transactions contemplated by the Agreement.

12. A certified copy of this Order may be filed with the appropriate clerk

and/or recorded with the recorder to act to cancel any Liens and other encumbrances of record

except those assumed as Assumed Liabilities.

13. If any person or entity which has filed statements or other documents or

agreements evidencing Liens on, Claims against, or interests in, all or any portion of the Assets

(other than statements or documents with respect to the Assumed Liabilities) shall not have

delivered to the Debtors prior to the Closing, in proper form for filing and executed by the

appropriate parties, termination statements, instruments of satisfaction, releases of liens and

easements, and any other documents necessary for the purpose of documenting the release of all

Liens, Claims, or other interests which the person or entity has or may assert with respect to all

or any portion of the Assets, the Debtors are hereby authorized and directed, and the Buyer is

hereby authorized, to execute and file such statements, instruments, releases and other

documents on behalf of such person or entity with respect to the Assets.

                14.     This Order is and shall be effective as a determination that, on the Closing

Date, all Liens, Claims or other interest of any kind or nature whatsoever existing as to the

Assets prior to the Closing Date, other than the Assumed Liabilities, shall have been

unconditionally released, discharged and terminated, and that the conveyances described herein

have been effected.  This Order is and shall be binding upon and govern the acts of all persons

and entities, including, without limitation, all filing agents, filing officers, title agents, title

companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative

agencies, governmental departments, secretaries of state, federal, state and local officials, and all

other persons and entities who may be required by operation of law, the duties of their office, or

contract, to accept, file, register or otherwise record or release any documents or instruments, or

who may be required to report or insure any title or state of title in or to any lease; and each of

the foregoing persons and entities is hereby directed to accept for filing any and all of the

documents and instruments necessary and appropriate to consummate the transactions

contemplated by the Agreement.

**Assumption and Assignment of Contracts**.

                15.     The Debtors are hereby authorized and directed in accordance with

Bankruptcy Code sections 105(a) and 365 to (a) assume and assign to Buyer, in accordance with

the Agreement and pursuant to the G Reorganization Notice, effective upon the Closing Date, the

Assumed Contracts free and clear of all Liens, Claims, and other interests of any kind or nature whatsoever (other than the Assumed Liabilities), and (b) execute and deliver to Buyer such documents or other instruments as Buyer deems may be necessary to assign and transfer the Assumed Contracts, and the Assumed Liabilities to Buyer in accordance with the Agreement and pursuant to the G Reorganization Notice.

16.     With respect to the Assumed Contracts: (a) each Assumed Contract is an executory contract or unexpired lease under Bankruptcy Code section 365; (b) the Debtors may assume each of the Assumed Contracts in accordance with Bankruptcy Code section 365; (c) the Debtors may assign each Assumed Contract in accordance with Bankruptcy Code sections 363 and 365, and any provisions in any Assumed Contract that prohibit or condition the assignment of such Assumed Contract or allow the party to such Assumed Contract to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Assumed Contract, constitute unenforceable anti-assignment provisions which are void and of no force and effect; (d) all other requirements and conditions under Bankruptcy Code sections 363 and 365 for the assumption by the Debtors and assignment to Buyer of each Assumed Contract, in accordance with the Agreement and pursuant to the G Reorganization Notice, have been satisfied; (e) the Assumed Contracts shall be transferred and assigned to, and following the Closing remain in full force and effect for the benefit of, the Buyer in accordance with the Agreement and pursuant to the G Reorganization Notice, notwithstanding any provision in any such Assumed Contract (including those of the type described in Bankruptcy Code sections 365(b)(2) and (f)) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to Bankruptcy Code section 365(k), the Debtors shall be relieved from any further liability with respect to the Assumed Contracts after such

assignment to and assumption by Buyer in accordance with the Agreement and pursuant to the G Reorganization Notice; and (f) upon Closing, in accordance with Bankruptcy Code sections 363 and 365, Buyer shall be fully and irrevocably vested in all right, title and interest of each Assumed Contract.

17.     All defaults or other obligations of the Debtors under the Assumed Contracts arising or accruing prior to the Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in Bankruptcy Code section 365(b)(2)) shall be cured by the Buyer at the Closing or as soon thereafter as practicable by payment of the Cure Amounts.  To the extent that any counterparty to an Assumed Contract did not object to its Cure Amount by the Sale Hearing, such counterparty is deemed to have consented to such Cure Amount and the assignments of its respective Assumed Contract(s) to the Buyer in accordance with the Agreement and pursuant to the G Reorganization Notice.

18.     Unless otherwise represented by the Debtors in a separate pleading, in open court at the hearing to consider the relief ordered herein, or pursuant to a contract or lease amendment entered into by the Debtors, the Buyer, and the appropriate contract or lessor counterparty (any such amendment being deemed approved by this Order), the Debtors' Unexpired Lease or Executory Contract Assumption and Cure Notices, sent to counterparties of the Assumed Contracts, reflects the sole amounts necessary under Bankruptcy Code section 365(b) to cure all monetary defaults under the Assumed Contracts (collectively, the "**Cure Amounts**"), and no other amounts are or shall be due in connection with the assumption by the Debtors and the assignment to Buyer of the Assumed Contracts in accordance with the Agreement and pursuant to the G Reorganization Notice.

19.    Upon the Debtors' assignment of the Assumed Contracts to the Buyer under the provisions of this Order and any additional orders of this Court and Buyer's payment of any Cure Amounts pursuant to Paragraph 18 hereof, no default shall exist under any Assumed Contract, and no counterparty to any Assumed Contract shall be permitted (a) to declare a default by the Buyer under such Assumed Contract or (b) otherwise take action against the Buyer as a result of any Debtor's financial condition, bankruptcy or failure to perform any of its obligations under the relevant Assumed Contract.  Each non-Debtor party to a Assumed Contract hereby is also forever barred, estopped, and permanently enjoined from (i) asserting against the Debtors or Buyer, or the property of any of them, any default or claim arising out of any indemnity obligation or warranties for acts or occurrences arising prior to or existing as of the Closing, including those constituting Excluded Liabilities or, against Buyer, any counterclaim, defense, setoff or any other Claim asserted or assertable against the Debtors; and (ii) imposing or charging against Buyer any rent accelerations, assignment fees, increases or any other fees as a result of the Debtors' assumption and assignment to Buyer of any Assumed Contract in accordance with the Agreement and pursuant to the G Reorganization Notice.  The validity of such assumption and assignment of each Assumed Contract shall not be affected by any dispute between the Debtors and any non-Debtor party to an Assumed Contract relating to such contract's respective Cure Amount.

20.    (a)  In resolution of the Objection of Roc-Le Triomphe Associates, LLC to Assumption and Assignment of a Certain Unexpired Lease and Cure Amounts Related Thereto [Docket. No. 447], upon Closing, the Buyer has agreed that Crunch Holdings, LLC will become a guarantor of all of the Tenant's obligations under the lease relating to certain space located in the building at 245 East 58th Street, New York, New York (the "**58th St. Lease**") as adequate

assurance of future performance under the 58th St. Lease. (b) The Objection of 708 Broadway LLC to the assignment and assumption of its lease (the "**Lafayette Lease**") with the Debtors for the premises located at 404 Lafayette Street, New York, New York [Docket Nos. 436 and 469] is resolved in accordance with the terms stated on Exhibit D hereof.

21.     Except as provided in the Agreement or this Order, after the Closing, the Debtors and their estates shall have no further liabilities or obligations with respect to any Assumed Liabilities and all holders of such Claims are forever barred and estopped from asserting such Claims against the Debtors, their successors or assigns, their property or their assets or estates.

22.     The failure of the Debtors or Buyer to enforce at any time one or more terms or conditions of any Assumed Contract shall not be a waiver of such terms or conditions, or of the Debtors' and Buyer's rights to enforce every term and condition of the Assumed Contracts.

**Prohibition of Actions Against the Buyer**

23.     Except for the Assumed Liabilities, or as otherwise expressly provided for in this Order or the Agreement, the Buyer shall not have any liability or other obligation of the Debtors arising under or related to any of the Assets. Without limiting the generality of the foregoing, and except as otherwise specifically provided herein or in the Agreement, the Buyer shall not be liable for any Claims against the Debtors or any of its predecessors or affiliates, and the Buyer shall not have successor or vicarious liabilities of any kind or character, including, but not limited to, under any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger, mere continuation, or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated,

including, but not limited to, liabilities on account of warranties, intercompany loans and receivables between the Debtors, and any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of any of the Assets prior to the Closing.

24.     Except with respect to the Assumed Liabilities, or as otherwise expressly provided for in this Order or the Agreement, all persons and entities, including, but not limited to, all debt holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, litigation claimants and other creditors, holding Liens, Claims or other interests of any kind or nature whatsoever against or in all or any portion of the Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate), arising under or out of, in connection with, or in any way relating to the Debtors, the Assets, the operation of the Debtors' Business prior to the Closing Date or the transfer of the Assets to the Buyer in accordance with the Agreement and pursuant to the G Reorganization Notice, hereby are forever barred, estopped and permanently enjoined from asserting against the Buyer, its successors or assigns, their property or the Assets, such persons' or entities' Liens, Claims or interests in and to the Assets, including, without limitation, the following actions:  (a) commencing or continuing in any manner any action or other proceeding against the Buyer, its successors, assets or properties; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Buyer, its successors, or their assets or properties; (c) creating, perfecting, or enforcing any Lien or other Claim against the Buyer, its successors, their assets, or their properties; (d) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due the Buyer o its successors; (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order or other orders of the Court, or the

agreements or actions contemplated or taken in respect thereof; or (f) revoking, terminating or failing or refusing to transfer or renew any license, permit or authorization to operate any of the Assets or conduct any of the businesses operated with the Assets.

25.    All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and transfer the Assets to the Buyer in accordance with the terms of the Agreement, the G Reorganization Notice and this Order.

26.    The Buyer has given substantial consideration under the Agreement for the benefit of the Debtors, their estates and creditors.  The consideration given by the Buyer shall constitute valid and valuable consideration for the releases of any potential Claims and Liens pursuant to this Order, including under Paragraphs 23-25 hereof, which releases shall be deemed to have been given in favor of the Buyer by all holders of Liens against or interests in, or Claims against any of the Debtors or any of the Assets, other than holders of Claims relating to the Assumed Liabilities.  The consideration provided by the Buyer for the Assets under the Agreement is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code.

## Other Provisions

27.    The consideration provided by the Buyer to the Debtors pursuant to the Agreement for the Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and under the laws of the United States, any state, territory, possession or the District of Columbia.

28.    The transactions contemplated by the Agreement are undertaken by the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the

Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale, unless such authorization and such Sale are duly stayed pending such appeal. The Buyer is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

29. Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (a) these chapter 11 cases, (b) any subsequent chapter 7 case into which any such chapter 11 case may be converted, or (c) any related proceeding subsequent to entry of this Order, shall conflict with or derogate from the provisions of the Agreement or the terms of this Order.

30. Pursuant to Bankruptcy Rules 7062, 9014, 6004(h), and 6006(d), this Order shall be effective immediately upon entry and the Debtors and Buyer are authorized to close the Sale immediately upon entry of this Order.

31. No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

32. The failure specifically to include any particular provision of the Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Agreement be authorized and approved in its entirety; provided, however, that this Order shall govern if there is any inconsistency between the Agreement (including all ancillary documents executed in connection therewith) and this Order. Likewise, all of the provisions of this Order are nonseverable and mutually dependent.

33. The Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance

with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

34.     The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors to the Buyer in accordance with the Agreement and pursuant to the G Reorganization Notice, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Assets to Buyer in accordance with the Agreement and pursuant to the G Reorganization Notice; (b) interpret, implement and enforce the provisions of this Order; (c) protect Buyer against any Liens, Claims or other interest in or against the Sellers or the Assets of any kind or nature whatsoever, attaching to the proceeds of the Sale, and (d) enter any orders under section 363 and 365 of the Bankruptcy Code with respect to the Assumed Contracts.

35.     Any amounts payable by the Debtors under the Agreement or any of the documents delivered by the Debtors in connection with the Agreement shall be paid in the manner provided in the Agreement and the Bid Procedures Order, without further order of this Court, shall be allowed administrative claims in an amount equal to such payments in accordance with Bankruptcy Code sections 503(b) and 507(a)(2), shall have the other protections provided in the Bid Procedures Order, and shall not be discharged, modified, or otherwise affected by any reorganization plan for the Debtors, except by an express agreement with Buyer, its successors, or assigns.

36.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

37.     To the extent that this Order is inconsistent with any prior order or pleading with respect to the Sale Motion in these chapter 11 cases, the terms of this Order shall govern.

DATE: August *17*, 2009
        New York, New York


                                    *s/ Robert E. Gerber*
                                    UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

## Agreement

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**CH FITNESS INVESTORS, LLC,**

**AGT CRUNCH ACQUISITION, LLC,**

**CRUNCH CFI, LLC**

**AND**

**the Subsidiaries of Crunch CFI, LLC**

**Signatories hereto**

**DATED AS OF MAY 5, 2009**

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS.................................................................................................2
    1.01    Definitions..........................................................................................................2

ARTICLE II PURCHASE AND SALE...........................................................................13
    2.01    Asset Acquisition ............................................................................................13
    2.02    Nonassignable Rights......................................................................................18

ARTICLE III PURCHASE PRICE..................................................................................19
    3.01    Purchase Price .................................................................................................19
    3.02    Allocation of Purchase Price..........................................................................19
    3.03    Assets Held in Trust .......................................................................................19

ARTICLE IV CLOSING AND TERMINATION ...........................................................20
    4.01    Closing Date....................................................................................................20
    4.02    Deliveries at Closing ......................................................................................20
    4.03    Termination .....................................................................................................21
    4.04    Procedure upon Termination; Limitation on Damages ...................................22
    4.05    Payments Upon Termination...........................................................................22

ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLERS...................23
    5.01    Organization and Qualification; Due Authorization ......................................23
    5.02    Violation; Consents and Approvals.................................................................23
    5.03    Financial Statements .......................................................................................24
    5.04    Absence of Undisclosed Liabilities ................................................................24
    5.05    Absence of Certain Changes or Events...........................................................25
    5.06    Title to Assets; Sufficiency of Assets.............................................................26
    5.07    Litigation.........................................................................................................26
    5.08    Taxes ...............................................................................................................26
    5.09    Compliance with Laws, Permits, Licenses, Etc.............................................26
    5.10    Real Property ..................................................................................................27

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF BUYER.....................27
    6.01    Organization and Due Authorization ..............................................................27
    6.02    No Violation; Consents and Approvals...........................................................27
    6.03    Litigation.........................................................................................................28

ARTICLE VII COVENANTS OF THE PARTIES..........................................................28
    7.01    Cooperation.....................................................................................................28
    7.02    Public Announcements....................................................................................28
    7.03    Certain Tax Matters........................................................................................28
    7.04    Employee and Labor Matters..........................................................................30
    7.05    Conduct of the Business Pending the Closing ...............................................30
    7.06    Access to Information .....................................................................................31
    7.07    Notices ............................................................................................................31
    7.08    Bankruptcy Court Orders................................................................................32
    7.09    Assumption and Rejection of Contracts and Leases.......................................33
    7.10    "G" Reorganization.........................................................................................33
    7.11    Name Changes ................................................................................................33

ARTICLE VIII CONDITIONS TO OBLIGATIONS OF PARTIES ............................................34
    8.01    Conditions to Obligations of the Sellers ................................................34
    8.02    Conditions to Obligations of Buyer ....................................................35
ARTICLE IX MISCELLANEOUS ........................................................................................36
    9.01    Fees and Expenses ............................................................................36
    9.02    Further Assurances ...........................................................................37
    9.03    Notices ..............................................................................................37
    9.04    Entire Agreement ..............................................................................38
    9.05    Severability ......................................................................................38
    9.06    Binding Effect ..................................................................................38
    9.07    Assignment ......................................................................................38
    9.08    No Third-Party Beneficiaries ...........................................................38
    9.09    Counterparts .....................................................................................39
    9.10    Interpretation ....................................................................................39
    9.11    Governing Law .................................................................................39
    9.12    Amendments ....................................................................................39
    9.13    Litigation Support ............................................................................39
    9.14    Terms Generally; Incorporation of Recitals.......................................40
    9.15    No Survival of Representations, Warranties and Covenants ...............40
    9.16    Specific Performance ........................................................................40

## SCHEDULES

1.01          Excluded Facilities
A.CC.ii.52     Excluded Contracts
7.03(b)       Taxes and Assessments

## EXHIBITS

A      Form of Assignment and Assumption Agreement
B      Form of Assignment of Membership Interests
C      Form of Assignment of Trademarks
D      Form of Bill of Sale and Assignment
E      Form of Lease Assignment and Assumption Agreement
F      Bidding Procedures
G      Reorganization Election

# ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT (together with the Schedules, Exhibits and Annexes hereto, collectively referred to as the "***Agreement***"), dated as of May 5, 2009 by and between CH Fitness Investors, LLC, a Delaware limited liability company ("***Buyer***"), AGT Crunch Acquisition, LLC, a Delaware limited liability company ("***AGT Crunch***" and a "***Seller***"), Crunch CFI, LLC, a Delaware limited liability company and a wholly-owned Subsidiary of AGT Crunch (the "***Company***" and a "***Seller***") and each of the other Subsidiaries of AGT Crunch (other than the Company) listed on the signature pages hereto (each, a "***Seller,***" and together with the Company and AGT Crunch, the "***Sellers***").

## W I T N E S S E T H:

**WHEREAS**, Sellers are engaged in the business of operating fitness centers at the Facilities, including any ancillary operations conducted at the Facilities, all as of the date hereof (the "***Business***");

**WHEREAS**, the Company believes, based on the recommendation of the Special Committee, following consultation with its financial advisors and after conducting reasonable due diligence, that in light of the current circumstances, a sale of its assets, as described herein, is necessary to maximize value and is in the best interest of the Sellers and their respective creditors and equity holders;

**WHEREAS**, Sellers filed voluntary petitions (the "***Chapter 11 Cases***") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (the "***Bankruptcy Code***") in the Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***") on May 5, 2009 (the "***Petition Date***");

WHEREAS, Buyer (the "**DIP Lender**"), has agreed to provide the Company with a $6,000,000 principal amount debtor in possession credit facility ("**DIP Financing**") pursuant to that certain Post-Petition Credit Agreement, dated as of the Petition Date, by and among the Company, the Lenders party thereto and the Buyer (the "**DIP Financing Agreement**"); and

WHEREAS, in accordance with and subject to the terms and conditions set forth in this Agreement, Buyer desires to acquire from the Company and, subject to the entry of the Transaction Approval Order, Sellers desire to sell to Buyer all or substantially all of the assets of Sellers (the "**Asset Acquisition**") in a transaction pursuant to section 363 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the foregoing and of the representations, warranties, covenants, agreements and conditions contained herein, the parties hereto, intending to be legally bound hereby, agree as follows:

## DEFINITIONS

BB.     Definitions.  Capitalized terms used in this Agreement shall have the meanings set forth below or as may be set forth throughout the provisions of this Agreement.  The preamble and recitals of this Agreement shall be deemed part of this Agreement and are incorporated fully herein.

"**Action**" shall mean any claim, charge, action, suit, arbitration, mediation, inquiry, proceeding or investigation by any Person or Governmental Entity before any Governmental Entity.

"**Affected Employees**" shall have the meaning ascribed to in Section 7.04 hereof.

"*Affiliate*" shall mean, with respect to any Person, any other Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by or is under common Control with such Person provided, that Buyer shall not be deemed an Affiliate of any of Sellers for all purposes hereof.

"*Agreement*" shall have the meaning ascribed to it in the preamble of this agreement.

"*Approved Budget*" shall have the meaning ascribed to it in the DIP Financing Agreement.

"*Asset Acquisition*" shall have the meaning ascribed to it in the recitals hereof.

"*Asset Contribution*" shall have the meaning ascribed to in the Section 7.10(a) hereof.

"*Assets*" shall have the meaning ascribed to it in Section 2.01 hereof.

"*Assignment and Assumption Agreement*" shall mean the Assignment and Assumption Agreement, to be dated as of the Closing Date, between each Seller, on the one hand, and Buyer or Newco, as applicable, on the other hand, substantially in the form attached hereto as <u>Exhibit A</u>.

"*Assignment of Membership Interests*" shall mean the Assignment of Membership Interests, to be dated as of the Closing Date, between each Seller and Buyer, substantially in the form attached hereto as <u>Exhibit B</u>.

"*Assignment of Trademarks*" shall mean the Assignment of Trademarks, to be dated as of the Closing Date, between each Seller, on the one hand, and Buyer or Newco, as applicable, on the other hand, substantially in the form attached hereto as <u>Exhibit C</u>.

"*Assumed Contracts*" shall have the meaning ascribed to it in Section CC.i.42.

"***Assumed Liabilities***" shall have the meaning ascribed to it in Section A.CC.iii.

"***Balance Sheets***" shall have the meaning ascribed to it in Section OO.xxii hereof.

"***Bankruptcy Code***" shall have the meaning ascribed to it in the recitals hereof.

"***Bankruptcy Court***" shall have the meaning ascribed to it in the recitals hereof.

"***Bankruptcy Period***" shall have the meaning ascribed to it in Section WWW hereof.

"***Bidding Procedures***" shall have the meaning ascribed to it in Section GGG.l.103.

"***Bid Procedures Order***" shall have the meaning ascribed to it in Section GGG.l.103 hereof.

"***Bill of Sale and Assignment***" shall mean the Bill of Sale and Assignment, to be dated as of the Closing Date, from each Seller to Buyer or Newco, as applicable, substantially in the form attached hereto as <u>Exhibit D</u>.

"***Business***" shall have the meaning ascribed to it in the recitals hereof.

"***Business Day***" shall mean any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in the city of New York.

"***Business Employees***" shall mean any employees of Sellers as of the date hereof.

"***Buyer***" shall have the meaning ascribed to it in the preamble of this Agreement.

"***Buyer Material Adverse Effect***" shall mean any change, effect, event, occurrence, development, circumstance or state of facts occurs which would materially impair the ability of Buyer to perform its obligations under this Agreement or the Other Agreements or have a materially adverse effect on or prevent or materially delay the consummation by the Buyer of the transactions contemplated by this Agreement or the Other Agreements.

"**_Chapter 11 Cases_**" shall have the meaning ascribed to it in the recitals hereof.

"**_Closing_**" shall have the meaning ascribed to it in Section HH hereof.

"**_Closing Date_**" shall have the meaning ascribed to it in Section HH hereof.

"**_Code_**" shall mean the Internal Revenue Code of 1986, as amended.

"**_Company Benefit Plan_**" shall mean any plan, program, arrangement or agreement that is a pension, profit-sharing, savings, retirement, employment, consulting, severance pay, termination, executive compensation, incentive compensation, deferred compensation, bonus, stock purchase, stock option, phantom stock or other equity-based compensation, change in control, salary continuation, retention, vacation, sick leave, disability, death benefit, group insurance, hospitalization, medical, dental, life (including all individual life insurance policies to which a Seller is the owner, the beneficiary or both), Code Section 125 "cafeteria" or "flexible" benefit, employee loan, educational assistance or fringe benefit plan, program, practice, arrangement, policy or agreement, whether written or oral, including, without limitation, any (i) "employee benefit plan" within the meaning of Section 3(3) of ERISA or (ii) other employee benefit plans, agreements, programs, policies, arrangement or payroll practices, whether or not subject to ERISA (including any funding mechanism therefor now in effect or required in the future as a result of the transaction contemplated by this Agreement or otherwise) under which any Business Employees or former employees, current or former officers, directors, leased employees, consultants or agents (or their respective beneficiaries) of any Seller has any present or future right to benefits.

"**_Contract_**" shall mean any legally binding agreement, contract, arrangement, lease, license, understanding, commitment or instrument.

"***Control***" (including the terms "Controlled by" and "under common Control with") shall mean the possession, directly or indirectly or as trustee or executor, of the power to direct or cause the direction of the management policies of a Person, whether through the ownership of capital stock or other equity, as trustee (other than a Chapter 11 trustee) or executor, by contract or credit arrangement or otherwise.

"***Cure Costs***" shall mean all monetary liabilities, including pre-petition monetary liabilities, of Sellers that must be paid or otherwise satisfied to cure all of the Sellers' monetary defaults under the Assumed Contracts at the time of the assumption thereof and assignment to Buyer as provided hereunder as such amounts are determined by the Bankruptcy Court.

"***DIP Financing***" shall have the meaning set forth in the recitals hereof.

"***DIP Financing Agreement***" shall have the meaning set forth in the recitals hereof.

"***DIP Obligations***" shall mean all obligations of Sellers under the DIP Financing Agreement and ancillary documents related thereto.

"***Encumbrances***" shall mean any mortgage, pledge, security interest, encumbrance, lien (statutory or other), claim, liability, charge, lease, covenant, easement, option, right of others, hypothecation, conditional sale agreement or restriction (whether on voting, sale, transfer, defenses, set-off or recoupment rights, disposition, or otherwise), whether imposed by Contract, Law, equity, or otherwise.

"***Equipment***" shall have the meaning ascribed to it in Section A.CC.i.38 hereof.

"***Equity Exchange***" shall have the meaning ascribed to it in Section 7.10(a) hereof.

"***ERISA***" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"***ERISA Affiliate***" shall mean any employer that would be considered a single employer with any of Sellers under Sections 414(b), (c), (m) or (o) of the Code.

"***Excluded Contracts***" shall have the meaning ascribed to it in Section A.CC.ii.52 hereof.

"***Excluded Facilities***" shall mean the Facilities listed on Schedule 1.01 hereof, it being agreed that Buyer may update Schedule 1.01 to add or delete Facilities from time to time at Buyer's sole discretion prior to the later of (x) with respect to any Contract exclusively relating to an Excluded Facility, five (5) days after the resolution of any dispute with a non-debtor party to such Assumed Contract relating to Cure Costs or adequate assurance and (y) the conclusion of the hearing in the Bankruptcy Court to approve the sale of the Assets.

"***Excluded Liabilities***" shall have the meaning ascribed to it in Section A.CC.iv hereof.

"***Expense Reimbursement***" shall have the meaning ascribed to it in Section A.LL.xv hereof.

"***Facility***" shall mean the corporate office of the Business and each fitness center identified as a "Facility" on Annex I including the Equipment currently used therein and any ancillary operations used in connection with such Facility (including retail stores and juice bars).

"***FICA***" shall mean the Federal Insurance Contribution Act.

"***Final Order***" shall mean an order of the Bankruptcy Court (a) as to which the time to appeal or reconsider shall have expired and as to which no appeal or motion to reconsider shall then be pending, or (b) if an appeal or motion for reconsideration shall have been filed or

sought, either (i) no stay of the order shall be in effect or (ii) if such a stay shall have been granted by the Bankruptcy Court, then (A) the stay shall have been dissolved or (B) a final order of the district court having jurisdiction to hear such appeal shall have affirmed the order and the time allowed to appeal from such affirmance or to seek review or rehearing thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible, and if a timely appeal of such district court order or timely motion to seek review or rehearing of such order shall have been made, any court of appeals having jurisdiction to hear such appeal or motion (or any subsequent appeal or motion to seek review or rehearing) shall have affirmed the district court's (or lower appellate court's) order upholding the order of the Bankruptcy Court and the time allowed to appeal from such affirmance or to seek review or rehearing thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible; provided, however, that Buyer in its sole discretion may treat as not being a Final Order, any order for which an appeal, motion to seek review, motion to seek rehearing, or any similar motion is pending notwithstanding that such order is not then subject to stay.

"**_Financial Statements_**" shall have the meaning ascribed to it in Section OO.xxii hereof.

"**_Financing Order_**" shall mean such interim or final order or orders of the Bankruptcy Court authorizing the DIP Financing.

"**_FUTA_**" shall mean the Federal Unemployment Tax Act, as amended.

"**_GAAP_**" shall mean United States generally accepted accounting principles, consistently applied in relation to Sellers' past practices.

"**_Governmental Entity_**" shall mean any court, administrative or regulatory agency or commission or other foreign, federal, state or local governmental authority or instrumentality.

"**_Improvements_**" mean the buildings, improvements, structures and fixtures (including fitness equipment) on the Real Property and/or demised under any lease of, or other Contract or for the use of, Real Property.

"**_Indebtedness_**" shall mean all obligations and liabilities for borrowed money or indebtedness, including without limitation, bank loans, mortgages, notes payable, capital lease obligations, equipment installment debt, guarantees of indebtedness of others, and all principal, interest, fees, prepayment penalties or amounts due or owing with respect thereto.

"**_Intellectual Property_**" shall have the meaning ascribed to it in Section A.CC.i.41 hereof.

"**_Inventory_**" shall have the meaning ascribed to it in Section A.CC.i.39 hereof.

"**_IRS_**" shall mean the Internal Revenue Service.

"**_Law_**" shall mean any domestic, foreign, federal, state, local or other law, statute, ordinance, writ, rule, regulation or governmental requirement of any kind, and the rules, regulations and orders promulgated thereunder and any final orders, decrees, judgments or injunction of any regulatory agency, court or other Governmental Entity.

"**_Lease Assignment and Assumption Agreement_**" shall mean the Lease Assignment and Assumption Agreement, to be dated as of the Closing Date, between each Seller, on the one hand, and Buyer or Newco, as applicable, on the other hand, substantially in the form attached hereto as Exhibit E.

"**_Leases_**" shall have the meaning ascribed to it in Section VV.xxxvii.

"**_Marks_**" shall have the meaning ascribed to it in Section 7.11(b).

"***Material Adverse Effect***" shall mean any change, effect, event, occurrence, development, circumstance or state of facts occurs except for (a) the commencement of the Chapter 11 Cases, and (b) events that would typically result from the commencement of the Chapter 11 Cases, as determined by Buyer in its reasonable discretion, in each case, which has had or would reasonably be expected to have, individually or in the aggregate, a materially adverse effect on the business, financial condition or results of operations of Sellers (including their respective businesses), taken as a whole, or which would materially impair the ability of any Seller to perform its obligations under this Agreement or the Other Agreements or have a materially adverse effect on or prevent or materially delay the consummation by the Sellers of the transactions contemplated by this Agreement or the Other Agreements.

"***Member***" means any member of fitness clubs operating as part of the Business (including third parties for whom other Persons have purchased fitness club memberships) who is subject to a Membership Contract of any kind.

"***Membership Contract***" means any Contract between the Business or any Seller, on the one hand, and any member of fitness clubs operating as part of the Business (including any other Person purchasing fitness club memberships for any third parties), on the other hand, providing for the use of any fitness clubs operating as part of the Business including, Contracts for personal training.

"***Newco***" shall have the meaning ascribed to it in Section 7.10(a) hereof.

"***Order***" shall mean any order, ruling, decision, verdict, decree, writ, subpoena, mandate, precept, command, directive, consent, approval, award, judgment, injunction, or other similar determination or finding by, before, or under the supervision of any Governmental Entity.

"***Other Agreements***" shall mean the Bill of Sale and Assignment, the Assignment and Assumption Agreement, the Lease Assignment and Assumption Agreement and the Assignment of Trademarks.

"***Permits***" shall mean all licenses, franchises, permits, certificates, notices, registrations, consents, authorizations and approvals of or issued by any Governmental Entity.

"***Permitted Liens***" shall mean liens for Taxes which are not yet due and payable or which are being contested in good faith through appropriate proceedings.

"***Person***" shall mean an individual, corporation, partnership, association, limited liability company, trust, joint venture, unincorporated organization, other entity or group (as defined in Section 13(d)(3) of the Securities and Exchange Act of 1934, as amended).

"***Petition Date***" shall have the meaning ascribed to it in the recitals hereof.

"***Pre-Petition First Lien Credit Agreement***" shall mean that certain Second Amended and Restated Credit and Guaranty Agreement, dated November 26, 2008, as amended by that certain Amendment No. 1, dated December 24, 2008, by and among Crunch CFI, LLC, AGT Crunch Acquisition LLC, certain Subsidiaries of AGT Crunch Acquisition LLC, and Buyer as Syndication Agent, Administrative Agent, Collateral Agent and Lender thereunder, as may be further amended or modified.

"***Pre-Petition First Lien Agreement Obligations***" shall mean the obligations of the Company under the Pre-Petition First Lien Credit Agreement.

"***Prevailing Bid***" shall have the meaning ascribed to it in the Bidding Procedures.

"***Purchase Price***" shall have the meaning ascribed to it in Section 3.01 hereof.

"***Qualifying Bid***" shall have the meaning ascribed to it in the Bidding Procedures.

"**Real Property**" shall mean all real property owned or leased by any of the Sellers, together with all the rights, benefits, privileges, easements, rights-of-way, tenements, hereditaments, and appurtenances thereon or in anyway appertaining thereto and all Improvements erected thereon.

"**Reorganization Notice**" shall have the meaning ascribed to it in Section 7.10(a) hereof.

"**Retained Real Property**" shall mean all Real Property other than the Real Property used in the operation of the Business at the Excluded Facilities.

"**Second Lien Notes**" shall mean the second lien notes issued under that certain Note Purchase Agreement dated June 30, 2008, by and among the Company, AGT Crunch Acquisition LLC, certain Subsidiaries of AGT Crunch Acquisition LLC and certain purchasers parties thereto.

"**Seller**" or "**Sellers**" shall have the meaning ascribed to it in the preamble of this Agreement.

"**Special Committee**" shall mean the committee of the board of directors of the Company, comprised of one or more independent directors.

"**Subsidiary**" means, with respect to any Person, any and all corporations, partnerships, limited liability companies, joint ventures, associations and other entities Controlled by such Person.

"**Taxes**" shall mean all taxes, charges, fees, levies, penalties or other assessments imposed by any United States federal, state, local or foreign taxing authority, including, but not limited to, income, gross receipts, license, stamp, occupation, premium, windfall profits, environmental (including taxes under Code Sec. 59A), custom duty, capital stock or other equity,

excise, real property, personal property, ad valorem, sales, use, transfer, franchise, payroll, employment, withholding, severance, social security or other tax of any kind whatsoever, including any interest, penalties or additions attributable thereto, whether disputed or not.

"**_Tax Adjustment Date_**" shall have the meaning ascribed to it in Section 7.03(b) hereof.

"**_Tax Return_**" shall mean any return, declaration, report, claim for refund, information return or other document (including any related or supporting information) required to be filed with respect to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**_Transaction Approval Hearing_**" shall have the meaning ascribed to it in Section GGG.l.103 hereof.

"**_Transaction Approval Order_**" shall have the meaning ascribed to it in Section GGG.l.104 hereof.

"**_Transfer Tax_**" shall mean any federal, state, county, local, foreign and other sales, use, transfer, conveyance, documentary transfer, recording or other similar Tax, fee or charge imposed upon the sale, transfer or assignment of property or any interest therein or the recording thereof, and any penalty, addition to Tax or interest with respect thereto (but excluding any gains and income Taxes).

## PURCHASE AND SALE

CC.    Asset Acquisition

i.    **Subject to the entry of the Transaction Approval Order and subject to the terms and conditions of this Agreement and on the basis of the representations, warranties, covenants and agreements herein contained, at the Closing, Sellers shall sell, assign, convey and deliver to Buyer free and clear of any and all Encumbrances (to the maximum extent provided in the Transaction Approval Order), except for Permitted Liens, and Buyer shall purchase, acquire and accept from Sellers, all of Sellers' right, title and interest in and to the Business and all their assets, rights and properties of every**

**kind and nature, whether real, personal or mixed, tangible or intangible, whether identifiable or contingent, wherever located, whether or not reflected on the books and records of Sellers, other than the Excluded Assets (collectively, the "*Assets*"), which Assets shall include, without limitation, all of the Seller's right, title and interest in the following:**

38.     all of the fixed assets and other tangible personal property, including all tools, fitness equipment and machines (whether or not currently located in any of the Facilities), other equipment, computers, management information systems (including without limitation all software and hardware related thereto), telephone systems, furniture, fixtures, leasehold improvements and supplies, wherever located, together with all manufacturers' warranties pertaining to the same, to the extent that such warranties may exist and be assignable (collectively, the "***Equipment***");

39.     all goods, products, clothing, health items, packaged food, drinks, packaging materials, bottles and labels, stores and supplies used in the sale of any goods or products and all other inventory whether on hand, on order, in transit or held by others on a consignment basis (collectively, the "***Inventory***");

40.     the outstanding accounts receivable, notes receivable, notes and other receivables in favor of any Seller, and all claims arising in connection therewith;

41.     all intellectual property, including all (A) copyright rights (registered and unregistered) and software (including source code and object code), in any case, whether domestic or foreign, registered, unregistered and/or common law (including, without limitation, all goodwill associated with any of the foregoing, licenses in respect of any of the foregoing and claims for infringement of or interference with any of the foregoing and the right to recover past damages); (B) trade names, trade name rights, trademarks, trademark applications, trademark rights, service marks, service mark rights, trade dress, domain names, URLs, web pages, in any case, whether domestic or foreign or registered, unregistered and/or common law (including without limitation, all goodwill associated with any of the foregoing, licenses in respect of any of the foregoing, and claims for infringement of or interference with any of the foregoing and the right to recover past damages); (C) invention disclosures, issued design patents, pending U.S. patent applications and corresponding international and foreign counterpart applications and issued patents, including any applications, continuation applications, divisional applications, issued patents, reexaminations and reissues thereof, whether domestic or foreign (including without limitation, all goodwill associated with any of the foregoing, licenses in respect of any of the foregoing, and claims for infringement of or interference with any of the foregoing and the right to recover past damages); and (D) confidential information, trade secrets, designs, specifications, know-how and other proprietary information and technology (collectively, the "***Intellectual Property***");

42.     subject to Section 7.09 hereof, all Contracts of any of Sellers or the Business not rejected by Sellers by Order of the Bankruptcy Court or the subject of a rejection motion on the Closing Date, but excluding (1) unless Buyer elected pursuant to Section 2.2(c)(ix) to assume obligations under the DIP Financing Agreement or the Pre-Petition First Lien Credit Agreement as the case may be, the DIP Financing Agreement and

the Pre-Petition First Lien Credit Agreement or any related agreements, instruments or other documents, (2) the Second Lien Notes or any related agreements, instruments or other documents and (3) the Excluded Contracts (other than the Contracts in the foregoing clauses (1), (2) and (3), the "***Assumed Contracts***");

43.    all goodwill, other intangible property, and causes of action, actions, claims and rights of any kind as against others (whether by contract or otherwise) relating to any of the Assets (including the Intellectual Property), the Assumed Liabilities or the Business;

44.    all books and records (financial, accounting and other) (other than those included in the Excluded Assets pursuant to Section A.CC.ii) and, correspondence and all sales, marketing, advertising, packaging and promotional materials, files, data, software (whether written, on disk, film, tape or other media, and including all computerized data), drawings or plans for Facilities and other technical information and data, and all other business and other records, in each case arising under or relating to the Assets, the Assumed Liabilities or the Business (collectively, the "***Books and Records***");

45.    all Permits now existing and all Permits issued after the date hereof and through the Closing Date, excluding only such Permits to the extent not legally transferable and Permits related exclusively to Excluded Facilities;

46.    all prepaid expenses, refunds (including, refunds with respect to Taxes paid by or on behalf of a Seller), security and like deposits, securities, instruments and other investments of Sellers;

47.    all rights, remedies and benefits of Sellers arising under or relating to any of the Assets, the Assumed Liabilities or the Business, including, without limitation, rights, remedies and benefits arising out of express or implied warranties from manufacturers or suppliers of the Equipment or the Inventory (or components thereof), the other Assets or products purchased or ordered by Sellers prior to the Closing Date (and in any case, any component thereof), and all claims and causes of action arising therefrom;

48.    all cash and cash equivalents, security and like deposits, securities, instruments and other investments of Sellers which relate to the Business, and all bank accounts;

49.    all other property and assets pertaining to or used or useful in the conduct of the Business or the ownership of any of the Assets, including without limitation, tax attributes, insurance policies and the proceeds thereof and all other tangible and intangible assets that are not expressly identified as Excluded Assets;

50.    assets of Sellers (whether in trust or otherwise) with respect to any Company Benefit Plan of Sellers (but not any ERISA Affiliate); and

51.    all of Sellers rights in or with respect to all actions, proceedings, claims or litigation, including any avoidance or preference actions for the benefit of any Seller under the Bankruptcy Code.

ii. **Excluded Assets. Sellers are not selling, assigning or conveying to Buyer, Buyer is not purchasing from Sellers, and the Assets shall not include, the following (collectively, the "*Excluded Assets*"):**

52. all Contracts set forth on Schedule 2.01(b)(i) (the "***Excluded Contracts***"), it being agreed that Buyer may update Schedule 2.01(b)(i) to add or delete Contracts from time to time at Buyer's sole discretion prior to the later of (x) with respect to any specific Assumed Contract, five (5) days after the resolution of any dispute with a non-debtor party to such Assumed Contract relating to Cure Costs or adequate assurance and (y) the conclusion of the hearing in the Bankruptcy Court to approve the sale of the Assets;

53. the DIP Financing Agreement, the Pre-Petition First Lien Credit Agreement, the Second Lien Notes and any related agreements, instruments or other documents, except with respect to any portion of the DIP Financing Agreement or the Pre-Petition First Lien Credit Agreement that Buyer elects to assume pursuant to Section 2.01(c)(ix);

54. the corporate minute books, equity transfer records and corporate seal of any Seller;

55. membership interests or other equity interests in any Subsidiary of AGT Crunch held by a Seller; (other than the equity interests to be transferred to Buyer pursuant to Section 7.10 if applicable);

56. all rights of Sellers arising under this Agreement and any Other Agreements to which a Seller is a party;

57. any security deposits at Excluded Facilities;

58. except as otherwise provided herein, all Contracts relating exclusively to Excluded Facilities; and

59. all of Sellers rights in or with respect to all actions, proceedings, claims or litigation against Bally's Total Fitness Health Corp.

iii. **Assumed Liabilities. Subject to the entry of the Transaction Approval Order and subject to the terms and conditions of this Agreement and on the basis of the representations, warranties, covenants and agreements herein contained, at the Closing, each Seller agrees to assign to Buyer and Buyer agrees to assume from Sellers only the liabilities of Sellers set forth below (collectively, the "*Assumed Liabilities*"):**

60. any employee-related liabilities shown on the consolidated balance sheets of Sellers dated as of December 31, 2008, other than liabilities relating to any Excluded Contracts and to Employees employed in Excluded Facilities;

61. the liabilities and obligations of Sellers under each of the Assumed Contracts;

62.     all obligations of any of the Sellers under any Membership Contracts;

63.     all obligations and liabilities of the Sellers to vendors, service providers and customers related to Facilities that are the subject of Assumed Contracts;

64.     post petition trade payables as of the Closing Date, other than items which are Excluded Liabilities;

65.     Bankruptcy Court approved accrued and unpaid professional fees and expenses incurred by Sellers for professionals engaged by Sellers in connection with the administration of the Chapter 11 Cases, as of the Closing Date in an amount not to exceed $500,000 and expenses payable to the trustee; but not including any fees and expenses of any professional in pursuing or supporting claims, objections, avoidance actions, or any other litigation against Buyer;

66.     any accrued and unpaid professional fees payable by Sellers to the professionals retained by Buyer pursuant to the Financing Order;

67.     obligations and liabilities with respect to any Company Benefit Plan of Sellers (but not of any ERISA Affiliate); and

68.     at the election of the Buyer in its sole discretion pursuant to a written notice delivered to the Company no later than two Business Days prior to the Closing Date, all or a portion of the obligations under the DIP Financing Agreement and/or the Pre-Petition First Lien Credit Agreement.

iv.     **No Other Liabilities. Except as provided in Section A.CC.iv hereof, Buyer shall not assume nor be deemed to assume and shall have no responsibility or obligation with respect to, any other liabilities or obligations of, or claim against, Sellers, of any kind or nature, whether absolute, accrued, contingent or otherwise and whether due or to become due and whether or not asserted, and whether or not known or unknown or currently existing or hereafter arising, and however arising, including the following (collectively, the "*Excluded Liabilities*"):**

69.     any liabilities or obligations in respect of or relating to the Excluded Assets (including the Excluded Contracts);

70.     any liabilities or obligations in respect of the Second Lien Notes;

71.     any DIP Obligations and any Pre-Petition First Lien Credit Agreement Obligations except as elected by Buyer pursuant to Section 2.01(c)(ix);

72.     any suit, action or proceeding brought by any Person against the Business or any of the Sellers, including any suits, actions or proceedings by any equity holders of Sellers or any of their respective Affiliates or any Person acting on behalf of, or claiming rights through, Sellers, including on account of the purchase, sale or rescission in respect of any security of any Seller;

73.    all liabilities or obligations of Sellers with respect to any Taxes, assessments or other governmental charges of Sellers or of the Business related to the taxable period (or portion thereof) ending on or prior to the Closing;

74.    any liabilities or obligations that are disallowed by the Bankruptcy Court;

75.    any expenses or fees of Sellers incident to or arising out of the negotiation, preparation, approval or authorization of this Agreement or the Other Agreements, in each case, unpaid as of the date hereof; and

76.    all liabilities or obligations in respect of or relating to Excluded Contracts.

DD.    Nonassignable Rights.  To the extent that Buyer shall have determined to close under this Agreement prior to receipt of any consent, approval or waiver necessary, under applicable bankruptcy or other Law or otherwise, to transfer the rights and benefits of Sellers under any Assumed Contract, Permit or Intellectual Property to Buyer, then, during the period from the Closing Date until the earlier of (x) the date that is the first anniversary of the Closing Date and (y) the date the Chapter 11 Cases are closed, the parties hereto will cooperate and use their respective commercially reasonable efforts to obtain as promptly as practicable all consents, approvals and waivers required by any third party or Governmental Entity to transfer to Buyer such Assumed Contract, Permit or Intellectual Property in a manner that will avoid any default, conflict, or termination of rights thereunder.  Until the time that such consent, approval or waiver is obtained or, if earlier, the earlier of (x) the date that is the first anniversary of following the Closing Date and (y) the date the Chapter 11 Cases are closed, each of the Sellers shall use its commercially reasonable efforts to cooperate in any lawful and commercially reasonable arrangement designed to provide the benefits of such Assumed Contract, Permit or Intellectual Property to Buyer in a manner that would as nearly as practicable reflect the purpose and intention of this Agreement.  In such event, to the extent applicable, (a) Buyer will promptly pay, perform or discharge, when due, any and all obligations and liabilities arising thereunder, other than those being contested in good faith, provided that the third party or parties to any such Assumed Contract, Permit or Intellectual Property has or have performed in all material respects all of its or their obligations thereunder and Sellers have fulfilled their obligations under clause (b) of this sentence and (b) Sellers will promptly pay to Buyer, when received, all moneys received by them under any such Assumed Contract, Permit or Intellectual Property or any claim, right or benefit arising thereunder, provided that Buyer has performed in all material respects all obligations under any such Assumed Contract, Permit or Intellectual Property required to be performed by Sellers after the Closing.  Notwithstanding anything contained in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Assumed Contract, Permit or Intellectual Property or any claim, right or benefit arising thereunder or resulting therefrom if an attempted assignment thereof without the consent of a third party thereto would be ineffective with respect to any such third party, or would in any way adversely affect the rights of Buyer or Sellers thereunder.

## PURCHASE PRICE

EE.     Purchase Price.  The purchase price (the "**Purchase Price**") for the purchase, sale, assignment and conveyance of Sellers' right, title and interest in, to and under the Assets shall consist of the release of the Company and any guarantors (and their respective successors and assigns) of obligations, claims, rights, actions, causes of action, suits, liabilities, damages, debts, costs, expenses and demands whatsoever, in law or in equity, arising under, or otherwise relating to, (i) the DIP Financing Agreement and (ii) the Pre-Petition First Lien Credit Agreement (collectively, the "**Credit Bid and Release**"), in an aggregate amount equal to $40,000,000 to be apportioned between the DIP Financing Agreement and the Pre-Petition First Lien Credit Agreement (including one or more tranches of the Pre-Petition First Lien Agreement Obligations), in each case, as determined by Buyer in its sole and absolute discretion (it being understood that Buyer may elect to allocate the entire amount to the Pre-Petition First Lien Credit Agreement and exclude the DIP Financing Agreement from the Credit Bid and Release).

FF.     Allocation of Purchase Price.  Promptly after the Closing, Buyer shall provide the Company with a draft of a reasonable allocation of the Purchase Price among the Assets.  Buyer shall incorporate all comments reasonably requested in writing by the Sellers within 60 days following the Closing.  The parties agree that such allocation of the Purchase Price is intended to comply with Section 1060 of the Code.  The parties shall cooperate to comply with all substantive and procedural requirements of Section 1060 of the Code and any regulations thereunder, and the allocation shall be adjusted and/or supplemented if, and to the extent, necessary to comply with the requirements of Section 1060 of the Code.  Neither of Buyer nor Sellers will take, nor permit any affiliated person to take, for federal, state or local income tax purposes, any position inconsistent with such allocation, or, if applicable, such adjusted or supplemental allocation.  Each of the Sellers and Buyer agree that they shall attach to their tax returns for the tax year in which the Closing shall occur an information statement on Form 8594, which shall be completed in accordance with such allocation, and shall cooperate with each other in preparing and filing any supplements to such form as may be required under Section 1060 of the Code.

GG.     Assets Held in Trust.  Following the Closing, any amounts paid by customers or Members or other third parties (i) to Sellers in connection with the Business or the Assets shall be held in trust by Sellers for the benefit of Buyer and tendered by Sellers to Buyer promptly after the receipt thereof, and (ii) to Buyer in connection with the Excluded Assets shall be held in trust by Buyer for the benefit of Sellers and tendered by Buyer to Sellers promptly after the receipt thereof.  Any party charged with the obligation to tender any such payment under this Section 3.03 shall tender such payment in the same form of consideration as such payment was made to such party by any customer or other third party.

## CLOSING AND TERMINATION

HH.    Closing Date.  Subject to the satisfaction of each of the conditions set forth in Article VIII hereof (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Assets and the assumption of the Assumed Liabilities, provided for in Article II hereof (the "***Closing***"), shall take place at 10:00 a.m., local time, at the offices of Akin Gump Strauss Hauer & Feld LLP located at One Bryant Park, New York, New York (or at such other place as the parties may mutually agree in writing) within three Business Days after the date on which all of the conditions set forth in Article VIII hereof have been satisfied or waived by the party entitled to waive that condition (other than conditions which, by their terms, may only be satisfied on the Closing Date), or on such other date and time as Sellers and Buyer may mutually agree in writing.  The date on which the Closing shall be held is referred to in this Agreement as the "***Closing Date***."

II.    Deliveries at Closing.

v.    **Deliveries by Buyer.  At the Closing, Buyer shall deliver to the Company the following:**

77.    the Purchase Price, in the form of the Credit Bid and Release (including documentation reasonably satisfactory to the Company evidencing a reduction of such obligations in an amount of such Credit Bid and Release);

78.    unless Buyer provides a Reorganization Notice pursuant to Section 7.10(a), an Assignment and Assumption Agreement, an Assignment of Trademarks, a Bill of Sale and a Lease Assignment and Assumption Agreement, in each case, executed by Buyer;

79.    if Buyer provides a Reorganization Notice pursuant to Section 7.10(a), an Assignment of Membership Interests, executed by Buyer;

80.    a certificate signed by an executive officer of Buyer in accordance with Section 8.01(a) and 8.01(b); and

81.    a secretary's certificate, duly executed by the Secretary of Buyer, certifying as to the resolutions of the board of managers of Buyer approving the transactions contemplated hereby.

vi.    **Deliveries by Sellers.  At the Closing, Sellers shall deliver to Buyer the following:**

82.    a certified copy of the Transaction Approval Order which shall be a Final Order;

83.    if Buyer provides a Reorganization Notice pursuant to Section 7.10(a), an Assignment and Assumption Agreement, an Assignment of Trademarks, a

Bill of Sale, a Lease Assignment and Assumption and an Assignment of Membership Interests, in each case, executed by each of the Sellers and Newco;

84.     if Buyer does not provide a Reorganization Notice pursuant to Section 7.10(a), an Assignment and Assumption Agreement, an Assignment of Trademarks, a Bill of Sale and a Lease Assignment and Assumption, in each case, executed by each of the Sellers;

85.     one or more certificates signed by a senior executive officer of each Seller in accordance with Section A.LLL.lxii and A.LLL.lxiii;

86.     one or more secretary's certificates, duly executed by the Secretary of each Seller certifying as to the resolutions of the board of directors (or similar governing body) of each Seller approving the transactions contemplated hereby;

87.     a "Certificate of Non-Foreign Status" pursuant to Treasury Regulation Section 1.1445-2(b)(2), executed by AGT Crunch; and

88.     such other documents as Buyer's counsel may reasonably request that are customary for a transaction of this nature or necessary to evidence or consummate the transactions contemplated by this Agreement.

JJ.     Termination.  This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date as follows:

vii.     **by mutual written agreement of Sellers and Buyer;**

viii.     **by Buyer upon a breach of any representation, warranty, covenant or agreement of Sellers set forth in this Agreement such that the conditions set forth in Section A.LLL would be incapable of being satisfied; provided, however, that the right to terminate this Agreement pursuant to this Section A.JJ.viii for breaches of covenants or agreements shall only be available to Buyer after the Company has received written notice of such breach and a reasonable opportunity (of not more than 15 days) to cure;**

ix.     **by Sellers upon a breach of any representation, warranty, covenant or agreement of Buyer set forth in this Agreement such that the conditions set forth in Section A.KKK would be incapable of being satisfied; provided, however, that the right to terminate this Agreement pursuant to this Section A.JJ.ix for breaches of covenants or agreements shall only be available to Sellers after Buyer has received written notice of such breach and a reasonable opportunity (of not more than 15 days) to cure;**

x.     **by Buyer or Sellers if there shall be any Order, binding on Buyer or Sellers which prevents or permanently prohibits or restrains Buyer and/or Sellers from consummating the transactions contemplated hereby and such Order is or shall become final and non-appealable;**

xi.     **by Buyer if (i) the Bankruptcy Court shall not have entered the Bid Procedures Order by the date that 30 calendar days following the Petition Date, or (ii)**

the Bankruptcy Court issues an order granting leave to any Person to commence an appeal of the Bid Procedures Order, or (iii) the Bankruptcy Court shall not have entered the Transaction Approval Order by the date that is 60 calendar days following the Petition Date, or (iv) the Transaction Approval Order shall not have become a Final Order on or prior to the date that is 10 days after the entry of such order, or (v) the Bid Procedures Order or the Transaction Approval Order shall have been stayed, vacated, modified or supplemented without Buyer's prior written consent;

        xii.      **(i) by Buyer or Sellers, if Sellers comply with the Bidding Procedures and accept a Qualifying Bid (as defined in the Bidding Procedures) from a Person other than Buyer or its permitted transferee or (ii) by Buyer, if Sellers enter into an agreement or transaction, including any Potential Transaction, with a third party (including any of Sellers' creditors or shareholders) which is materially inconsistent with this Agreement and the transactions contemplated hereby in any material respect;**

        xiii.      **by Buyer, if for any reason, other than the Buyer's failure to comply with its representations, covenants and agreements contained in this Agreement in a manner that would entitle Sellers to terminate this Agreement under Section 4.03(c), the Closing has not occurred prior to the date that is 150 calendar days after the Petition Date; or**

        xiv.      **by Buyer, if there shall have occurred following the date of this Agreement a change, effect, event, occurrence, development, circumstance or state of facts, that has had or would reasonably be expected to have or result in a Material Adverse Effect.**

      KK.     Procedure upon Termination; Limitation on Damages.  In the event of the termination of this Agreement, written notice thereof shall forthwith be given by the party or parties so terminating to the other party or parties, and this Agreement shall terminate, and the transactions contemplated hereby shall be abandoned, without further action by Sellers or Buyer, except that the provisions of this Section A.KK and Sections A.LL (to the extent the provisions of Section A.LL are approved by the Bankruptcy Court in the Bid Procedures Order), A.AAA, A.MMM, A.OOO, A.PPP, A.QQQ, A.RRR, A.SSS, A.TTT, A.UUU, A.VVV, A.WWW, A.XXX, A.ZZZ and 9.16 hereof shall survive any termination of this Agreement and nothing contained in this Agreement shall relieve any party hereto from liability for any breach or inaccuracy of its representations, warranties, covenants or agreements contained in this Agreement prior to such termination.  Notwithstanding anything to the contrary set forth in this Agreement, except in the event of fraud, (x) Sellers' aggregate liability for money damages in the event of the termination of this Agreement shall not exceed an amount equal to the Expense Reimbursement and (y) Buyer's aggregate liability for money damages in the event of the termination of this Agreement shall not exceed an amount equal to the Expense Reimbursement.

      LL.     Payments Upon Termination.

        xv.      **If this Agreement is terminated for any reason other than pursuant to Sections A.JJ.vii, A.JJ.ix or 4.03(d) Sellers shall reimburse Buyer for all of its reasonable and documented out-of-pocket costs and expenses (including legal,**

accounting, and other consultant fees and expenses) incurred in connection with the **Acquisition and the other transactions contemplated by this Agreement (the "**_Expense Reimbursement_**").**

xvi.     **The Expense Reimbursement, to the extent payable pursuant to Section A.LL.xv, shall be paid by Sellers to Buyer immediately upon the termination of this Agreement by wire transfer of immediately available funds to an account designated by Buyer to the Company.**

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers hereby jointly and severally represent and warrant to Buyer as follows:

MM.    Organization and Qualification; Due Authorization.

xvii.    **Each Seller is a limited liability company duly formed, validly existing and in good standing under the laws of the jurisdiction of its formation and has all requisite limited liability company power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted, subject to the limitations, if any, imposed by applicable bankruptcy law.  Each Seller is duly qualified to do business and is in good standing in all jurisdictions in which the location of its assets or the operation of its business makes such qualification necessary; except to the extent that the failure to be so qualified would not have a Material Adverse Effect.**

xviii.    **Each Seller has full power and authority to execute and deliver this Agreement and the Other Agreements to which it is a party, and, subject to Bankruptcy Court approval, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and the Other Agreements to which any Seller is a party and the performance and consummation of the transactions contemplated hereby and thereby by such Seller have been duly authorized by all necessary limited liability company action on the part of such Seller.**

xix.    **This Agreement and the Other Agreements to which any Seller is a party have been (or to the extent to be entered into on or prior to the Closing, will be) duly executed and delivered by such Seller and, subject to Bankruptcy Court approval and the due authorization, execution and delivery of such agreements by the other parties thereto (other then other Sellers), this Agreement and the Other Agreements constitute (or to the extent to be entered into on or prior to the Closing, will constitute) valid and binding obligations of such Seller, enforceable against such Seller in accordance with their terms.**

NN.    Violation; Consents and Approvals.

xx.    **Neither the execution and delivery by any Seller of this Agreement or the Other Agreements to which it is (or will be) a party nor, after giving effect to the**

**Transaction Approval Order, the consummation of the transactions contemplated hereby or thereby nor, after giving effect to the Transaction Approval Order, compliance by it with any of the provisions hereof or thereof will (i) conflict with or result in a violation of (A) any provision of the certificate of formation, limited liability company operating agreement or bylaws (or other organizational or governing documents) of such Seller or (B) any Order or Law binding upon such Seller or by which the Business or any Assets are subject or bound, (ii) violate, conflict with, or result in a breach of any of the terms of, or constitute a default under, or give rise to any right of termination, modification, cancellation or acceleration under (A) any material note, bond, mortgage, indenture, deed of trust, Contract or other obligation to which such Seller is a party or by which such Seller may be bound or to which any of the Assets may be subject or affected, or (B) any material Permit or Order of, or registration, declaration or filings with, any Governmental Entity, or (iii) result in the creation of any Encumbrance upon the properties or assets of such Seller being sold or transferred hereunder except, in the case of clauses (i)(B) and (iii), as would not materially and adversely affect the ability of the Sellers to carry out their obligations under this Agreement and the Other Agreements or otherwise have a Material Adverse Effect.**

        xxi.    **Other than the Bid Procedures Order and the Transaction Approval Order, no consent, waiver, approval, order, Permit or authorization of or from, or declaration or filing with, or notification to, any Person or Governmental Entity is required on the part of Sellers in connection with the execution and delivery of this Agreement or the Other Agreements, or the compliance by Sellers with any of the provisions hereof or thereof.**

    OO.    Financial Statements.

        xxii.    **Sellers have provided to Buyer prior to the date of this Agreement (i) audited consolidated balance sheets of Sellers as of December 31, 2007 and unaudited balance sheets as of December 31, 2008 (together, the "*Balance Sheets*") and (ii) audited consolidated statements of operations and cash flows of Sellers for the years ended December 31, 2007 and unaudited statements for the year ended on December 31, 2008 (the Balance Sheets and the other financial statements referred to in this Section A.OO.xxii, collectively, the "*Financial Statements*").**

        xxiii.    **The Financial Statements are true and correct in all material respects, were prepared in accordance with GAAP and the historical accounting practices of Sellers consistently applied and fairly present, in all material respects, the financial condition, results of operations and cash flows of Sellers as of the dates and for the periods indicated, subject to, in the case of the unaudited financial statements, normal year-end adjustments (which shall not be material) and the absence of footnotes, and except for the reclassification of certain long-term debt to short-term debt due to the acceleration of such debt obligations.**

    PP.    Absence of Undisclosed Liabilities.  Except as and to the extent specifically disclosed in the December 31, 2008 Balance Sheet Sellers do not have any material liabilities other than liabilities and obligations incurred during the period between December 31, 2008 and

the date hereof related to the restructuring of Sellers and those incurred since December 31, 2008 in accordance with the Approved Budget or in the ordinary course of business and consistent with past practice.

QQ.    Absence of Certain Changes or Events.  Since December 31, 2008 Sellers have not (except with respect to matters for which Buyer or its Controlling Affiliates received written notice (including email) from the Company prior to the date of this Agreement):

xxiv.    **except for executory contracts and unexpired leases rejected by any of Sellers by Order of the Bankruptcy Court with the prior written consent of Buyer, terminated, modified or amended any Assumed Contract or taken any action which violates, conflicts with or resulted in a breach of any provision of, or constitutes a default under, any Assumed Contract;**

xxv.    **(i) purchased or otherwise acquired any material properties or assets (tangible or intangible) or sold, leased, transferred or otherwise disposed of any of the Assets, except for sales of finished inventory in the ordinary course of business consistent with past practice, (ii) permitted, allowed or suffered any of the Assets to be subjected to any Encumbrance (other than Permitted Liens), or (iii) removed any Equipment or other material assets (other than finished inventory) from the Real Property other than in the ordinary course of business consistent with past practice;**

xxvi.    **waived or released any claim or rights included in or related to the Assets or the Business with a value individually or in the aggregate in excess of $100,000 or revalued any of the Assets, except for adjustments to the value of inventory in the ordinary course of business consistent with past practice;**

xxvii.    **other than in the ordinary course of business consistent with past practice, increased the benefits of or compensation (whether in the form of salary, bonus or otherwise) payable to any employee, contractor or consultant of Sellers or granted any bonus, benefit, payment (contingent or otherwise) or other direct or indirect compensation to any employee, contractor or consultant of Sellers;**

xxviii.    **except as required by Law, adopted, amended or terminated any Company Benefit Plan;**

xxix.    **changed in any way the Company's or any other Seller's accounting methods, principles or practices;**

xxx.    **entered into any commitment or transaction or series of commitments or transactions in respect of indebtedness or paid, discharged or satisfied any claims, liabilities or obligations (absolute, accrued, asserted or unasserted, contingent or otherwise), other than the payment, discharge or satisfaction in the ordinary course of business of liabilities incurred in the ordinary course of business consistent with past practice;**

xxxi.    **experienced a material loss or reduction in the number of employees employed in the operation of the Business; or**

xxxii. **agreed or committed to do any of the foregoing.**

RR.     Title to Assets; Sufficiency of Assets.  Sellers have good and valid right, title and/or interest in the Assets free and clear of all Encumbrances other than Permitted Liens, and at the Closing will convey all of their right, title and interest to all of such Assets to Buyer free and clear of all Encumbrances except for the Assumed Liabilities and Permitted Liens.  The Assets constitute all of the assets and properties which are used in or reasonably required to carry on the Business at the Facilities (other than the Excluded Facilities) as currently conducted.  The tangible Assets are in good operating condition and repair, ordinary wear and tear excepted.

SS.     Litigation.  There are no material claims, charges, actions, suits or proceedings pending, or to the knowledge of Sellers, threatened against or affecting Sellers, including but not limited to any claims, charges, grievances, actions, suits or proceedings relating to the Assets, the Assumed Liabilities, the Business, Sellers' current or former employees, consultants or contractors, or the transactions contemplated by this Agreement, at law, in equity or otherwise, in, before, or by any Governmental Entity, arbitrator or mediator.  No Seller is in material default under any Order.

TT.     Taxes.

xxxiii. **All federal, state, foreign, county, and local income and other material Tax Returns required to be filed by or on behalf of Sellers have been timely filed, or extensions of the time to file have been obtained, and when filed were true and correct in all material respects, and the Taxes due and owing on such Tax Returns were paid or adequately accrued, except to the extent contested in good faith by proper proceedings.  True and complete copies of all Tax Returns filed by Sellers for each of its three most recent fiscal years have been delivered to Buyer.  Sellers have duly withheld and paid all Taxes required to have been withheld and paid relating to any employee, independent contractor, creditor, stockholder, member, or other third party, and all Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed.**

xxxiv. **The Company's Chief Financial Officer has not received from the Internal Revenue Service or from the tax authorities of any state, county, local or other jurisdiction any written notice of underpayment of Taxes or other deficiency which has not been paid.**

UU.     Compliance with Laws, Permits, Licenses, Etc.

xxxv. **Sellers have been at all times within the applicable statute of limitations in compliance in all material respects with all applicable Laws and Permits material to any Seller or the Business.  Since January 1, 2008, no communication, whether from a Governmental Entity, citizens group, employee or otherwise, has been received by Sellers and no investigation or review is pending or, to the knowledge of Sellers, threatened by any Governmental Entity with respect to (i) any alleged violations by Sellers thereof of any Law or Permit or (ii) any alleged failure to have all Permits required in connection with the operation of the Business or the ownership of the Assets.**

xxxvi. **Sellers hold all material Permits necessary or required to operate the Business as currently conducted and all of such Permits are valid, effective and in good standing. Each of such Permits is freely transferable to Buyer.**

VV. Real Property.

xxxvii. **The Retained Real Property constitutes all of the real property, real property leases, subleases, occupancy and use agreements, operating agreements, easements, licenses and other real property interests (collectively, the "*Leases*") used in, or held by Sellers for, the operation of the Business at the Facilities (other than the Excluded Facilities) as currently conducted.**

xxxviii. **The Leases are in force and effect.**

xxxix. **The Retained Real Property, including, without limitation, each Improvement thereon, is in good condition, normal wear and tear excepted, for the purpose for which used in the Business at the Facilities (other than the Excluded Facilities), has sufficient rights of access and egress for the purposes for which it is used and complies, in all material respects, with all municipal, state and federal statutes, ordinances, rules and regulations applicable thereto, and no material improvements or repairs are necessary or currently contemplated with respect thereto.**

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Sellers as follows:

WW. Organization and Due Authorization. Buyer is a limited liability company duly formed, validly existing and in good standing under the laws of the state of Delaware. Buyer has full power and authority to execute and deliver this Agreement and the Other Agreements to which it is (or to the extent to be entered into on or prior to the Closing, will be) a party and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Other Agreements to which Buyer is a party and the performance and consummation of the transactions contemplated hereby and thereby by Buyer have been duly authorized by all necessary limited liability company action on the part of Buyer. This Agreement and the Other Agreements to which Buyer is a party have been (or to the extent to be entered into on or prior to the Closing, will be) duly executed and delivered by Buyer and, subject to the due authorization, execution and delivery of such agreements by the other parties thereto, this Agreement and the Other Agreements constitute (or to the extent to be entered into on or prior to the Closing, will constitute) the valid and binding obligations of Buyer, enforceable against Buyer in accordance with their terms.

XX. No Violation; Consents and Approvals. Neither the execution and delivery by Buyer of this Agreement or the Other Agreements to which it is a party nor the consummation of the transactions contemplated hereby or thereby nor compliance by it with any of the provisions hereof or thereof (a) conflict with or result in a violation of (i) any provision of the organizational

documents of Buyer or (ii) any judgment, order, writ, injunction, decree, statute, law, ordinance, rule or regulation in any material respect binding upon Buyer or (b) violate, conflict with, or result in a breach of any of the terms of, or constitute a default under, or give rise to any right of termination, modification, cancellation or acceleration under, (A) any Contract or other instrument or obligation to which Buyer is a party or by which Buyer may be bound or to which any of Buyer's assets may be subject or affected in any material respect and that, in each case, is material to the business of Buyer, or (B) any material license, permit, authorization, consent, order or approval of, or registration, declaration or filings with, any Governmental Entity except, in the case of clause (i)(B), as would not have a Buyer Material Adverse Effect.

YY.    Litigation.  There is no claim, action, lawsuit, or proceeding, or to the knowledge of Buyer, any pending inquiry or investigation or any threatened claim, action, lawsuit, proceeding, inquiry or investigation, in each case, by or against or affecting Buyer which has had or can be reasonably expected to have a material adverse effect on the ability of Buyer to consummate the transactions contemplated hereby.


## COVENANTS OF THE PARTIES

ZZ.    Cooperation.  From the date hereof until the Closing, Sellers and Buyer agree (i) to cooperate with each other in determining whether any filings are required to be made or consents are required to be obtained in any jurisdiction in connection with the consummation of the transactions contemplated hereby and in making or causing to be made any such filings promptly and in seeking to obtain in a timely manner any such consent; and (ii) to use all commercially reasonable efforts to obtain promptly the satisfaction of the conditions to the Closing of the transactions contemplated herein and to fulfill their respective obligations hereunder.  Sellers and Buyer shall furnish to each other all such information as may be reasonably required in order to effectuate the foregoing.

AAA.  Public Announcements.  Except as required by applicable Law, the rules of any applicable stock exchange, orders of the Bankruptcy Court or in filings required to be made with the Bankruptcy Court (which Sellers shall provide to Buyer in a reasonable number of days, but, in any event, at least two Business Days, in advance of filing with the Bankruptcy Court), neither Buyer nor Sellers shall, nor shall they permit any of their respective Affiliates to, make any public announcement in respect of this Agreement or the transactions contemplated hereby without the prior written consent of the other parties hereto (which consent shall not be unreasonably withheld or delayed).

BBB.  Certain Tax Matters.

xl.    **All Transfer Taxes, if any, that may be imposed by reason of the sale, transfer, assignment and delivery of the Assets and that are not exempt under the Bankruptcy Code shall be borne by Buyer.  Buyer and Sellers shall cooperate to (a) determine the amount of Transfer Taxes payable in connection with the transactions contemplated under this Agreement, (b) provide all requisite exemption certificates and**

**(c)** prepare and file any and all required Tax Returns for or with respect to such Transfer Taxes with any and all appropriate taxing authorities.

xli.       The items listed on Schedule 7.03(b) relating to taxes and assessments on the Real Property for any taxable period commencing on or prior to the day immediately preceding the Closing Date (the "*Tax Adjustment Date*") and ending after the Tax Adjustment Date shall be prorated between Buyer and Sellers as of the close of business on the Tax Adjustment Date.  Such proration shall not be affected by any changes in the applicable assessments following the Tax Adjustment Date.  All such prorations shall be allocated so that items relating to time periods ending on the Tax Adjustment Date shall be allocated to Sellers based upon the number of days in the period prior to the Closing Date and items related to time periods beginning after the Tax Adjustment Date shall be allocated to Buyer based upon the number of days in the period from and after the Closing Date.  The amount of all such prorations shall be settled and paid on the Closing Date; <u>provided</u>, <u>however</u>, that final payments with respect to prorations that are not able to be calculated on the Closing Date shall be calculated and paid as soon as practicable thereafter.

xlii.       Buyer shall retain possession of all accounting, business, financial and Tax records and information 89. relating to the Assets or the Assumed Liabilities that are in existence on the Closing Date and transferred to Buyer hereunder and 90. coming into existence after the Closing Date that relate to the Assets or the Assumed Liabilities before the Closing Date, for a period of at least seven (7) years from the Closing Date.  Buyer shall give Sellers notice and an opportunity to retain any such records in the event that Buyer determines to destroy or dispose of them after such period.  In addition, from and after the Closing Date, Buyer shall provide access to Sellers and its agents (after reasonable notice and during normal business hours and without charge), to the books, records, documents and other information relating to the Assets or the Assumed Liabilities as Sellers may reasonably deem necessary to (i) properly prepare for, file, prove, answer, prosecute and/or defend any Tax Return, claim, filing, tax audit, tax protest, suit, proceeding or answer or (ii) administer or complete any of the Sellers' cases pending under the Bankruptcy Code.  Such access shall include, without limitation, access to any computerized information retrieval systems relating to the Assets or the Assumed Liabilities.

xliii.       Company and Buyer shall cooperate with each other and provide each other with such assistance as reasonably may be requested by either of them in connection with the preparation of any Tax Return or any audit or other examination by any taxing authority, or any judicial or administrative proceedings relating to any liability for Taxes under this Agreement.  If Buyer requests assistance hereunder Buyer shall reimburse the Sellers for all reasonable third-party out-of-pocket expenses incurred in providing such assistance.  Nothing in this Section A.BBB or any other provision of this Agreement shall require Buyer to be liable for any of the income tax liability of the Sellers or require Sellers to be liable for any of the income tax liability of the Buyer.

xliv.     **As of the Closing, Sellers agree to join in any election made by Buyer regarding the procedure to be utilized with respect to wage reporting under Revenue Procedure 2004-53.**

CCC.   Employee and Labor Matters.

xlv.     **Buyer shall offer employment to such Business Employees employed in the Facilities (other than Excluded Facilities) on the Closing Date (all such employees accepting such offer are hereinafter referred to as the "*Affected Employees*"), on terms and conditions substantially similar to the existing terms and conditions of the Affected Employees' employment, <u>provided</u>, <u>however</u>, that nothing herein shall limit Buyer's right to terminate any Affected Employee or modify or terminate any Company Benefit Plan in accordance with its terms and applicable Law.**

xlvi.     **Sellers shall assign to Buyer the Company Benefit Plans, make such amendments as are required to effectuate such assignments and further cooperate with Buyer to effectuate such assignments.**

xlvii.     **Sellers intend that Buyer will qualify as a successor employer for the purpose of receiving credit for the payment of taxes under FICA and FUTA by Sellers with respect to Affected Employees.  Buyer and Sellers shall cooperate to effectuate the foregoing.**

DDD.   Conduct of the Business Pending the Closing.  Except as contemplated by this Agreement or with the prior written consent of Buyer, Sellers covenant and agree that, between the date hereof and the Closing Date, Sellers shall operate the Business in the ordinary course in a manner consistent with past practice, and shall confer with Buyer and its representatives, as reasonably requested, to report on operational matters and the general status of ongoing operations.  Notwithstanding the generality of the foregoing, Sellers shall, between the date hereof and the Closing Date, except as expressly required by this Agreement or with the prior written consent of Buyer, not to be unreasonably withheld or delayed:

91.     pay all of their non-terminated Employees consistent with ordinary course and past practice;

92.     conduct the Business in compliance with all applicable Laws (except for those Laws whose effect is waived or suspended by the Application of the Bankruptcy Code);

93.     use commercially reasonable efforts to preserve the relationships with the current Members, customers, distributors, suppliers, vendors and others having business dealings with any of the Sellers;

94.     maintain their physical assets, properties and Facilities in their current working order, condition and repair as of the date hereof, ordinary wear and tear excepted;

95.     not take any action, or omit to take any action, the intent of which is to cause the termination of their current officers or key employees;

96.     perform all obligations required to be performed by Sellers under the Assumed Contracts;

97.     bill for Membership Contracts, products sold or services rendered and pay accounts payable in a manner consistent with past practice;

98.     not encumber nor enter into any material new leases, licenses or other use or occupancy agreements for the Retained Real Property or any part thereof;

99.     grant Buyer reasonable access to Sellers' customers, distributors, landlords, suppliers and vendors and cooperate with Buyer in communicating with such Persons, provided that the Company shall have the opportunity to have a representative of the Company present (in person or by telephone, as applicable);

100.    not adopt, amend or terminate any Company Benefit Plan, except as may otherwise be required by applicable Law;

101.    maintain all insurance policies in full force and effect through the close of business on the Closing Date; and

102.    not enter into any agreement with any labor union or labor organization, including but not limited to any collective bargaining agreement, except as required by Law.

EEE.   Access to Information.

xlviii.   **From the date hereof until the Closing, Sellers shall permit Buyer and its representatives to have reasonable access upon reasonable prior notice, during normal business hours, to the Real Property, the employees of Sellers and to such records, Contracts and documents relating to Sellers and the Assets as Buyer or its representatives shall request in connection with the transactions contemplated hereby.**

xlix.   **For a period equal to the longer seven years after the Closing Date or the applicable statute of limitations, Buyer shall permit Sellers and their representatives to have reasonable access, during normal business hours, following reasonable advance notice, to the Books and Records as is reasonably necessary for the preparation and filing of Tax Returns and other reports and documents required to be filed by Sellers pursuant to applicable Law or regulation and to employee and Company Benefit Plan records so as to effectuate the assumption of certain Company Benefit Plan liabilities, provided, however, that these exceptions shall not limit any rights to discovery Sellers or any of their Subsidiaries may have in connection with any cause of action or litigation.**

FFF.   Notices.  Between the date hereof and the Closing, Sellers shall give prompt written notice to Buyer of (i) receipt of any notice or other communication from any third party alleging that the consent of such party is or may be required in connection with the transactions contemplated by this Agreement or the Other Agreements, (ii) any notice or other communication from any Governmental Entity in connection with the transactions contemplated

by this Agreement or the Other Agreements and (iii) any actions, suits, claims, investigations or proceedings commenced, or, to the knowledge of Sellers, threatened, relating to or involving or otherwise affecting Sellers or the transactions contemplated by this Agreement or the Other Agreements.

GGG.  Bankruptcy Court Orders.

l.  **In connection with the transactions contemplated by this Agreement, Sellers shall file with the Bankruptcy Court after the execution of this Agreement by each of the parties hereto, applications for, and shall use their best efforts to obtain the following orders:**

103.  an order (the "***Bid Procedures Order***") to be entered within 30 calendar days of the Petition Date, in form and substance acceptable to Buyer, (i) fixing the date, time and location of the hearing (the "***Transaction Approval Hearing***") to approve consummation of the Asset Acquisition (ii) fixing the time, date and location of an auction, (iii) approving the Expense Reimbursement, (iv) containing such other appropriate buyer protections as may be reasonably requested by Buyer, and (v) otherwise approving the Bidding Procedures attached as <u>Exhibit F</u> hereto (the "***Bidding Procedures***"); and

104.  an order (the "***Transaction Approval Order***") to be entered within 60 calendar days after the Petition Date, in form and substance acceptable to Buyer, among other things, (i) approving the Asset Acquisition by Buyer (free and clear of all Encumbrances pursuant to sections 363(b) and 363(f) of the Bankruptcy Code), (ii) approving the assumption by and assignment to Buyer of the Assumed Contracts pursuant to section 365 of the Bankruptcy Code and (iii) containing findings of fact and conclusions of law that Buyer is a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code.

li.  **If the Bid Procedures Order or the Transaction Approval Order or any other Orders of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to any such Order), Sellers shall diligently defend against such appeal, petition or motion and shall use their reasonable best efforts to obtain an expedited resolution of any such appeal, petition or motion; provided that Sellers consult with Buyer at Buyer's reasonable request regarding the status of any such Actions.**

lii.  **Sellers shall consult with Buyer and its representatives upon Buyer's reasonable request concerning the Bid Procedures Order, Transaction Approval Order, any other Orders of the Bankruptcy Court and the bankruptcy proceedings in connection therewith and provide Buyer with copies of requested applications, pleadings, notices, proposed orders and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court.  Sellers further covenant and agree that, after the Closing, the terms of any reorganization plan it submits to the Bankruptcy Court or any other court for confirmation shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way**

**prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement, including, any transaction contemplated by or approved pursuant to the Bid Procedures Order or the Transaction Approval Order.**

HHH.   Assumption and Rejection of Contracts and Leases.  At the election of Buyer pursuant to written notice given to Sellers at any time prior to the date that is 5 Business Days prior to the Closing Date, Sellers shall seek to assume or reject, as directed by Buyer, any executory contracts or unexpired leases to which any Seller is a party or is otherwise bound.  Sellers shall give written notice to Buyer prior to the submission of any motion in their Chapter 11 Cases to assume or reject any executory contracts or unexpired leases, and, without the prior written consent of Buyer, Sellers shall not assume or reject any executory contract or unexpired lease.  Any executory contracts or unexpired leases that are rejected subject to Bankruptcy Court approval or are the subject of a rejection motion on the Closing Date, after complying with the provisions of this Section A.HHH shall constitute Excluded Assets at Closing.  Promptly, but, in any event, within ten days from the date hereof, Sellers shall provide Buyer with a written schedule containing the Sellers' best estimate of the Cure Costs for each executory contract or unexpired lease to which each Seller is a party or is otherwise bound.

III.   "G" Reorganization**.**

liii.   **The parties agree that the Buyer has the right to elect by written notice (the "***Reorganization Notice***" substantially in the form attached hereto as __Exhibit G__) to Sellers at any time prior to the Closing, to direct that the Asset Acquisition shall instead be effected pursuant to the following transactions which are intended to qualify as a reorganization pursuant to Section 368(a)(1)(G) of the Code: (i) Sellers shall contribute the Assets (other than Excluded Assets) (the "***Asset Contribution***") to a newly formed Subsidiary of the Company which is treated as a corporation for U.S. tax purposes ("***Newco***") or one or more wholly-owned Subsidiaries of Newco which are treated as disregarded entities for U.S. income tax purposes in consideration for equity interests of Newco (with allocation of the equity interests to each Seller to be reasonably determined by Buyer) and Newco shall accept the Assets and assume only the Assumed Liabilities pursuant to Article II herein as if Newco was substituted for Buyer; (ii) immediately following the Asset Contribution, Sellers shall exchange and deliver to Buyer, free and clear of any and all Encumbrances and with all rights attached thereto, and Buyer shall acquire, 100% of the equity interests of Newco (the "***Equity Exchange***") from the Sellers, and (iii) in consideration of the equity interests, Buyer shall exchange the Purchase Price in the same manner as set forth in this Agreement.**

liv.   **The Asset Contribution and Equity Exchange contemplated by this Section 7.10 shall be affected pursuant to amendments to this Agreement and such other customary documentation as may be agreed between Buyer and Sellers, and such amended Agreement and other documentation is intended to constitute part of a "plan of reorganization" as defined in Treasury Regulation Section 1.368-2(g).**

JJJ.   Name Changes

lv.      **Immediately following the Closing and in any event within five days after the Closing Date, each Seller shall file with the Secretary of State for the State of Delaware an amendment to their respective limited liability company agreements eliminating "Crunch" from their company names and promptly thereafter deliver to Buyer evidence, in form and substance reasonably satisfactory to Buyer, of such change to its company name.**

lvi.      **From and after the Closing Date, the Sellers shall cease all use of the trademarks of Sellers (the "*Marks*") or any confusingly similar variation thereof. Thereafter, the Sellers shall not (i) in any proceeding allege that the Marks are not distinctive or that the Marks have not achieved secondary meaning; or (ii) own any interest, directly or indirectly, in, become associated with, or otherwise lend any aid or support to any Person (other than Buyer or any Affiliate thereof) using the Marks or any confusingly similar variation thereof. Sellers acknowledge that a material breach of this Section 7.11(b) would result in irreparable harm to Buyer and, in the event of any such breach, and without waiving any other rights which Buyer may have, Buyer shall be entitled to injunctive and other equitable relief in order to enforce the provisions of this Section 7.11(b).**


## CONDITIONS TO OBLIGATIONS OF PARTIES

KKK.   Conditions to Obligations of the Sellers.  The obligation of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment at or prior to the Closing of each of the following conditions (any or all of which may be waived in whole or in part by Sellers):

lvii.      **Representations and Warranties.  Each representation and warranty of Buyer contained herein shall have been true and correct in all respects as of the date hereof and as of the Closing Date, as if made on the Closing Date (unless, in each case, such representations and warranties are expressly made as of a different date, in which case such representations and warranties shall have been true and correct in all respects as of such other date), except to the extent that the failure of such representations and warranties to be true and correct shall not, either individually or in the aggregate, constitute a Buyer Material Adverse Effect.  For purposes of determining compliance with this Section 8.01(a), all references to the words "material," "Material Adverse Effect" or words of similar import in such representations and warranties shall be disregarded.  Buyer shall have delivered to Sellers a certificate, executed by an officer of Buyer, certifying Buyer's compliance with this Section 8.01(a).**

lviii.      **Performance.  Buyer shall have performed and complied, in all material respects, with all agreements, obligations and covenants required by this Agreement to be so performed or complied with by Buyer at or prior to the Closing Date, and Buyer shall have delivered to Sellers a certificate, executed by an officer of Buyer, to such effect.**

lix.    **Closing Documents.  On or prior to the Closing Date, Buyer shall have delivered to Sellers, in form and substance reasonably acceptable to Sellers, each of the documents listed in Section 4.02(b) hereof.**

lx.    **Judgments, Decrees and Litigation.  There shall not be in effect or exist any judgment, Order, injunction or decree issued by a Governmental Entity restraining or prohibiting the consummation of or imposing material modifications on the transactions contemplated by this Agreement.**

lxi.    **Bankruptcy Court.**

105.    The Bid Procedures Order (A) shall have been entered no later than 30 calendar days after the Petition Date, which date may be waived or extended by Buyer in its sole discretion, (B) shall not have been stayed, modified, amended, dissolved, revoked or rescinded without Buyer's consent, and (C) shall be in full force and effect on the Closing Date.

106.    The Transaction Approval Order (A) shall have been entered no later than 60 calendar days after the Petition Date, which date may be waived or extended by Buyer in its sole discretion, (B) shall not have been stayed, modified, amended, dissolved, revoked or rescinded without Buyer's consent, and (C) shall be in full force and effect on the Closing Date.

LLL.    Conditions to Obligations of Buyer.  The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the fulfillment at or prior to the Closing Date of each of the following conditions (any or all of which may be waived in whole or in part by Buyer).

lxii.    **Representations and Warranties.  Each representation and warranty of Sellers contained herein shall have been true and correct in all respects as of the date hereof and as of the Closing Date, as if made on the Closing Date (unless, in each case, such representations and warranties are expressly made as of a different date, in which case such representations and warranties shall have been true and correct in all respects as of such other date), except to the extent that the failure of such representations and warranties to be true and correct shall not either, individually or in the aggregate, constitute a Material Adverse Effect.  For purposes of determining compliance with this Section 8.02(a), all references to the words "material," "Material Adverse Effect" or words of similar import in such representations and warranties shall be disregarded.  Sellers shall have delivered to Buyer one or more certificates, executed by an officer of each Seller, certifying Sellers' compliance with this Section 8.02(a).**

lxiii.    **Performance.  Sellers shall have performed and complied, in all material respects, with all agreements, obligations and covenants required by this Agreement to be so performed and complied with by Sellers at or prior to the Closing, and Sellers shall have delivered to Buyer one or more certificates, executed by an officer of each Seller to such effect.**

lxiv.    **Closing Documents.  On the Closing Date, Sellers shall have executed and delivered to Buyer, in form and substance reasonably acceptable to the Buyer, each of the documents listed in Section A.II.v hereof.**

lxv.    **Judgments, Decrees and Litigation.  There shall not be in effect or exist any Order, issued by a Governmental Entity restraining or prohibiting the consummation of or imposing material modifications on the transactions contemplated by this Agreement or any pending or threatened litigation by a Governmental Entity or other third party seeking to restrain, prohibit or impose material modifications on the consummation of the transactions contemplated hereby.**

lxvi.    **Bankruptcy Court.**

107.    The Bankruptcy Court shall have entered the Bid Procedures Order no later 30 calendar days following the Petition Date, which date may be waived or extended by Buyer in its sole discretion, and the Bid Procedures Order shall have become a Final Order, shall have remained in full force and effect and shall not have been stayed, vacated, modified or supplemented without Buyer's prior written consent.  The Bid Procedures Order shall be in form and substance acceptable to Buyer.

108.    The Bankruptcy Court shall have entered no later than 30 calendar days after the Petition Date a Final Order, in form and substance reasonably acceptable to Buyer, approving the DIP Financing and such order shall have remained in full force and effect and shall not have been stayed, vacated, modified or supplemented without Buyer's prior written consent.

109.    The Bankruptcy Court shall have entered the Transaction Approval Order no later than 60 calendar days after the Petition Date, which date may be waived or extended by Buyer in its sole discretion, and the Transaction Approval Order shall have become a Final Order, shall have remained in full force and effect and shall not have been stayed, vacated, modified or supplemented without Buyer's prior written consent.  The Transaction Approval Order shall be in form and substance acceptable to Buyer.

lxvii.    **DIP Financing Agreement.  No Event of Default under the DIP Financing Agreement shall have occurred and be continuing, and the Termination Date under the Financing Order shall not have occurred.**

lxviii.    **Material Adverse Effect.  At the Closing Date, since the date hereof, no event or events shall have occurred, no information shall have become known nor shall any condition exist that, individually or in the aggregate, have had or would be reasonably likely to result, in a Material Adverse Effect.**


## MISCELLANEOUS

MMM. Fees and Expenses.  Except to the extent provided in Sections A.CC.iii, A.LL, A.BBB.xli, A.NNN and A.YYY and the Financing Order the Sellers and Buyer shall each

respectively pay all fees and expenses incurred by it, or on behalf of it, in connection with, or in anticipation of, this Agreement and the consummation of the transactions contemplated hereby.

NNN.   Further Assurances.  From time to time after the Closing, at the request of one of the parties hereto and at the expense of the party so requesting, each of the Sellers and Buyer agree to execute and deliver to such requesting party such documents and take such other action as such requesting party may reasonably request in order to consummate more effectively the transactions contemplated hereby.  Sellers and Buyer shall cooperate with each other and provide each other with such assistance as reasonably may be requested by either of them, including with respect to the prosecution and defense of claims.  The party requesting assistance hereunder shall reimburse the party providing assistance for all reasonable third-party out-of-pocket expenses incurred in providing such assistance.

OOO.   Notices.  All notices, requests, demands, waivers and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if delivered personally, sent by overnight courier, facsimile transmission or mailed (certified or registered mail, return receipt requested):

If to Sellers to:

Crunch CFI, LLC

22 West 19th Street

New York, NY 10011

Attention:  Chief Financial Officer

Facsimile: 347-401-2201

with a copy to:

Dechert LLP

30 Rockefeller Plaza

New York, NY 10112

Attention:  Charles Weissman

Facsimile: 212-698-3599

If to Buyer, to:

CH Fitness Investors, LLC

c/o Angelo Gordon & Co., L.P.

245 Park Ave.

New York, NY 10167

Attention:  Brent Leffel

Facsimile: 212-599-2920

**with a copy to:**

Akin Gump Strauss Hauer & Feld LLP

One Bryant Park

New York, New York 10036

Attention: David J. D'Urso and Phillip C. Dublin

Facsimile:  212-872-1002

or to such other person or address as any party shall specify by notice in writing to the other party.  All such notices, requests, demands, waivers and communications shall be deemed to have been received on the date on which so hand-delivered or telecommunicated or delivered by overnight courier or on the fifth Business Day following the date on which so mailed, except for a notice of change of address, which shall be effective only upon receipt thereof.

PPP.    Entire Agreement.  This Agreement, the Other Agreements, the Schedules and the Exhibits hereto and thereto contain the entire understanding of the parties hereto with respect to their subject matter.  This Agreement supersedes all prior agreements and understandings, oral and written, with respect to its subject matter.

QQQ.  Severability.  Should any provision of this Agreement for any reason be declared invalid or unenforceable by a court of competent jurisdiction, such decision shall not affect the validity or enforceability of any of the other provisions of this Agreement, which other provisions shall remain in full force and effect and be enforced to the fullest extent permitted by law.

RRR.   Binding Effect.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

SSS.    Assignment.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned, directly or indirectly, by any party hereto without the prior written consent of the other parties; provided, however, that Buyer may assign its rights under this Agreement and the Other Agreements to a wholly-owned Subsidiary or Affiliate without the prior consent of Sellers, however, any such assignment shall not relieve Buyer of its obligations hereunder or under any Other Agreement.

TTT.   No Third-Party Beneficiaries.  This Agreement is not intended, and shall not be deemed, to confer upon or give any Person (including, without limitation, any past or current Business Employee) except the parties hereto and their respective successors and permitted assigns, any remedy, claim, liability, reimbursement, cause of action or other right under or by reason of this Agreement.

UUU.  Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

VVV.  Interpretation.  The article and section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties and shall not in any way affect the meaning or interpretation of this Agreement.

WWW.  Governing Law.  This Agreement and any claim related directly or indirectly to this Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to the principles of conflicts of law thereof that would defer to the substantive laws of any other jurisdiction.  The parties agree that, during the period from the date hereof until the date on which Sellers' Chapter 11 Cases are closed or dismissed (the "*Bankruptcy Period*"), the Bankruptcy Court shall have exclusive jurisdiction to resolve any controversy, claim or dispute arising out of or relating to this Agreement or any other agreement entered into in connection herewith.  The parties further agree that, following the Bankruptcy Period, any action or proceeding with respect to such controversy, claim or dispute shall be brought against any of the parties exclusively in either the United States District Court for the Southern District of New York or any state court of the State of New York located in such district, and each of the parties hereby consents to the personal jurisdiction of such court and the Bankruptcy Court (and to the appropriate appellate courts) in any such action or proceeding and waives any objection, including, without limitation, any objection to the laying of venue or on the grounds of forum non conveniens, which any of them may now or hereafter have to the bringing of such action or proceeding in such respective jurisdictions.  Each party hereby irrevocably consents to the service of process of any of the aforesaid courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to the other parties to such action or proceeding.  Each party acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues, and therefore each party hereby irrevocably and unconditionally waives any right such party may have to a trial by jury.

XXX.  Amendments.  This Agreement may not be amended, modified or supplemented except pursuant to an instrument in writing signed by each of the parties hereto.  Any failure of Sellers to comply with any term or provision of this Agreement may be waived by Buyer at any time by an instrument in writing signed on behalf of Buyer and any failure of Buyer to comply with any term or provision of this Agreement may be waived by Sellers at any time by an instrument in writing signed on behalf of Sellers, but any such waiver or failure to insist upon strict compliance with such term or provision shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure to comply.

YYY.  Litigation Support.  In the event and for so long as any party hereto is actively contesting or defending any action, suit, grievance, arbitration, proceeding, hearing, investigation, charge, complaint, claim or demand with respect to any third party in connection with (i) any transaction contemplated under this Agreement or (ii) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act or transaction on or prior to Closing relating to or involving the Business, the Assets, the Affected Employees or the Assumed Liabilities, the other parties will reasonably cooperate with

such contest or defense and make reasonably available its personnel, records and information applicable to such matter as may be necessary in connection with prudent handling of such contest or defense, at the contesting or defending party's expense.

ZZZ. Terms Generally; Incorporation of Recitals. As used in this Agreement (a) words in the singular shall be held to include the plural and vice versa, (b) words of one gender shall be held to include the other genders as the context requires, (c) the terms "hereof", "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, (d) references to Article, Section, paragraph, Annex, Exhibit and Schedule are references to the Articles, Sections, paragraphs, Annexes, Exhibits and Schedules to this Agreement, unless otherwise specified, (e) the word "including" and words of similar import when used in this Agreement, shall be deemed to be followed by the words "without limitation", unless otherwise specified, and (f) the word "or" shall not be exclusive. The preamble and recitals of this Agreement shall be deemed part of this Agreement and are incorporated fully herein.

AAAA. No Survival of Representations, Warranties and Covenants. The representations and warranties of Buyer and Sellers contained in this Agreement and the covenants and agreements of Buyer and Sellers contained in this Agreement that, by their terms, are to be performed prior to the Closing, shall not survive the Closing and the consummation of the transactions contemplated by this Agreement. All other covenants and agreements shall survive the Closing and the consummation of the transactions contemplated by this Agreement until fully performed.

BBBB. Specific Performance. It is understood and agreed by Buyer and Sellers that money damages would be an insufficient remedy for any breach of this Agreement by Buyer or Sellers and as a consequence thereof, after the entry of the Transaction Approval Order, each non-breaching party shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring Buyer or Sellers to comply promptly with any of its obligations hereunder; provided that nothing in this Section A.BBBB shall obligate Sellers to consummate the Asset Acquisition with Buyer if Sellers comply with the Bidding Procedures and Sellers accept a Qualifying Bid (as defined in the Bidding Procedures) from a Person other than Buyer.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the parties have duly executed this Asset Purchase Agreement as of the date first above written.

CH FITNESS INVESTORS, LLC


By:_____
Name:
Title:

AGT CRUNCH ACQUISITION, LLC


By:_____
Name:
Title:
CRUNCH CFI, LLC


By:_____
Name:
Title:

AGT CRUNCH ATLANTA LLC
AGT CRUNCH CHICAGO LLC
AGT CRUNCH LOS ANGELES LLC
AGT CRUNCH MIAMI LLC
AGT CRUNCH NEW YORK LLC
AGT CRUNCH SAN FRANCISCO LLC
AGT CRUNCH SERVICES LLC
AGT CRUNCH WASHINGTON D.C. LLC
SPORTS & FITNESS VENTURES, LLC
FORT GREENE SPORTS CLUB, LLC
HAUPPAUGE SPORTS CLUB, LLC
PARK SLOPE SPORTS CLUB, LLC
THE SILVER SPRING SPORTS CLUB, L.L.C.
113 4TH SPORTS CLUB, LLC
CRUNCH CFI ATLANTA, LLC
CRUNCH CFI GEORGIA, LLC
CRUNCH CFI GW, LLC
CRUNCH CFI NEW YORK, LLC
CRUNCH CFI SAN FRANCISCO, LLC
AGT UNION STREET LLC


By:_____
Name:
Title:

# EXHIBIT B

## Schedule of Insider Payments

**<u>Crunch Insider Payment Analysis</u>**

I.  <u>Payments Subject to Retained Claims:</u>

- Angelo Gordon and its affiliates
  (excluding CH Fitness):                                    $1,321,816.45

- CH Fitness (interest on 1st lien debt):               $1,313,192.63

- McGowan:                                                   $353,878.16

- Tascher:                                                   $234,300.00

    **TOTAL:**                                   **$3,223,187.24**


II. <u>Payments not Subject to Retained Claims:</u>

- NEFC:                                                      $211,369.97

- Jacobs:                                                    $458,620.85

- Miller:                                                    $625,485.49

- Hines:                                                     $38,182.00

- Davis:                                                     $5,000.00

- Rowly:                                                     $57.90

- Mastrov:                                                   $8,712.93

- Feeny:                                                     $2,060.03

    **TOTAL:**                                   **$1,349,489.17**

**AGGREGATE TOTAL:**                                         **$4,572,646.41**

# EXHIBIT C

## Schedule of 90 Day Payments

## Crunch 90 Day Payments

| | |
|---|---|
| Payments made to Parties on Assumed Contracts: | $5,089,442.57 |
| Payments made on account of Assumed Leases: | $998,025.85 |
| **Subtotal**: | $6,087,488.42 |
| Payments made to Continuing Vendors: | $5,094,441.58 |
| **Subtotal**: | $11,181,930.00 |
| Member Refunds: | $28,760.22 |
| **TOTAL:** | **$11, 210, 690.22** |
| Payment on Rejected Leases: | $1,029,481.95 |
| Payments to Vendors to Rejected Clubs: | $626,299.77 |
| **TOTAL:** | **$1,655,781.72** |
| **TOTAL PAYMENTS:** | **$12,866,471.94** |

15214423

# EXHIBIT D

Resolution of 708 Broadway LLC's Objection to
Lease Assumption and Assignment

<u>Agreed Upon Terms</u>

1.     Within five business days of the entry of the order, the Debtors or the Buyer shall pay 708 Broadway LLC (the "**Landlord**") $249,000 designed to provide the Landlord an effective monthly rent payment of $150,547.11 for the months of June, July and August 2009, by paying, in addition to the $67,547.11 currently paid under the Lease, an additional monthly amount of $83,000 with respect of each of the aforementioned months.  The payment required pursuant to this paragraph shall be delivered to Landlord's bankruptcy counsel, Backenroth, Frankel & Krinsky, LLP.

2.     Within five business days of the entry of the order, the Debtors or the Buyer shall deposit in escrow with the Landlord's counsel the in litigation pending in the Supreme Court of the State of New York, Index No. 603432/08 (the "**Lease Litigation**") $249,000 (representing an additional $83,000 monthly deposit with respect of June, July and August 2009) to be held by said counsel in accordance with the So Ordered Escrow Stipulation In Lieu Of Bond, approved in the Lease Litigation on January 15, 2009, as may be amended from time to time (the "**Stipulation**").

3.     For the month of September 2009 and thereafter and until interim or final resolution of the rent to be paid under the Lease pursuant to the Lease Litigation, the Buyer shall make the following payments on a monthly basis as follows:  (i) $67,547.11 currently paid under the Lease, (ii) an additional $83,000 and (iii) deposit $83,000 in escrow with Landlord's counsel to be held in escrow in accordance with the Stipulation.

4.     The Landlord may withdraw $498,000 from the amount held by its counsel in escrow pursuant to the Stipulation (representing an additional monthly payment of $83,000 for the months December 2008 through and including May, 2009).

5.     No additional payments are required to be made with respect of November 2008, and the Buyer's obligations with respect thereof will be governed by any interim or final resolution of the Lease Litigation.

6.     Except as provided herein, the Landlord shall not seek an increase in the amount held in escrow pursuant to the Lease Litigation.

7.     Nothing contained herein shall be deemed to determine the appropriate rent under the Lease or be otherwise admissible in the Lease Litigation as evidence thereof.

8.     Should the rent fixed in or pursuant to the Lease Litigation (the "**Fixed Rent**"), be determine to be more than $233,547.11, the Buyer shall be liable to the Landlord for any such excess.  Should the Fixed Rent be determined to be less than $233,547.11, the Landlord shall be liable to the Buyer for the amount representing the difference between the payments made by the Debtors and/or the Buyer to the Landlord, inclusive of escrowed payments, and the Fixed Rent.

9.     Within five business days of the entry of the order, the Debtors shall execute the stipulation annexed hereto.

# Supreme Court of the State of New York
## County of New York

---------------------------------------------------------X
                                                         :
AGT CRUNCH NEW YORK LLC,
                                                         :
                Plaintiff,
                                                         :
        - against -                      Index No. 603432/08
                                                         :
708 BROADWAY DEL, LLC,
                                                         :
                Defendant.
                                                         :
---------------------------------------------------------X

**"SO ORDERED"**
**STIPULATION OF SETTLEMENT**

**WHEREAS,** defendant 708 Broadway Del, LLC ("Landlord") is landlord under that certain Lease dated October 13, 1994 by and between Wilson Realty Co., as landlord, and 708 Gym Corp., as tenant, as amended by: (i) that certain Amendment of Lease dated September 18, 1995; (ii) that certain Second Amendment of Lease, dated June 4, 1997; (iii) that certain Third Amendment of Lease dated August 20, 1998; (iv) that certain Fourth Amendment of Lease dated December, 2001; and (iv) that certain Stipulation of Settlement dated May 29, 2008 in the action entitled: <u>708 Gym , LLC and AGT Crunch New York LLC v. 708 Broadway Del, LLC,</u> New York County Clerks Index No. 110941/05 (the foregoing Lease and Amendments are

collectively referred to as the "Lease"), for certain ground floor, basement, sub-basement and second floor space as more particularly set forth on the floor plans annexed as Exhibit A hereto (the "Demised Premises") at the premises known as 708 Broadway, New York, New York (the "Building"); and

WHEREAS, plaintiff, AGT Crunch New York LLC ("Tenant") is tenant under the Lease; and

WHEREAS, Landlord served a Notice to Cure dated October 31, 2008, on Tenant alleging, *inter alia,* that a dispute has arisen as to the market value of the rent (the "Fair Market Rent") for the Demised Premises for the first extension period provided for in paragraph 78 of the Lease (the "First Extension Period"); and

WHEREAS, Tenant brought on an Order to Show Cause, dated November 25, 2008, in the above-captioned action seeking*, inter alia*, a "Yellowstone" injunction tolling the time within which Tenant was obligated to cure the defaults set forth in the Notice to Cure; and

**WHEREAS**, by Orders dated December 5 and 9, 2008, this Court (Fried, J.S.C.), granted Tenant a "Yellowstone" injunction on condition that, *inter alia*, Tenant post a bond in the sum of $1 million (the "Bond") and pay monthly rent in the sum of $67,547.11, on account, pending final determination of the fair Market Rent for the First Extension Period together with additional rent, if any, due under the Lease (collectively, the "Rent"); and

**WHEREAS,** pursuant to the terms of the So-Ordered Escrow Stipulation in Lieu of Bond, dated January 9, 2009, and So-Ordered on January 15, 2009 (the "Escrow Stipulation"), Tenant deposited the sum of $1 Million in an Attorney Escrow Account (the "Escrowed Funds") maintained by Zane and Rudofsky (the "Escrow Agent") in lieu of posting the Bond;

**WHEREAS,** on or about May 6, 2009, Tenant filed a Chapter 11 Petition with the United States Bankruptcy Court for the Southern District of New York, which proceeding was and is being jointly administered as part of: In re: AGT Crunch Acquisition, LLC, *et al*, Case No. 09-12899 (REG) (the "Crunch Bankruptcy Proceeding"); and

**WHEREAS**, as part of the Crunch Bankruptcy Proceeding, Tenant agreed, *inter alia*¸ to (a) pay Landlord, on a without prejudice basis, monthly rent, retroactive to December, 2008, in the sum of $150,000, per

month (the "Interim Rent") (receiving a credit for any sum previously paid for the period December, 2008 through and including August, 2009); and (b) deposit, in escrow, with Zane and Rudofsky, the sum of $83,000, per month (the "Bankruptcy Court Escrow Payments"), for the period retroactive to December, 2008, until the Fair Market Rent for the First Extension Period is determined and paid in full (the "Bankruptcy Court Agreement"); and

**WHEREAS**, Zane and Rudofsky has heretofore released the sum of $498,000 to Landlord from the Escrow Account, representing the shortfall between the Rent paid for the period December 1, 2008 and May 1, 2009 and the Interim Rent that Tenant agreed to pay in the Crunch Bankruptcy Proceeding; and

**WHEREAS**, Tenant has heretofore (a) paid Landlord the sum of $249,000 representing the shortfall between the Rent paid for the period June, July and August, 2009 and the Interim Rent that Tenant agreed to pay in the Crunch Bankruptcy Proceeding; and (b) deposited the sum of $249,000 in escrow with Zane and Rudofsky, representing the Bankruptcy Court Escrow Payments due from Tenant for the month's June, July and August, 2009 as per the Bankruptcy Court Agreement; and

**WHEREAS,** Landlord and Tenant have agreed to resolve and settle their dispute relating to the Fair Market Rent for the First Extension Period upon the terms and conditions set forth herein; and

**NOW, THEREFORE,** in exchange for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant hereby stipulate and agree as follows:

*Measurement of the Demised Premises*

1.      Within three (3) business days of the date this Stipulation is fully "So Ordered", Tenant shall provide Landlord, in writing, with the name of three (3) individuals or entities (the "Space Measurers"), who are not architects, to measure the square footage of the Demised Premises in accordance with the rules and regulations of the Real Estate Board of New York.

2.      Within three (3) business days of the receipt of the Space Measurers designated by Tenant, Landlord shall select one (1) of the Space Measurers (the "Designated Space Measurer") who shall then be responsible for measuring and determining the amount of square footage of the Demised Premises in accordance with the rules and regulations of the Real Estate Board of New York.

3. Landlord and Tenant shall (a) instruct the Designated Space Measurer to measure the Demised Premises within one (1) week of his/her/its selection; and (b) provide the Designated Space Measurer with unfettered access to the Building and the Demised Premises.

4. The cost of the Designated Space Measurer shall be borne equally between Landlord and Tenant.

5. The square footage of the Demised Premises as determined by the Designated Space Measurer shall be (a) binding on Landlord and Tenant for all future payments of rent and/or additional rent or other charges due under the Lease, to the extent same are based upon the amount of square footage of the Demised Premises, and (b) used by the Independent Appraiser as that term is hereinafter defined to determine the Fair Market Rent for the Demised Premises for the First Extension Period.

6. Notwithstanding the foregoing, neither Landlord nor Tenant shall be entitled to a credit for any prior rent, Interim Rent, additional rent or other items previously paid under the Lease in the event the square footage of the Demised Premises as determined by the Designated Space Measurer is greater or lesser than the amount of square footage previously utilized by Landlord for billing purposes.

7.      Landlord hereby designates Jerome Haims of Jerome Haims Realty Inc. ("Haims"), 630 Third Avenue, New York, New York, as its appraiser pursuant to the Article 78 of the Lease.

8.      Tenant hereby designates Brian Corcoran of Cushman & Wakefield, 51 West 52ND Street, New York, New York ("Corcoran"), as its appraiser pursuant to the provisions of paragraph 78 of the Lease.

9.      Within one (1) week of the date this Stipulation is "So Ordered", Haims and Corcoran shall meet in a good-faith attempt to agree upon a third, independent appraiser (the "Independent Appraiser"), who shall determine the Fair Market Rent for the First Extension Period in accordance with the terms and conditions of this Stipulation.  At that meeting, Haims and Corcoran shall have a list setting forth their three (3) proposed, third independent appraisers, in order of priority.   Haims and Corcoran shall have additional list(s) of proposed appraisers in the event there is no match on the first list.

10.     In the event Haims and Corcoran agree upon the Independent Appraiser based upon their respective lists, then, in such event, said individual shall be the Independent Appraiser and he/she shall determine the Fair Market Rent for the First Extension Period in accordance

with the terms and conditions of this Stipulation.  In the event there is no match on the lists, then Haims and Corcoran shall use their best efforts to agree upon the Independent Appraiser at the time of said meeting.

11.     In the event Haims and Corcoran cannot agree upon the Independent Appraiser at the time of the meeting, then Landlord and Tenant shall, within two (2) business days of the aforesaid meeting, submit a single list to the Court setting forth the original six (6) appraisers proposed by Haims and Corcoran, without any order of preference, and/or any indication as to which party proposed which appraiser.  Notwithstanding the foregoing, both Landlord and Tenant shall have the right to object to any independent appraiser proposed by the other side based upon a conflict or other applicable stated grounds, in which case such appraiser shall not be submitted to the Court.

12.     In the event it is necessary to submit a list of appraisers to the Court, the parties will request that the Court will use its best efforts to notify the parties of its selection of the Independent Appraiser within one (1) week of the receipt of the aforesaid list.

*Determination of Fair Market*
*Rent For First Extension Period*

13.    (a)    The Fair Market Rent for the Demised Premises for the First Extension Period shall be based on the fair market rental value for the Demised Premises as of November 1, 2007, and shall be determined as follows:

(b)    Within three (3) weeks of the latter to occur of the (a) designation of the Independent Appraiser and (b) determination of the square footage of the Demised Premises by the Designated Space Measurer, Haims and Corcoran shall submit their initial appraisal reports to the Independent Appraiser and, contemporaneously therewith, shall hand-deliver a copy of their respective reports to the attorney for the other side.

(c)    Haims and Corcoran shall have two (2) weeks from the date their initial reports are submitted to prepare and submit rebuttal reports to the Independent Appraiser.  Contemporaneously with the submission of the rebuttal reports to the Independent Appraiser, Haims and Corcoran shall hand-deliver a copy of their rebuttal reports to the attorney for the other side.

(d)     The Independent Appraiser shall meet with both Haims and Corcoran, simultaneously, on at least one (1) occasion to review their respective reports.   The Independent Appraiser shall be entitled to conduct additional meetings and/or undertake additional inquiries in order to determine the Fair Market Rent for the Demised Premises for the First Extension Period.

(e)  The parties shall mutually request that the Independent Appraiser issue his/her determination of the Fair Market Rent for the Demised Premises for the First Extension Period within two (2) weeks of the initial meeting with Haims and Corcoran.

(f)     The Independent Appraiser shall be entitled to set the Fair Market Rent for the Demised Premises for the First Extension Period at any rate that he/she deems to be the fair market rental value for the Demised Premises as of November 1, 2007, based upon the reports prepared by Haims and Corcoran and any other information that he/she elects to rely upon.

(g)     The Independent Appraiser's determination of the Fair Market Rent for the Demised Premises for the First Extension Period shall be binding upon Landlord and Tenant for all purposes under the Lease, and Tenant shall be obligated to pay Landlord the Fair Market Rent for the

Demised Premises for the First Extension Period in accordance with the provisions of the Lease and as otherwise provided hereunder. Neither Landlord nor Tenant shall seek judicial review of the Fair Market Rent as determined by the Independent Appraiser, nor shall either party appeal from the entry of this "So Ordered" Stipulation of Settlement.

*Payment of Any "Short-Fall" Rent*

14. Contemporaneously with the submission of the initial reports to the Independent Appraiser, the Escrow Agent is authorized to release to the Landlord from the Escrowed Funds the difference between the Interim Rent paid by Tenant (i.e. $150,000, per month), on the one hand, and the proposed Fair Market Rent set forth in the initial report prepared by Corcoran, on the other hand, for the period beginning on December 1, 2008 and continuing through and including the month that the initial reports are submitted. For example, but in no way by means of limitation, in the event Corcoran proposes that the Fair Market Rent shall be $200,000 per month, and his initial report is submitted to the Independent Appraiser on October, 10, 2009, then, in such event, the Escrow Agent shall release the sum of $550,000 to the Landlord from the Escrowed Fund representing the "short-fall" between the Fair Market Rent as proposed by Corcoran and the "rent"

paid by Tenant for the months of December , 2008 through and including October, 2009 (provided Tenant has paid the October, 2009 rent).

15. In addition to the payments provided for in paragraph 14 hereof, on the first day of each month after the appraisers submit their initial reports to the Independent Appraiser, the Escrow Agent shall release from the Escrowed Funds the difference between the monthly Fair Market Rent proposed by Corcoran in his initial report and the Interim Rent. For example, but in no way by means of limitation, if Corcoran's initial report proposes that the Fair Market Rent is $200,000, per month, and his initial report is submitted to the Independent Appraiser on October 10, 2009, and the Independent Appraiser has not issued his report by November 1, 2009, then, in such event, the Escrow Agent shall release the sum of $50,000 per month for November, 2009 and each month thereafter until the Independent Appraiser issues his/her report to Landlord from the Escrowed Funds, representing the short-fall between the $200,000 Fair Market Rent proposed by Corcoran and the Interim Rent.

16. Upon the Independent Appraiser's determination of the Fair Market Rent for the First Extension Period, the Escrow Agent shall release to the Landlord from the Escrow Funds (a) the difference between the rent paid by Tenant for November, 2008 (*i.e,* $67,547.11) and the Fair

Market Rent as determined by the Independent Appraiser; and (b) the difference between the Interim Rent and the Fair Market Rent as determined by the Independent Appraiser for each month beginning as of December, 2008, and continuing through the month that the Independent Appraiser issues his/her report. For example, but in no way by means of limitation, if the Independent Appraiser determines that the Fair Market Rent for the First Extension Period is $200,000 per month, and his/her report is issued in October, 2009, then, in such event, the Escrow Agent shall release (a) the sum of $132,452.89 from the Escrowed Funds to Landlord representing the difference between the rent paid for November, 2008 and the Fair Market Rent determined by the Independent Appraiser; plus (b) the sum of $550,000 from the Escrowed Funds to the Landlord representing the difference between the Interim Rent and the Fair Market Rent determined by the Independent Appraiser for the months of December, 2008, through and including October, 2009.

17. By executing this Stipulation, Tenant hereby acknowledges and agrees that the Escrow Agent may make each of the foregoing payments to the Landlord from the Escrowed Funds. The Escrow Agent shall contemporaneously provide Tenant's counsel with copies of all checks issued to the Landlord as provided for herein.

18.     In the event there are insufficient funds to make any of the payments provided for hereunder, then, in such event, the Escrow Agent shall provide Tenant and its counsel with written notice of the dollar amount of such insufficiency and Tenant shall pay such funds directly to Landlord within five (5) business days of the service of such notice.  The failure of Tenant to make such payment shall be deemed to be a material default under the terms of the Lease and Landlord shall be entitled to apply to this Court for any such relief that it deems appropriate.  The foregoing shall be in addition to, but not in lieu of, any other rights that Landlord may have under the Lease.

19.     In the event the Independent Appraiser determines that the Fair Market Rent is less than the Interim Rent, then in such event, Landlord shall pay Tenant the difference between the Interim Rent paid by Tenant and the Fair Market Rent as determined by the Independent Appraiser.  For example, but in no was by means of limitation, if the Fair Market Rent is determined to be $140,000 per month, and his/her report is issued in October, 2009, then, in such event, Landlord shall pay Tenant the sum of $90,000 representing the difference between the Interim Rent and the Fair Market Rent determined by the Independent Appraiser for the months of December, 2008, through and including October, 2009.

*Determination of Fair Market Rent*
*for the Second Extension Period*

20.     Contemporaneously herewith, Landlord and Tenant shall execute a modification of the Lease in the form annexed as Exhibit B hereto, setting forth the procedure to be followed for the determination of the Fair Market Rent for the Second Extension Period provided for in paragraph 78 of the Lease.

*Miscellaneous*

21.     Upon the Independent Appraiser's issuance of his/her determination of the Fair Market Rent for the First Extension Period and Tenant's payment, in full, of all rent due and owing for the period November, 2008, through and including the date that the Independent Appraiser issues his/her determination of the Fair Market Rent for the First Extension Period based upon the Fair Market Rent as provided for therein, Landlord and Tenant's respective attorneys shall execute and file with the Court a Stipulation of Discontinuance of the captioned action in the form annexed as Exhibit C hereto.

22.     Except as modified herein, the terms and conditions of the Lease and Escrow Stipulation shall remain in full force and effect.

23.     Tenant shall pay each of the Bankruptcy Court Escrow Payments to Zane and Rudofsky, which shall hold such funds in escrow subject to the terms and conditions of the Escrow Stipulation, except as modified by the terms and conditions hereof.

24.     Provided and on condition that Tenant complies with its obligations hereunder, including, but not limited to payment of the Interim Rent and Bankruptcy Escrow Payments, Landlord agrees that it will not

apply to the State and/or Bankruptcy Courts for the deposit of an additional bond or undertaking.

25.    This "So Ordered" Stipulation of Settlement shall be binding on the Landlord and Tenant's permitted successors and assigns.

26.    By executing this Agreement, the attorneys for Landlord and Tenant hereby confirm that they have reviewed the terms and conditions of this Agreement with representatives of the Landlord and Tenant, as the case may be; Landlord and Tenant have approved the terms and conditions of this Agreement; and duly authorized representatives of the Landlord and Tenant, as the case may be, have authorized counsel to execute this Agreement on behalf of Landlord and Tenant, as the case may be. Notwithstanding the foregoing, the procedure set forth herein shall commence once this agreement is executed by the attorneys for Landlord and Tenant, and shall not await the execution of this Agreement by the Landlord and Tenant.

27.    All notices due hereunder and any and all notices hereinafter served under and/or pursuant to the Lease, shall be served by either (a) hand-delivery or (b) Federal Express, or other overnight delivery service and delivered as follows:

If to Plaintiff:

        AGT Crunch New York LLC
        22 West 19th Street
        New York, New York  10011
        Attn:  James Somoza

With a copy to:

        Paul, Weiss, Rifkind, Wharton
         & Garrison, LLP
        1285 Avenue of the Americas
        New York, New York 10019
        Attn:  Andrew G. Gordon

If to Defendant:

        708 Broadway DEL LLC
        c/o The Chetrit Group
        404 Fifth Avenue
        New York, New York 10018
        Attn:  Joseph Chetrit

With a copy to:

        Zane And Rudofsky
        The Starrett Lehigh Building
        601 West 26th Street
        New York, New York 10001
        Attn:  Eric S. Horowitz

Dated:    New York, New York
           August ___, 2009

PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON, LLP
*Attorneys for Plaintiff*
1285 Avenue of the Americas
New York, New York  10019

ZANE AND RUDOFSKY
*Attorneys for Defendant*
The Starrett Lehigh Building
601 West 26th Street
New York, New York 10001


By:_____
     Andrew G. Gordon

By:_____
Eric S. Horowitz


AGT CRUNCH NEW YORK LLC

708 BROADWAY DEL LLC


By:_____

By:_____


SO ORDERED this ____ day
  of August, 2009


_____
   Hon. Bernard J. Fried, J.S.C.

# ACKNOWLEDGEMENTS

STATE OF NEW YORK    )
                          ss.:

COUNTY OF NEW YORK  )


        On August ___, 2009, before me, the undersigned, personally appeared _____, the _____ of AGT Crunch New York LLC, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.


_____
Notary Public


STATE OF NEW YORK    )
                          ss.:

COUNTY OF NEW YORK  )


        On August ___, 2009, before me, the undersigned, personally appeared _____, the _____ of 708 Broadway Del LLC, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.


_____
Notary Public