UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

In re:                                                    Chapter 11

AGT WIND DOWN ACQUISITION LLC, *et al.*,                  Case No. 09-12889 (REG)

                            Debtors.                      (Jointly Administered)

-------------------------------------------------------------x

## DISCLOSURE STATEMENT WITH RESPECT TO JOINT PLAN OF LIQUIDATION OF AGT WIND DOWN ACQUISITION LLC, *et al.* UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

[THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.]

SILVERMANACAMPORA LLP
Counsel to Official Committee of Unsecured Creditors
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
(516) 479-6300

-and-

**DECHERT LLP**
Counsel to the Debtors and Debtors-in-Possession
1095 Avenue of the Americas
New York, New York 10036
(212) 698-3500

Dated:  February 8, 2010

15486859

KB/D294507v/F057049

# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | INTRODUCTION | 1 |
| | A. Key Disclosures | 1 |
| | B. Recommendation of Plan from Debtors and Committee | 3 |
| | C. General Summary Regarding Plan Confirmation | 4 |
| II. | VOTING PROCEDURES AND REQUIREMENTS | 5 |
| | A. Ballots and Voting Deadline | 5 |
| | B. Holders of Claims Entitled to Vote | 5 |
| | C. Voting Procedures | 6 |
| III. | SUMMARY OF DISTRIBUTIONS UNDER THE PLAN | 6 |
| IV. | THE DEBTORS' PREPETITION OPERATIONS, CAPITAL STRUCTURE, AND EVENTS LEADING TO FILING | 9 |
| | A. Description of the Debtors' Business | 9 |
| | B. Prepetition Capital Structure | 9 |
| | C. Circumstances Leading to Chapter 11 Filing | 10 |
| V. | THE DEBTORS' CHAPTER 11 CASES | 12 |
| | A. Commencement and Conduct of the Chapter 11 Cases | 12 |
| | B. Appointment of Creditors' Committee | 12 |
| | C. Initial Bankruptcy Hearings and Initial Orders | 13 |
| | D. Other Key Orders Granted During the Chapter 11 Cases | 13 |
| | E. The "Main Sale" of Substantially All of the Debtors' Assets | 14 |
| | F. Debtor in Possession Financing and the Use of Cash Collateral | 17 |
| | G. Contribution of Second Lien Debt | 18 |
| | H. Additional Operational Restructuring of the Debtors' Business | 19 |
| | I. The Prepetition Bar Date and Administrative Expense Bar Date | 21 |
| | J. Committee Analysis of the Senior Debt Claims under the Prepetition Senior Credit Facility and Second Lien Notes | 21 |
| | K. Avoidance Actions / Fraudulent Conveyances | 22 |
| VI. | SUMMARY OF THE PLAN OF LIQUIDATION | 23 |
| | A. Grouping and Classification of Claims and Interests under the Plan | 23 |
| | B. Claims and Interests Not Impaired Under the Plan | 25 |
| | C. Claims and Interests Impaired Under the Plan | 26 |
| VII. | MEANS OF EXECUTION OF THE PLAN | 26 |
| VIII. | DISTRIBUTIONS TO CLAIMANTS | 26 |
| IX. | IMPLEMENTATION OF THE PLAN | 27 |
| | A. Revesting of Assets and Appointment of Distribution Agent | 27 |
| | B. Settlement of Claims | 27 |
| | C. Substantive Consolidation | 27 |

KB/D294507v/F057049

|       | D. | Dissolution of Creditors' Committee | 29 |
|       | E. | Transfer of Cash to Fund the Plan | 29 |
|       | F. | Corporate Action | 29 |
|       | G. | Winding Up Affairs | 29 |
| X. | | EXECUTORY CONTRACTS AND LEASES | 29 |
| XI. | | DISPUTED CLAIM RESOLUTION | 30 |
|       | A. | No Distribution Pending Allowance | 30 |
|       | B. | Resolution of Disputed Claims | 30 |
|       | C. | Disputed Claims Reserve | 30 |
| XII. | | DUTIES AND RIGHTS OF DISTRIBUTION AGENT | 30 |
|       | A. | Nomination of Distribution Agent | 30 |
|       | B. | Duties and Rights of Distribution Agent | 31 |
|       | C. | No Agency Relationship, Indemnification and Insurance | 32 |
| XIII. | | DISTRIBUTION TO THE CLAIMANTS | 33 |
|       | A. | Delivery of Distributions | 33 |
|       | B. | Record Date for Distributions | 33 |
|       | C. | Distributions to Holders of Claims—Generally | 33 |
|       | D. | Unclaimed Property | 35 |
| XIV. | | RETENTION OF JURISDICTION | 36 |
| XV. | | EFFECT OF CONFIRMATION | 36 |
|       | A. | Conditions Precedent to the Effective Date | 36 |
|       | B. | Discharge, Injunctions and Releases | 36 |
| XVI. | | MISCELLANEOUS PROVISIONS | 39 |
|       | A. | Notices | 39 |
|       | B. | Change of Address | 40 |
|       | C. | Modification of the Plan | 40 |
|       | D. | Reservation of Rights | 40 |
|       | E. | Payment Dates | 41 |
|       | F. | Severability | 41 |
|       | G. | Successors and Assigns | 41 |
|       | H. | Governing Law | 41 |
|       | I. | Withholding Taxes | 41 |
| XVII. | | ALTERNATIVES TO THE PLAN | 41 |
|       | A. | Liquidation Under Chapter 7 of the Bankruptcy Code | 41 |
|       | B. | Alternative Chapter 11 Plan | 42 |
|       | C. | Certain Risk Factors | 42 |
| XVIII. | | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 43 |

KB/D294507v/F057049

|  | A. | Certain U.S. Federal Income Tax Consequences to the Debtors | 44 |
|---|---|---|---|
|  | B. | Certain U.S. Federal Income Tax Consequences to U.S. Holders of Claims | 45 |
| XIX. |  | CONFIRMATION OF THE PLAN | 48 |
|  | A. | Acceptance of the Plan | 48 |
|  | B. | Best Interests Test | 48 |
|  | C. | Feasibility of the Plan | 49 |
|  | D. | Classification of Claims Under the Plan | 49 |
|  | E. | Confirmation of the Plan over the Class 4 Deemed Rejection | 49 |
|  | F. | Confirmation Hearing | 50 |

KB/D294507v/F057049

## PRELIMINARY STATEMENT

THIS DISCLOSURE STATEMENT WAS FILED WITH THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK ON JANUARY __, 2010. [AFTER A HEARING ON THE ADEQUACY OF THE DISCLOSURE CONTAINED HEREIN, THE BANKRUPTCY COURT HAS DETERMINED THAT THIS DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION, AS DEFINED IN SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE.]  A HEARING ON CONFIRMATION OF THE PROPOSED PLAN OF REORGANIZATION DESCRIBED HEREIN HAS BEEN SCHEDULED FOR _____, 2010 AT _:__ _.M. (PREVAILING EASTERN TIME).

AS DISCUSSED IN GREATER DETAIL HEREIN, THE BANKRUPTCY COURT HAS DIRECTED THAT OBJECTIONS, IF ANY, TO CONFIRMATION OF THE PLAN MUST BE FILED AND SERVED ON OR BEFORE_____, 2010 AT _:00 P.M. (PREVAILING EASTERN TIME) IN THE MANNER DESCRIBED HEREIN.

KB/D294507v/F057049

15486859

# I.    INTRODUCTION

AGT Acquisition Wind Down LLC (f/k/a AGT Crunch Acquisition LLC) and its direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the "Debtors"),[1] and the Official Committee of Unsecured Creditors (the "Committee"), jointly submit this Disclosure Statement (the "Statement") pursuant to section 1125 of title 11, United States Code (the "Bankruptcy Code"). The Statement is provided to the Debtors' known creditors entitled to receive this Statement in order to disclose the information deemed to be material, important, and necessary for the Debtors' creditors to arrive at a reasonably informed decision in exercising their rights to vote on the Debtors' proposed plan of liquidation (the "Plan"). A copy of the Plan is annexed hereto as **Exhibit A.** Unless otherwise defined herein, all capitalized terms contained in this Plan have the meanings ascribed to them in the Plan. All Exhibits to the Statement are incorporated as if fully set forth and are a part of the Statement.

Also accompanying the Plan and this Statement is a creditor's voting ballot (the "Ballot") for the acceptance or rejection of the Plan, together with a copy of the Order approving the Statement and Scheduling a Hearing on Confirmation of the Plan. The Court has set [_____] 2010 at ___:00 a.m. (Prevailing Eastern Time) as the date for the hearing (the "Confirmation Hearing") on the confirmation of the Plan before the Honorable Robert E. Gerber, United States Bankruptcy Judge, United States Bankruptcy Court, Alexander Hamilton U.S. Custom House, Room 621, One Bowling Green, New York, New York 10004. The Court has directed that objections, if any, to confirmation of the Plan be served and filed on or before 4:00 p.m. Eastern Time on [_____] 2010 (the "Objection Deadline"). The Confirmation Hearing may be adjourned from time to time by the Court without further notice except for the announcement of the adjourned date made on the Court's docket or at the Confirmation Hearing or at any subsequent adjourned date for the Confirmation Hearing.

## A.    Key Disclosures

Each Creditor should read this Disclosure Statement and the Plan in their entirety. All exhibits to this Statement are incorporated into, and are part of, this Statement. No solicitation of votes on the Plan may be made except pursuant to this Statement, and no person has been authorized to use any information concerning the Debtor or its business other than the information contained herein for purposes of solicitation.

[The Bankruptcy Court has approved this Statement as containing information of a kind and in sufficient detail to enable a hypothetical, reasonable investor typical of creditors or interest holders to make an informed judgment as to whether to accept or to reject the Plan.] **APPROVAL OF THIS STATEMENT BY THE BANKRUPTCY COURT DOES NOT, HOWEVER, CONSTITUTE AN ENDORSEMENT OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT OR A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN.**

---

[1]    The Debtors in these cases are: AGT Acquisition Wind Down LLC, Sports & Fitness Ventures LLC, AGT Services Wind Down LLC, CFI Wind Down, LLC, AGT Atlanta Wind Down LLC, CFI Georgia Wind Down, LLC, CFI Atlanta Wind Down, LLC, AGT Crunch Chicago LLC, Crunch CFI GW, LLC, AGT Los Angeles Wind Down LLC, AGT Union Street LLC, AGT Miami Wind Down LLC, AGT New York Wind Down LLC, Fort Greene Sports Club, LLC, Hauppauge Sports Club, LLC, CFI New York Wind Down, LLC, Park Slope Sports Club, LLC, 113 4th Sports Club, LLC, AGT San Francisco Wind Down LLC, CFI San Francisco Wind Down, LLC, AGT Washington D.C. Wind Down LLC, and The Silver Springs Sports Club, L.L.C. The Debtors, pursuant to an Order of the Court, dated October 14, 2009, amended the caption to AGT Wind Down Acquisition LLC, et al.

KB/D294507v/F057049

**Safe harbor statement under the private securities litigation reform act of 1995**: this document was compiled from information obtained by the Debtors from numerous sources believed to be accurate, to the best knowledge, information, and belief of the Debtors. This Statement may include projections and other statements that constitute "forward-looking statements" within the meaning of the securities act of 1933, as amended (the "securities act"), and the securities exchange act of 1934, as amended, by the private securities litigation reform act of 1995. Any "forward-looking statements" in the projections and elsewhere include the intent, belief, or current expectations of the Debtors, members of their management, and the Committee and/or others with respect to, among other things, the timing of, completion of, and scope of the current contemplated restructuring, the Plan, and the Debtors' future liquidity and operations, as well as the assumptions on which such statements are based. While the Debtors and the Committee believe that the expectations are based on reasonable assumptions within the bounds of the Debtors' knowledge of their business and operations, parties-in-interest are cautioned that any such "forward-looking statements" are not guarantees of future performance and involve risks and uncertainties, and that actual results may differ materially from those contemplated by such "forward-looking statements."

This Statement also contains a summary of certain provisions of the Plan and the transactions contemplated thereunder and certain other documents. While the Debtors and the Committee believe that these summaries are fair and accurate, such summaries are qualified to the extent that they do not set forth the entire text of such documents. Reference is made to the Plan for a complete statement of the terms and provisions thereof.

The statements contained in this Statement are made as of the date hereof unless another time is specified in this Statement. The delivery of this Statement shall not, under any circumstance, create an implication that there has been no change in the facts set forth in this Statement since the date of this Statement or such other specified time.

This Statement is intended for the sole use of those holders whose claims against the Debtors are impaired under the Plan, in order to enable such holders to make an informed decision about the Plan. This Statement may not be relied upon for any purpose other than to determine how to vote on the Plan.

This Statement shall not constitute or be construed as an admission of, or stipulation to, any fact or liability, or a waiver of any rights, but rather as a statement made in the context of settlement negotiations.

Other than as expressly set forth herein, this Statement shall not be admissible in any proceeding involving the Debtors, the Post Confirmation Debtors, the Distribution Agent, or the Post Effective Date Debtor, or any other party, nor shall it be construed to be conclusive advice on the tax, securities, or other legal effects of the reorganization or liquidation as to any interested party. Any interested party desiring any such advice should consult with its own advisors.

The financial information contained in this Statement has not been subject to a certified audit. Accordingly, the Debtors and the Committee are unable to warrant or represent that the information is accurate and complete in all respects, although the Debtors and the Committee have used their best efforts to set forth information and disclosures that are complete and accurate. This Statement has been prepared on the basis of assumptions which the Debtors and the Committee believe to be reasonable, however, there can be no assurance that these assumptions will prove to have been accurate.

**CIRCULAR 230 NOTICE**: TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, EACH CREDITOR AND INTEREST HOLDER IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON BY SUCH CREDITOR OR INTEREST HOLDER, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY

KB/D294507v/F057049

BE IMPOSED ON SUCH CREDITOR OR INTEREST HOLDER UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) YOU SHOULD SEEK ADVICE BASED ON YOUR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**IMPORTANT:** **THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR TO REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.**

### B.   Recommendation of Plan from Debtors and Committee

The Plan is a product of consensual discussions among the Debtors and the Committee. The Debtors and the Committee believe that the terms of the Plan are fair, taking into account the financial situation of the Debtors and the legal priority of the Debtors' creditors. At this time, the Debtors and the Committee do not believe that there is a viable alternative for completing these Chapter 11 cases, other than through confirmation of the Plan.

As discussed below, pursuant to a Court-approved sale in the Chapter 11 Cases, the Debtors have sold substantially all of their assets to CH Fitness Investors, LLC ("CH Fitness") – their insider prepetition and postpetition first lien lender – and its designees through a credit bid of approximately $40 million of CH Fitness' first lien prepetition and postpetition debt. Notwithstanding the credit bid of substantially all assets (referred to herein as the "Main Sale"), CH Fitness has a deficiency claim of more than $20 million on account of its senior debt. If the Plan were to be approved, in exchange for comprehensive releases, and pursuant to Bankruptcy Rule 9019, CH Fitness agree to fund $150,000 as a Carve Out for the benefit of the Debtors' creditors and agree to pay Fee Claims, receive all Cash on the Effective Date in the Debtors' Estates other than necessary to fund the $150,000 Carve Out and Fee Claims, otherwise waive its deficiency claim and right to receive any future distributions, and vote in favor of the Plan. Under the Plan, the Debtors' remaining assets -- which are comprised primarily but not solely of certain causes of action, including Avoidance Actions not released or acquired through the Main Sale -- will revest in the Post Effective Date Debtor be administered, prosecuted, and liquidated by the Distribution Agent.

Absent confirmation of the Plan, due to its deficiency claim, CH Fitness will be entitled to a significant share of any of the proceeds of the Avoidance Actions. As such, the Committee and the Debtors believe that approval of this Plan is the best opportunity for unsecured creditors to receive any distribution in these Chapter 11 Cases.

**Therefore, it is the opinion of the Debtors and the Committee that confirmation and implementation of the Plan is in the best interests of the Debtors' estates and the Debtors' creditors. The Debtors and the Committee recommend that creditors vote to approve or otherwise support the Plan.**

**If the Plan cannot be confirmed for any reason, the Debtors will immediately convert these cases to cases under Chapter 7 of the Bankruptcy Code.**

### C.   General Summary Regarding Plan Confirmation

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor may reorganize or liquidate its business and assets. The formulation and confirmation of a plan of reorganization or liquidation is the principal purpose of a chapter 11 case. The plan sets forth the means of satisfying or discharging the claims against or interests in a chapter 11 debtor. Chapter 11 does not require

3

that each holder of a claim against a debtor vote in favor of a plan in order for the Bankruptcy Court to approve a plan.

In order for the Plan to be accepted and confirmed, it must be accepted by one class of claims that is impaired under the Plan (determined without including any acceptance of the Plan by any insider of the Debtor). Under Bankruptcy Code section 1126, an impaired class of claims has accepted the Plan if creditors representing at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Claims that actually vote in each impaired class of claims; provided that the vote of any creditor whose acceptance or rejection is determined to not have been made in good faith may not be counted. Any class that does not receive or retain property under the Plan is deemed to have rejected the Plan. In the event that the Plan is rejected by a class of creditors, the Court may confirm the Plan under the "cram down" procedure set forth in Bankruptcy Code section 1129(b).

"Cram down" permits confirmation of the Plan, notwithstanding rejection by one or more Classes of Claims if: (i) at least one impaired Class has accepted the Plan (not including votes of insiders); (ii) Claimants receive more under the Plan than they would in a liquidation; (iii) the absolute priority rule established by the Bankruptcy Code is satisfied; and (iv) the Court finds that the Plan does not discriminate unfairly and is fair and equitable with respect to the rejecting Class.

Pursuant to the Bankruptcy Code, only Creditors in Classes 2A and 3, which are impaired and entitled to vote, may vote on the Plan. Creditors entitled to vote may vote on the Plan by filling out and mailing the accompanying Ballot to SilvermanAcampora LLP ("SilvermanAcampora"), counsel to the Committee, 100 Jericho Quadrangle, Suite 300, Jericho, New York 11753, Attention: Katina Brountzas so the Ballot is received on or before [_____,] 2010 at 4:00 p.m. Eastern Time (the "Voting Deadline"). Creditors in Class 1 have been deemed to accept the Plan because they are not impaired and, therefore, are not entitled to vote on the Plan.

**The Debtors and the Committee are hopeful that creditors in at least Class 3 will vote to accept the Plan. If creditors in Class 3 do not vote to accept the Plan, the Debtors and the Committee do not believe that the Plan will be confirmed, and the Debtors will have no choice other than to convert the Chapter 11 Cases to those under chapter 7 of the Bankruptcy Code.** Notwithstanding the deemed rejection of Class 4, the Debtors intend to request confirmation of Plan under Bankruptcy Code section 1129(b) upon the Bankruptcy Court finding that all of the foregoing requirements have been met.

NOTE, AMENDMENTS TO THE PLAN'S CLASSIFICATION AND TREATMENT OF ONE OR MORE CLASSES THAT DO NOT MATERIALLY AND ADVERSELY CHANGE THE TREATMENT OF ANY OTHER CLASS MAY BE MADE. SUCH AMENDMENTS MAY BE APPROVED BY THE BANKRUPTCY COURT AT THE CONFIRMATION HEARING OR AT SOME OTHER TIME WITHOUT ENTITLING THE MEMBERS OF ANY CLASS WHOSE TREATMENT IS NOT MATERIALLY AND ADVERSELY CHANGED TO WITHDRAW ANY VOTES CAST FOR OR AGAINST THE PLAN.

## II.    VOTING PROCEDURES AND REQUIREMENTS

### A.    Ballots and Voting Deadline

IT IS IMPORTANT THAT THE HOLDERS OF CLAIMS IN CLASS 3 TIMELY EXERCISE THEIR RIGHT TO VOTE TO ACCEPT OR REJECT THE PLAN. All known holders of Claims entitled to vote on the Plan have been sent a Ballot together with this Disclosure Statement. Such holders should read

4

the Ballot carefully and follow the instructions contained therein. Please use only the Ballot that accompanies this Disclosure Statement.

Counsel to the Committee shall serve as voting agent (the "Voting Agent") to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan.

FOR VOTES TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT AT THE ADDRESS SET FORTH BELOW BEFORE THE VOTING DEADLINE OF 4:00 P.M., PREVAILING EASTERN TIME, ON [_____], 2010. THE VOTING AGENT IS ONLY PROVIDING COPIES OF THIS STATEMENT, EXHIBITS THERETO, AND BALLOTS TO ALL CLASSIFIED HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE ON THE PLAN.

IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE VOTING AGENT AT THE NUMBER SET FORTH BELOW. ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OF REORGANIZATION WILL NOT BE COUNTED.

IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE VOTING AGENT AT:

SilvermanAcampora LLP
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
(516) 479-6300
Attn:   Ronald J. Friedman
        Katina Brountzas

Additional copies of this Disclosure Statement are available upon request made to the Voting Agent, at the address set forth immediately above.

**B.      Holders of Claims Entitled to Vote**

Class 2A and Class 3 are impaired and, therefore, all holders of allowed claims in such classes as of the record date are entitled to vote to accept or reject the Plan.   Each holder of Class 2 and Class 3 as of the record date established by the Debtors for purposes of this solicitation may vote to accept or reject the Plan. Class 4 is also impaired but, pursuant to Bankruptcy Code section 1126(g), because holders of interests in such class will not receive or retain any property under the Plan on account of such interests, Class 4 is deemed to have rejected the Plan, and holders of interests are not entitled to vote on the Plan.  Class 1 and Class 2B are unimpaired and therefore deemed to have accepted the Plan, and holders of claims in Class 1 and Class 2B are not entitled to vote on the Plan.

**C.      Voting Procedures**

Except as provided below, unless the Ballot being furnished is timely submitted on or prior to the Voting Deadline, the Debtors and the Committee may, in their sole discretion, reject such Ballot as invalid and, therefore, decline to utilize it in connection with seeking confirmation of the Plan by the Bankruptcy Court.

In the event of a dispute with respect to a Claim, any vote to accept or to reject the Plan cast with respect to such Claim will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Bankruptcy Court orders otherwise.

KB/D294507v/F057049

The following procedures will be utilized in tabulating votes contained on Ballots:

a. All votes must be cast either to accept or to reject the Plan and may not be split;

b. Any Ballot that partially rejects and partially accepts, or conditionally accepts the Plan, will be deemed to be an acceptance of the Plan;

c. Except as the Voting Agent may otherwise agree in their discretion, a Ballot received by facsimile, e-mail, or any other electronic means will not be counted;

d. Except as the Voting Agent may otherwise agree in its discretion, only Ballots properly executed and timely received by the Voting Agent will be counted;

e. The Voting Agent, in its discretion, may waive any defect in any Ballot at any time, whether before or after the Voting Deadline;

g. The Voting Agent reserves the right, in its discretion, either to reject any and all Ballots not in proper form or to otherwise attempt to cure any and all defective Ballots;

h. Any Ballot that is illegible or contains insufficient information to permit identification of the claimant or interest holder may not be counted;

i. Any Ballot cast by a person or entity that does not hold a Claim or Interest in a Voting Class will not be counted; and

j. Except as the Voting Agent may otherwise agree in its discretion, any Ballot that does not bear an original signature will not be counted.

If a Ballot is signed by trustees, executors, administrators, guardians, attorneys-in-fact, officers of corporations, or others acting in a fiduciary or representative capacity, each such person should indicate such capacity when signing its Ballot and, if so requested by the Debtor or the Claims Agent, must submit proper evidence satisfactory to the Debtor of its authority to so act.

## III.  SUMMARY OF DISTRIBUTIONS UNDER THE PLAN

The Plan is a liquidating plan. As such, all remaining assets of the Debtors, plus certain assets contributed to the Debtors by CH Fitness under the Plan, will be liquidated and administered by the Distribution Agent. After payment in full of Administrative Expense Claims and Priority Claims, the balance of the estates will be distributed ratably to general unsecured creditors. The only secured creditor of the Debtors' estates is CH Fitness, which has agreed to waive its deficiency claim and fund the Distribution Agent in exchange for comprehensive releases.

| Class | Type of Claim or Interest | Treatment | Allowed Amount | Percentage Recovery |
|---|---|---|---|---|
| N/A | **Administrative Expenses** | All Allowed Administrative Expenses shall be **paid in full** within thirty (30) days after | **Undetermined.** Administrative Expenses (other than Fee Claims), Priority | **100%** |

KB/D294507v/F057049

| Class | Type of Claim or Interest | Treatment | Allowed Amount | Percentage Recovery |
|-------|---------------------------|-----------|----------------|---------------------|
| | | the Effective Date, or at such other date and upon such other terms as may be agreed to by the holder and the Debtors.<br><br>CH Fitness shall pay Fee Claims in full, in Cash, in an amount equal to such Allowed Claim through September 15, 2009. CH Fitness shall pay an amount up to $500,000 in Allowed Fee Claims accruing after September 15, 2009. | Tax Claims, and Class 1 Claims are not expected to exceed $150,000 in the aggregate. | |
| N/A | **Priority Tax Claims** | All Allowed Priority Tax Claims shall be **paid in full**, in Cash, after the payment of the Allowed Administrative Expenses as soon as practicable after the Effective Date, but in no event later than thirty (30) days after the Effective Date. | **Undetermined.**<br><br>Administrative Expenses (other than Fee Claims), Priority Tax Claims, and Class 1 Claims are not expected to exceed $150,000 in the aggregate. | **100%** |
| Class 1 | **Allowed Priority Non Tax Claims** | **Unimpaired.**<br><br>Allowed Priority (Non-Tax) Claims shall be paid in full, in Cash, after the payment of Allowed Administration Claims and Allowed Priority Tax Claims as soon as practicable after the Effective Date, but in no event later than thirty (30) days after the Effective Date. | **Undetermined.**<br><br>Administrative Expenses (other than Fee Claims), Priority Tax Claims, and Class 1 Claims are not expected to exceed $150,000 in the aggregate. | **100%** (Deemed to Accept) |

KB/D294507v/F057049

| Class | Type of Claim or Interest | Treatment | Allowed Amount | Percentage Recovery |
|---|---|---|---|---|
| **Class 2A** | **Secured Claims – CH Fitness** | **Impaired.** CH Fitness – the only holder of an Allowed Secured Claim – will receive all Cash from the Estates other than the Carve Out Funds, will waive its claim under the Prepetition Senior Credit Facility with respect to distributions after the Effective Date, will provide $150,000 in Carve Out Funds under the Plan, and pay up to $500,000 in Fee Claims accruing after September 15, 2009. | **$21,617,696** (CH Fitness Claim under Prepetition Senior Credit Facility) | **[1]%** (Entitled to Vote) |
| **Class 2B** | **Other Allowed Secured Claims** | **Unimpaired.** Each holder of an Allowed Other Secured Claim will receive from the Distribution Agent treatment as necessary to satisfy section 1124 of the Bankruptcy Code. | **$0** | **100%** (Deemed to Accept) |
| **Class 3** | **General Unsecured Claims** | **Impaired.** Each holder of an Allowed General Unsecured Claim shall receive on the Distribution Date its Pro Rata Share of the Distributable Cash in the Distribution Account, after payment of Administrative Claims, Allowed Priority Tax Claims and Allowed Priority (Non-Tax) Claims. | **Unknown** | **Unknown** (Entitled to Vote) |
| **Class 4** | **Interests** | **Impaired.** Class 4 Interests shall | **$0** | **0%** (Deemed to Reject) |

8

| Class | Type of Claim or Interest | Treatment | Allowed Amount | Percentage Recovery |
|-------|---------------------------|-----------|----------------|---------------------|
|       |                           | receive no Cash or other property under the Plan. Class 4 Interests shall be cancelled as of the Effective Date. |                |                     |

## IV.    THE DEBTORS' PREPETITION OPERATIONS, CAPITAL STRUCTURE, AND EVENTS LEADING TO FILING

### A.    Description of the Debtors' Business

Prior to the Commencement Date, the Debtors operated high-end fitness clubs in seven major metropolitan areas of the United States. As of December 31, 2008, the Debtors operated: (i) fourteen fitness clubs in New York, New York; (ii) seven fitness clubs in San Francisco, California; (iii) two fitness clubs in Atlanta, Georgia; (iv) three fitness clubs in Chicago, Illinois; (v) two fitness clubs in Miami, Florida; (vi) one fitness club in Los Angeles, California; and (vii) one fitness club in Rock Creek, Maryland. The majority of the Debtors' fitness clubs operated under the name "Crunch" or "Crunch Fitness."

The Debtors' primary sources of revenue were: (i) sales of gym memberships; (ii) sales of personal training services to their members; and (iii) sales of products, such as branded apparel, nutritional products, and juice bar drinks at their on-site retail stores, and other goods and services.

### B.    Prepetition Capital Structure

#### *Prepetition Senior Credit Facility*

Prior to the Commencement Date, the Debtors entered into that certain second amended and restated credit and guaranty agreement dated as of October 11, 2007 (as amended, the "Prepetition Senior Credit Facility"), by and among Goldman Sachs Credit Partners L.P. (as Swing Line Lender and Lender), Camulos SPC, for the account of Camulos Master Fund Segregated Portfolio, Camulos Master Fund LP, and Grand Center Asset Trust, CMF Series, Wachovia Bank, N.A. (as Issuing Bank), and certain investing affiliates of Angelo, Gordon & Co. as lenders (the "AG Parties").[2]  As noted below, the AG Parties are insiders and affiliates of the Debtors as such terms are defined under the Bankruptcy Code.

The Prepetition Senior Credit Facility is secured by a prepetition first lien on all assets of the Debtors. As of April 30, 2009, the balance of the senior debt due and owing under the Prepetition Senior Credit Facility, including accrued but unpaid interest thereon, was approximately $56.7 million.  As discussed below, the majority of the outstanding debt under the Prepetition Senior Credit Facility was credit bid pursuant to the Main Sale (as defined and discussed below).

For reasons discussed in the "Circumstances Leading to Chapter 11 Filing" below, in December 2008, CH Fitness purchased all of the outstanding senior debt under the Prepetition Senior Credit Facility and assumed all administrative responsibilities with respect thereto. CH Fitness is a joint venture primarily owned

---

[2]      The "AG Parties" are:  AG Private Equity Partners II, L.P., AG Private Equity Partners III, L.P., AG Super Fund, L.P., AG Princess, L.P., Nutmeg Partners, L.P., AG MM, L.P., and AG CNG Fund, L.P.

KB/D294507v/F057049

by certain of the AG Parties and their affiliates and NEFC Crunch, LLC ("NEFC"), a private equity fund that focuses on development opportunities in the fitness industry. CH Fitness is an affiliate and insider of the Debtors. Following the acquisition of the Senior Debt by CH Fitness, NEFC entered into a management services agreement with the Debtors. NEFC is not affiliated with the Debtors other than through its interest in CH Fitness.

### Second Lien Notes

Pursuant to a note purchase agreement dated June 30, 2008, AG Super Fund committed to fund up to $40 million in notes (the "Second Lien Notes") secured by a second lien on all of the Debtors' assets. As of April 30, 2009, the balance of the Second Lien Notes, including all accrued and unpaid interest, was approximately $22.7 million. As discussed below, during the Chapter 11 Cases, AG Super Fund contributed the outstanding amount of the Second Lien Notes to the Debtors' equity and cancelled their repayment obligations under the Second Lien Notes.

### Equity and Corporate Structure

Debtor AGT Crunch Wind Down LLC (the "Parent") directly or indirectly owns all of the equity interests in the other Debtors. As set forth in the Parent's list of equity security holders, the AG Parties own a majority of the equity interests in AGT. The Parent's equity structure (not including the equity held by AG Super Fund for the balance of the Second Lien Notes) is comprised of the following: (i) mandatorily redeemable series A senior preferred units, which bear interest at a rate of 18% per annum, compounded quarterly and payable in kind; (ii) certain other mandatorily redeemable senior preferred units, which are junior to the series A units and have substantially similar payment terms; (iii) preferred units, which accrue interest at a rate of 12% per annum, compounded quarterly and payable in kind; (iv) common units; and (v) senior management units.

## C.    Circumstances Leading to Chapter 11 Filing

In 2006, the Debtors acquired (the "Acquisition") 25 fitness clubs from Bally Total Fitness Corporation ("Bally") and 5 additional clubs from entities unrelated to Bally. The Debtors believe that Bally materially misrepresented the number of active members at the closing of the Acquisition and failed to disclose certain restrictions on rate increases under the transferred members' contracts. Thus, a number of the Debtors' initial financial projections turned out to be inaccurate, which in turn caused the Debtors to miscalculate their working capital and capital expenditure requirements and their ability to service long term debt. In May 2007, prior to Bally commencing its first chapter 11 case, the Debtors commenced a lawsuit against Bally asserting the same, and they have filed proofs of claim in Bally's chapter 11 cases. The Debtors subsequently assigned their interest in such claims to CH Fitness pursuant to the Main Sale.

Following the Acquisition, the Debtors also experienced significant billing and collections difficulties with respect to the transfer of member information from Bally. Consequently, the Debtors retained Alvarez & Marsal to provide interim management services throughout 2007 until the Debtors could recruit a permanent management team. Since the Acquisition and through the Commencement Date, the Debtors invested over $30 million in capital expenditures, opened new clubs, and divested several unprofitable clubs.

Throughout 2008, and continuing through the Commencement Date, the Debtors suffered operating losses as a result of deficient membership sales and the inability of the Debtors to divest themselves of certain unprofitable club locations that are saddled with overpriced long-term leases. For the year ended 2008, the Debtors had operating losses totaling $11.2 million. The Debtors had operating losses of approximately $2.8 million for the first quarter 2009.

KB/D294507v/F057049

By the second quarter of 2008, the Debtors were in default under the Prepetition Senior Credit Facility. As a result, on June 30, 2008, the Debtors and the then-existing lenders amended and restated the Prepetition Senior Credit Facility.

In connection with this financial restructuring, AG Super Fund made the commitment to purchase up to $40 million in principal amount of the Second Lien Notes. By October 2008, however, the Debtors were not in compliance with certain financial covenants under the Second Lien Notes, which were a condition precedent to additional funding thereunder. On October 30, 2008, in order for the Debtors to make an interest payment to the non-insider lenders under the Prepetition Senior Credit Facility (i.e., lenders other than the AG Parties), as well as to fund working capital, AG Super Fund waived certain covenants and advanced approximately $3.8 million under the Second Lien Notes (as defined below), $400,000 of which was to make the interest payment to the non-AG Party lenders.

Following this payment, AG Super Fund indicated its unwillingness to continue to advance funds under the Second Lien Notes while the Debtors could not comply with conditions precedent to additional funding thereunder, and the non-AG Parties under the Prepetition Senior Credit Facility were also unwilling to increase their own commitment under the Prepetition Senior Credit Facility.

As a result, in December 2008, CH Fitness acquired all of the first lien debt under the Prepetition Senior Credit Facility, in the aggregate amount of approximately $46.2 million, and committed to fund up to an additional $17 million for working capital and capital expenditures on a first lien basis. As of the Commencement Date, the Debtors had drawn down approximately $10.5 million of the $17 million of this additional commitment from CH Fitness.

Despite the Debtors' out of court financial restructuring efforts, Debtors' operations continued to suffer. On April 30, 2009, the Debtors failed to make an interest payment of approximately $1.5 million that had become due under the Prepetition Senior Credit Facility, causing a payment default thereunder. As a result, the Debtors entered into a forbearance agreement with CH Fitness.

Adding to these financial difficulties was the fact that the fitness club industry itself is highly competitive, which limited the Debtors' ability to maintain or increase the pricing of its membership fees. Furthermore, as noted above, the Debtors were burdened by a number of legacy lease obligations from the Acquisition that rendered a number of their clubs unprofitable. Given the nature of the fitness industry, the Debtors' burdensome lease obligations, excessive leverage, and financial condition, the Debtors concluded that their business could not be a viable and profitable enterprise without a major restructuring of their operations and capital structure.

Accordingly, the Debtors determined that it was in the best interests of their business, their creditors, and their gym members to file petitions under chapter 11 of the Bankruptcy Code with the goal of effectuating a going concern sale of their business with CH Fitness serving as a stalking horse bidder through a Court-approved auction process.

## V.    THE DEBTORS' CHAPTER 11 CASES

### A.    Commencement and Conduct of the Chapter 11 Cases

On May 6, 2009 (the "Commencement Date"), each of the Debtors filed separate, voluntary petitions for relief under chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the Southern District of New York. By Order of the Court on May 6, 2009, the Debtors' cases have been jointly administered. Since the Commencement Date, the Debtors have managed their affairs as debtors and debtors

KB/D294507v1/F057049

in possession under Bankruptcy Code sections 1107 and 1108. No trustee or examiner has been appointed in the Debtors' Chapter 11 Cases.

As debtors in possession, the Debtors have been authorized to manage their properties and clubs in the ordinary course of business without further approval of the Court. Pursuant to various Court orders, the Debtors have received authorization from the Bankruptcy Court to consummate certain transactions outside of the ordinary course of business as discussed herein.

In connection with the Chapter 11 Cases, the Debtors were provided professional services by Dechert LLP ("Dechert"), as general bankruptcy counsel, FocalPoint Securities LLC ("Focalpoint"), as financial advisor, and Omni Management Group ("Omni"), as claims and noticing agent. The retentions of Dechert, Focalpoint, and Omni were all subsequently approved by the Bankruptcy Court. Andrew P. Hines serves as the Debtors' Chief Restructuring Officer.

### B. Appointment of Creditors' Committee

On May 12, 2009, the United States Trustee for Region 2 (the "US Trustee") appointed the Committee pursuant to Bankruptcy Code section 1102. Once formed, the Committee selected SilvermanAcampora to represent it as legal counsel and CBIZ Mahoney Cohen ("CBIZ"), as financial advisors. The Bankruptcy Court subsequently approved the retentions SilvermanAcampora and CBIZ by the Committee.

The Committee currently consists of the following members: DFD Development, LP; 8000 Sunset Boulevard Owner, LLC; 25 Broadway Sublandlord, LLC; 2700 Halsted Building, LLC; Bigtime Design Studios; Tower Place, LP; and Hollywood Horizon Properties, LLC.

The Committee has actively participated in all aspects of these cases, including negotiating the terms of the Plan and this Statement. **The Committee supports confirmation of the Plan, and recommends that all general unsecured creditors vote to approve the Plan.**

### C. Initial Bankruptcy Hearings and Initial Orders

In connection with initial bankruptcy hearings held in May and June 2009, the Debtors sought relief from the Bankruptcy Court to facilitate the transition between the Debtors' prepetition and postpetition business operations by approving certain regular business practices that may have not been specifically authorized under the Bankruptcy Code and/or required specific Court approval (collectively, the "Initial Orders").[3]

These Initial Orders in the Debtors' cases authorized, among other things:

- payment of prepetition trust fund and franchise taxes;

- payment of certain undisputed claims of critical vendors in the ordinary course of business;

- payment of prepetition wages and salaries, and payments honoring the prepetition employee insurance policies and benefits;

---

[3] Copies of motions, Initial Orders, or other documents filed in these cases may be obtained online at ecf.nysb.uscourts.gov (for registered PACER users) or by visiting the website of the Debtors' claims and noticing agent, Omni Management Group, Inc., at http://www.omnimanagementgroup.com/agtcrunch.

KB/D294507v/F057049

- continued use of the Debtors' cash management system and existing bank accounts;

- incurrence of post-petition financing and use of cash collateral (as discussed in greater detail below);

- procedures to employ certain professionals used in the ordinary course of the Debtors' business;

- procedures for determining, and payment of deposits regarding, adequate assurance to the Debtors' utility providers;

- extension of the deadline to file their schedules of assets and liabilities and statements of financial affairs (which were subsequently filed on June 22, 2009);

- procedures for monthly compensation for bankruptcy professionals; and

- payment and honoring of prepetition and postpetition insurance obligations; and

- procedures for sales of de minimis assets.

### D. Other Key Orders Granted During the Chapter 11 Cases

In addition to the Initial Orders, the Debtors have sought authority with respect to a multitude of matters designed to assist in the administration of their cases and to maximize the value of the Debtors' Estates. Such matters included, among others, (i) the extension of time within which the Debtors could assume or reject nonresidential real property leases and (ii) the extension of certain exclusive periods within which the Debtors could file the Plan and solicit acceptances thereon.

#### *Extension of Time to Assume or Reject Unexpired Leases of Nonresidential Real Property*

As of the Commencement Date, the Debtors were parties to approximately 36 unexpired nonresidential real property leases. Since the Commencement Date, the Debtors worked diligently to determine in the best interests of their Estates whether to seek to assume, assume and assign, or reject those leases. Because the Debtors were unable to complete their analysis of all nonresidential real property leases during the time limitation prescribed by Bankruptcy Code section 365(d)(4), and because certain proposed assignments of leases were pending before the Court by the time the Debtors' initial section 365(d)(4) period was due to expire (i.e., September 2, 2009), on August 7, 2009, the Debtors moved for an extension of time within which they could assume or reject such unexpired leases of nonresidential real property.

On August 13, 2009, the Bankruptcy Court entered an order extending the time to assume or reject unexpired leases through October 31, 2009. As of October 29, 2009, the Debtors were party to only one remaining unexpired lease of nonresidential real property, which was for their "North & Sheffield" club. Accordingly, in connection with the potential rejection or assumption and assignment of that lease, on October 29, 2009, the Debtors moved for an extension of time within which they could assume or reject that lease in accordance with Bankruptcy Code section 365(d)(4). On November 20, 2009, the Bankruptcy Court entered an order extending the time to assume, assume and assign, or reject the lease for the North & Sheffield Club through a date no later than December 2, 2009. As discussed in greater detail below, the Debtors subsequently rejected this lease effective as of November 23, 2009.

#### *Extension of Exclusive Plan Filing and Solicitation Periods*

Pursuant to a bridge order dated August 20, 2009, the Bankruptcy Court extended the Debtors' exclusive period to propose a plan through September 8, 2009. On September 8, 2009, the Bankruptcy Court entered an order extending the Debtors' exclusive period to propose a plan through January 19, 2010, and extending the Debtors' exclusive period to solicit acceptances of such plan through March 20, 2010. The

Debtors, in consultation with the Committee, determined not to move for a further extension of exclusivity past January 19, 2010.

### E.    The "Main Sale" of Substantially All of the Debtors' Assets

#### *The Decision to Pursue a Sale and the Bidding Procedures*

Prior to the Commencement Date, the Debtors engaged FocalPoint to provide financial advisory services in connection with a restructuring of their business and capital structure. In consultation with FocalPoint and the Debtors' advisors, the Debtors and their independent director concluded that the most viable and cost-effective means of implementing a restructuring of their operational and capital structure to maximize value for creditors was through a going concern sale (the "Main Sale") of substantially all of their assets pursuant to Bankruptcy Code sections 363(b) and 363(f).

To that end, CH Fitness agreed to provide the Debtors with up to $6 million in debtor in possession financing (as discussed in section following below, the "DIP Facility") and to serve as a stalking horse bidder in connection with the Main Sale with a credit bid which consisted of the release of the Debtors of obligations, claims, rights, actions, causes of action, suits, liabilities, damages, debts, costs, expenses and demands whatsoever, in law or in equity, arising under, or otherwise relating to, (i) the DIP Facility and (ii) the Prepetition Senior Credit Facility, in an aggregate amount equal to $40,000,000.

On May 6, 2009, the Debtors filed a motion seeking to (a) establish bidding procedures in connection with Sale of substantially all of their assets; (b) approving the form and manner of notices; (c) setting a date for the Sale hearing; (d) authorizing the sale of their assets free and clear of all liens, claims, and encumbrances, and (e) authorizing the assumption and assignment of certain executory contracts and unexpired leases (the "CH Fitness Sale Motion"). Among other things, the CH Fitness Sale Motion provided that CH Fitness was permitted to credit bid the $40 million purchase price for the acquisition of substantially all of the Debtors' assets.

CH Fitness was and is an insider of the Debtors and the proposed credit bid under the Prepetition Senior Credit Facility and the DIP Facility was adequately noticed and subject to higher or better offers.

The Committee and the Debtors engaged substantial discussions and negotiations regarding the Main Sale process. As a result of these negotiations, amended bidding procedures were agreed upon. Among the amendments was the inclusion of assets in the sale that originally were not part of the sale. Furthermore, the parties agreed to allow bidding on groups of assets or on individual assets that were all subject to higher or better (i.e., "component bids"). On June 2, 2009, the Bankruptcy Court entered an order approving the modified bidding procedures that were agreed upon by the Committee, the Debtors, and CH Fitness.

#### *The Marketing Process*

Prior to the Commencement Date, FocalPoint began a marketing process for the Debtors' business. After the Commencement Date, FocalPoint continued to extensively market the Debtors' assets (the "Assets"), seeking a bid, or combination of bids, capable of topping the stalking horse bid of CH Fitness.

In particular, FocalPoint utilized an extensive database that it maintains of potential strategic purchasers of health and fitness clubs to solicit interest from the Debtors' competitors. FocalPoint availed itself of its wide range of contacts in the capital markets to solicit interest from potential financial buyers that could be in a position to purchase some or all of the Debtors' Assets.

14

KB/D294507v/F057049

As a result of these efforts, FocalPoint assembled a "buyer's list" of 95 potential purchasers, including 31 potential strategic buyers and 64 potential financial buyers. FocalPoint required all potential strategic and financial buyers, as a pre-condition to receipt of confidential information about the Debtors' businesses, to sign a standard nondisclosure agreement ("NDA"). Eventually, 16 strategic buyers and 7 financial buyers entered into an NDA with the Debtors.

Upon execution of the NDA, FocalPoint provided these parties with a "Confidential Information Memorandum," a compilation of financial and operational information relevant to acquirers of the Debtors' businesses, as well as club-specific financial information. The Confidential Information Memorandum includes an overview of the sale process, the fitness club industry, and the "Crunch" brand and operations. A virtual dataroom, which was established by the Debtors with the assistance of FocalPoint, was available for review by parties that signed the NDA who were seeking information beyond that contained in the Confidential Information Memorandum.

During the marketing process it became clear that a single topping bid for substantially all of the Debtors assets would not be forthcoming. In accordance with the Court's bid procedures order, FocalPoint continued to market the Assets to buyers that expressed interest in purchasing fitness clubs in specific regions or specific clubs, exploring the possibility that a combination of purchasers might top the stalking horse bid. FocalPoint worked with a number of potential acquirers in each of the cities in which the Debtors businesses operated.

FocalPoint marketed the Assets to one potential strategic purchaser in New York that valued the Debtors' New York assets between $10 million and $12 million. This potential purchaser suggested a potential purchase price in that range, to be paid in some form of debt and equity securities of the purchaser. This party had received extensive financial and operational data from FocalPoint and had been provided access to the virtual dataroom. However, prior to the expiration of the bid deadline, this party informed FocalPoint that it would not be making a qualified bid. FocalPoint did not receive any offers or serious expressions of interest in the other geographic regions in which the Debtors operate. As a result, no combination of bids was capable of topping the stalking horse bid.

### _Modification of Sale Agreement to Benefit Unsecured Creditors_

The Committee was intimately involved in the Main Sale and marketing process and believed that, despite the extensive marketing efforts, no bid would provide value to the Debtors' Estates in excess of the CH Fitness stalking horse bid. As such, the Committee immediately turned its attention to negotiating with CH Fitness to modify the Assets being purchased and attempt to provide some consideration to unsecured creditors.

The Debtors sought the Bankruptcy Court's authority to consummate the sale to CH Fitness at a hearing held on or about August 10, 2009. On August 4, 2009, the Committee filed a limited objection to the Sale to CH Fitness (the "Limited Objection") asserting that Avoidance Actions should not be purchased by CH Fitness. Specifically, the Committee asserted that, according to the Debtors records, (i) $4,577,676.41 in payments were made to insiders during the one prior to the Commencement Date and (ii) $12,880,945.88 of payments were made to creditors within the 90 days prior to the Commencement Date. The Committee believed that such actions could provide a recovery to unsecured creditors. On August 7, 2009, the Debtors filed a response to the Limited Objection.

From and after the filing of the Limited Objection, CH Fitness, the Debtors, and the Committee engaged in extensive negotiations regarding the Main Sale. Based on negotiations with the Committee, CH Fitness modified the sale agreement pursuant to the Sale Order on the following terms (the "Sale Agreement"):

KB/D294507v/F057049

(i)     The definition of "Excluded Assets" in the Sale Agreement was modified to include all of the Debtors' rights in or with respect to all actions, proceedings, claims or litigation, including any avoidance or preference actions for the benefit of any Debtor under the Bankruptcy Code: (a) against the AG Parties, (b) against CH Fitness; *provided, however,* that any such actions, proceedings, claims or litigation against CH Fitness were subject to the Final DIP Order; (c) relating to the "Payments Subject to Retained Claims" that were indentified in an exhibit to the Sale Order and are attached as **Exhibit B** to this Statement; *provided, however,* that any actions, proceedings, claims or litigation against CH Fitness with respect to such payments were subject to the Final DIP Order; (d) relating to the "Payments on Rejected Leases" that were indentified in an exhibit to the Sale Order and are attached as **Exhibit B** to this Statement; (e) relating to the "Payments to Vendors to Rejected Clubs" that were indentified in an exhibit to the Sale Order and are attached as **Exhibit B** to this Statement, and (f) any other avoidance or preference actions for the benefit of any Debtor under the Bankruptcy Code that do not relate to a creditor whose claim is being paid or assumed by CH Fitness under the Sale Agreement and the Sale Order.

(ii)    The definition of "Assets" in the Sale agreement was modified to include all of the Debtors' rights in or with respect to all actions, proceedings, claims or litigation, including any avoidance or preference actions for the benefit of any Debtor under the Bankruptcy Code, regarding (a) the "Payments not Subject to Retained Claims" that were indentified in an exhibit to the Sale Order and are attached as **Exhibit B** to this Statement; (b) the "Payments made to Parties on Assumed Contracts and Assumed Leases" that were indentified in an exhibit to the Sale Order and are attached as **Exhibit B** to this Statement; (c) the "Payments made to Continuing Vendors" that were indentified in an exhibit to the Sale Order and are attached as **Exhibit B** to this Statement; and (d) the "Member Refunds" that were indentified in an exhibit to the Sale Order and are attached as **Exhibit B** to this Statement.

(iii)   CH Fitness agreed to maintain $150,000 in cash with the Debtors for funding of a litigation trust (or similar vehicle) under a plan of liquidation for the benefit of Debtors' general unsecured creditors pursuant to the record of the Sale Hearing.

(iv)    CH Fitness agreed to waive a recovery on its deficiency claim from the proceeds of any Avoidance Actions.

(v)     Any claims or causes of action assertable against the AG Parties would be released in accordance with the terms of this Plan.

As a result of the agreement reached among the Debtors, the Committee, and CH Fitness, the Court authorized the sale of substantially all of the Debtors assets to CH Fitness pursuant to the Sale Order. Under the Plan, pursuant to Bankruptcy Rule 9019, the additional Excluded Assets carved out of the Main Sale will be administered by the Distribution Agent, other than claims against the AG Parties and CH Fitness which shall be released as discussed below.

The closing with respect to the sale to CH Fitness pursuant to the Sale Order occurred on or about September 15, 2009 (the "Closing"). Pursuant to the Sale Order, the Acquired Assets were purchased by CH Fitness through, among other things, a credit bid of $38.5 million outstanding under the Goldman Credit Facility and $1.5 million outstanding under the DIP Facility (the "Credit Bid"). Following the Credit Bid, CH Fitness has a remaining allowed claim against each of the Debtors for $21,617,696 (the "CH Deficiency Claim").

KB/D294507v/F057049

Importantly, absent entry into the Sale Agreement, unsecured creditors would have received no distributions in the Chapter 11 Cases. Moreover, given the CH Deficiency Claim, CH Fitness would have otherwise been entitled to a significant share of any of the proceeds of the Avoidance Actions. As such, the Committee and the Debtors believe that approval of this Plan is the best opportunity for unsecured creditors to receive a distribution in these Chapter 11 Cases.

## F.   Debtor in Possession Financing and the Use of Cash Collateral

In order to effectuate a going concern sale of substantially all of the Debtors' assets and business (as described below), and to ensure the continued viability of their enterprise, upon the commencement of these Chapter 11 Cases, the Debtors had an immediate and urgent need to access funds to allow them to pay various operating expenses, including payroll, postpetition lease payments, and payments to vendors. To that end, CH Fitness committed to provide short-term financing and access to its cash collateral to allow the Debtors to operate their business as debtors in possession with the goal of effectuating a going concern sale to a successful bidder.

The Debtors, in consultation with their financial advisor, FocalPoint Securities, LLC, and their independent director, determined that projected postpetition cash flows would be insufficient to adequately finance the Debtors' postpetition activities for a period necessary to effectuate a thorough marketing, bidding, and auction process for their business. Accordingly, in addition to the use of cash collateral, the Debtors requested approval of the DIP Facility in order to continue to fund their operations.

Prior to the Commencement Date, the Debtors and FocalPoint solicited interest from potential third-party postpetition lenders. Each of the preliminary proposals received by FocalPoint contained less attractive terms that those contained under the DIP Facility. In addition, the Debtors did not believe that they could have provided CH Fitness with "adequate protection" with respect to its liens under the Goldman Credit Facility without considerable additional cost if a third party were granted liens that primed CH Fitness.

As such, prior to the Commencement Date, the Debtors, with the assistance of their restructuring and financial advisors, assessed the Debtors' liquidity needs, the proposal of the DIP Facility offered by the CH Fitness, and the market for other financing alternatives. As indicated above, in search of financing alternatives, FocalPoint surveyed the credit markets for financing proposals more favorable than those proposed by CH Fitness. However, after carefully considering the DIP Facility offered by CH Fitness, and the advice of their restructuring and financial advisors, the Debtors and their independent director determined that the cost of the short-term capital available in the credit markets would exceed the cost of capital proposed by CH Fitness. In other words, the DIP Facility provided significant advantages that the Debtors determined were unavailable through other lenders. As noted above, even if the Debtors were able to obtain an attractive proposal for postpetition financing, it was doubtful that they would have been able to afford such financing because they would not be able to make "market" adequate protection payments (such as contractual interest) to CH Fitness under the Goldman Credit Facility. Moreover, given the Debtors' financial condition, capital structure, and the current state of the market, the possibility of obtaining unsecured postpetition financing was remote, and FocalPoint did not receive any such proposal from any potential postpetition lenders.

The terms of the DIP Facility were negotiated in good faith and at arm's length between the Debtors and CH Fitness (both parties being represented by competent and experienced counsel), and the terms of the DIP Facility were recommended by FocalPoint and approved by the Debtors' independent director.

On May 6, 2009, the Debtors filed a motion seeking approval of the DIP Facility. On May 8, 2008, and prior to the formation of the Committee, the Court authorized the Debtors obtain post-petition secured financing and use of cash collateral under the DIP Facility on an interim basis.

17

Upon its formation, the Committee immediately engaged the Debtors and CH Fitness in extensive negotiations regarding the terms of a final DIP Order. These negotiations resulted in modifications to the DIP Facility that were acceptable to the Debtors, the Committee and CH Fitness. The Court entered the consensual final DIP Order on June 9, 2009 approving the DIP Facility on a final basis. As of the closing of the Main Sale, the outstanding indebtedness under the DIP facility was credit bid and, thus, no obligations remain outstanding thereunder.

## G. Contribution of Second Lien Debt

As of April 30, 2009, the balance of the Second Lien Notes, including all accrued and unpaid interest, was approximately $22.7 million. Effective as of June 30, 2009, pursuant to a certain contribution agreement, AG Super Fund cancelled the Second Lien Notes and contributed the balance thereof to the Debtors' equity. Accordingly, as of the date hereof, the Debtors do not owe any amounts on account of the Second Lien Notes.

The Debtors and the Committee believe that AG Super Fund's contribution of the Second Lien Notes, which were otherwise senior in priority to general unsecured claims, was necessary to provide general unsecured creditors with any form of recovery in these Chapter 11 Cases.

## H. Additional Operational Restructuring of the Debtors' Business

### Rejection of Certain Unexpired Leases and Executory Contracts

Prior to the Commencement Date, the Debtors were burdened by a number of legacy lease obligations that rendered certain of their clubs unprofitable. Given these burdensome lease obligations, as well as other unprofitable agreements, the Debtors undertook a major restructuring of their operations prior to the commencement of their Chapter 11 cases and throughout the course of these cases.

This operational restructuring began in part prior to the Commencement Date with the closure or divestiture of certain of the Debtors' clubs that were unprofitable, and which the Debtors were aware that CH Fitness was not interested in acquiring. Accordingly, on the Commencement Date, the Debtors filed a motion (the "First Lease Rejection Motion") to reject the leases respecting such clubs, among other things. On June 1, 2009, the Bankruptcy Court entered an order granting the First Lease Rejection Motion *nunc pro tunc* to the Commencement Date. All movable and tangible assets maintained at clubs whose leases were rejected under the order granting the First Lease Rejection Motion were transferred to clubs that the Debtors operated prior to the closing of the Sale Agreement. Such assets and clubs were subsequently acquired by CH Fitness pursuant to the Sale Agreement.

Additionally, on the Commencement Date, the Debtors filed a motion (the "First Contract Rejection Motion") to reject (i) executory separation agreements with certain of their former employees and (ii) an executory management agreement pursuant to which they managed the operations of the "West End Sports Club," located in New York, New York. On June 1, 2009, the Bankruptcy Court entered an order granting the First Contract Rejection Motion.

On May 15, 2009, the Debtors also filed a motion (the "Second Lease Rejection Motion") to reject a certain lease of real property where the Debtors had operated a club in San Francisco, California. On May 29, 2009, the Bankruptcy Court granted the Second Lease Rejection Motion. All movable and tangible assets maintained at this club were transferred to clubs that the Debtors operated prior to the closing of the Main Sale. Such assets and clubs were subsequently acquired by CH Fitness pursuant to the Main Sale.

KB/D294507v/F057049

On May 29, 2009, the Debtors filed a motion (the "Third Lease Rejection Motion") to reject five leases for five different clubs that CH Fitness was not interested in acquiring pursuant to the Main Sale. The Third Lease Rejection Motion was subsequently adjourned as the Debtors continued to explore marketing options for asset sales for the five clubs, as well as potential assumption and assignment of the five leases.

The five particular clubs whose leases were subject to the Third Lease Rejection Motion were: "Grand & Wabash" (Chicago, Illinois); "North & Sheffield" (Chicago, Illinois); "Buckhead" (Atlanta, Georgia); the "Hauppauge Sports Club" (Hauppauge, New York); and the "Rock Creek Sports Club" (Rock Creek, Maryland). The leases for the Hauppauge Sports Club and Rock Creek Sports Club were ultimately assumed and assigned to the purchasers for such clubs pursuant to Court-approved sales, as discussed in the section below. The leases for Buckhead, Grand & Wabash, and the North & Sheffield clubs were ultimately rejected in connection with additional Court-approved sales, as also discussed below.

In connection with the closing of the Main Sale, the Debtors filed a motion (the "Second Contract Rejection Motion") to reject certain executory contracts that were not assigned to CH Fitness and which the Debtors did not have operations to sustain performance on. The Bankruptcy Court granted the Second Contract Rejection Motion on October 15, 2009.

### *Additional Asset Sales and Related Assignment and Rejection of Contracts and Leases*

The Main Sale of substantially all of the Debtors' assets to CH Fitness excluded certain of the Debtors' fitness clubs, which included the clubs whose leases were subject to the Third Lease Rejection Motion. Accordingly, the Debtors separately marketed the assets of these clubs (including the membership contracts of the members belonging to such clubs), as well as the leases themselves, for potential sale and/or assumption or assignment to third party purchasers. The marketing process resulted in the successful sales of the assets and assumption and assignment of certain contracts and leases of the five excluded clubs, as discussed below:

- Rock Creek. On June 30, 2009, following a competitive auction, the Bankruptcy Court approved a going sale of all assets and the assumption and assignment of all membership contracts pertaining to the Rock Creek Sports Club for approximately $705,000, subject to certain adjustments. The Debtors assumed and assigned the underlying lease for the Rock Creek Sports Club to the respective buyer pursuant to section 365 of the Bankruptcy Code.

- Hauppauge. On August 13, 2009, the Bankruptcy Court approved a going concern sale of all assets and the assumption and assignment of all membership contracts of the Hauppauge Sports Club for approximately $225,000, subject to certain adjustments. The Debtors assumed and assigned the underlying lease for the Hauppauge Sports Club to the respective buyer pursuant to section 365 of the Bankruptcy Code.

- Buckhead. On September 8, 2009, the Bankruptcy Court approved the assumption and assignment of the majority of membership contracts of members belonging to the Crunch Buckhead club to a third party fitness club operator for approximately $200,000, subject to certain adjustments. The buyer did not acquire the Buckhead club as a going concern, but rather took an assignment of the majority of the membership contracts, which it honored at a separate facility that it operated. In connection therewith, the Debtors rejected certain membership contracts that the buyer was not interested in acquiring. Following this acquisition, the Debtors no longer maintained operations at the Buckhead club. Accordingly, the Bankruptcy Court entered an order rejecting the lease for the Buckhead club, effective as of September 15, 2009.

KB/0294507v/F057049

- Grand & Wabash. On September 30, 2009, following competitive bidding, the Bankruptcy Court approved the assumption and assignment of the majority of membership contracts of members belonging to the Crunch Grand & Wabash club to a third party fitness club operator for approximately $155,000, subject to certain adjustments. The buyer did not acquire the Grand & Wabash club as a going concern, but rather took an assignment of the majority of the membership contracts, which it honored at a separate facility that it operated. In connection therewith, the Debtors rejected certain membership contracts that the buyer was not interested in acquiring. Following this acquisition, the Debtors no longer maintained operations at the Grand & Wabash club. Accordingly, the Bankruptcy Court entered an order rejecting the lease for the Grand & Wabash club, effective as of October 5, 2009.

- North & Sheffield. On November 11, 2009, the Court approved the sale of substantially all of the assets and the assumption and assignment of substantially all of the membership contracts pertaining to the North & Sheffield club for $300,000, subject to certain adjustments. The buyer of this club entered into a new lease with the respective landlord; and accordingly, the Bankruptcy Court entered an order rejecting the lease for the North & Sheffield club, effective as of closing date of the sale of the assets for the North & Sheffield club (which was November 23, 2009).

### I. The Prepetition Bar Date and Administrative Expense Bar Date

On October 14, 2008, the Bankruptcy Court entered an order (the "Prepetition Bar Date Order") establishing November 23, 2008 at 5:00 p.m. (Eastern Time) as the last date and time (the "Prepetition Bar Date") for each person or entity other than a Governmental Unit to file proofs of claim based on prepetition Claims against any of the Debtors, including claims under section 503(b)(9) of the Bankruptcy Code. The Prepetition Bar Date Order also established November 1, 2009 as the bar date for Governmental Units to files proofs of claim. In accordance with the Prepetition Bar Date Order, the Debtors mailed notice of the Prepetition Bar Date to all known creditors.

On January 11, 2009, the Bankruptcy Court entered an order (the "Administrative Expense Bar Date Order") establishing March 1, 2010, at 5:00 p.m. (Eastern Time) as the last date and time (the "Administrative Expense Bar Date") for each person or entity to file a proof of administrative expense against any of the Debtors as set forth therein. The Debtors mailed notice of the Administrative Expense Bar Date in accordance with the Administrative Expense Bar Date Order.

### J. Committee Analysis of the Senior Debt Claims under the Prepetition Senior Credit Facility and Second Lien Notes

Pursuant to the Final DIP Order, the Debtors stipulated that all claims in respect of the indebtedness under the Prepetition Senior Credit Facility and Second Lien Notes (together, the "Senior Debt Claims") were not subject to any avoidance, reductions, set off, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity. Also pursuant to the Final DIP Order, the deadline for any other party to file an adversary proceeding or contested matter asserting a Lender Claim (as such term is defined in the Final DIP Order) was set as August 10, 2009 (the "Challenge Period").

As such, from the outset of its involvement in this case, the Committee was under time constraints to investigate the Senior Debt Claims and underlying liens. Thus, the Committee expended a significant amount of professional time investigating the amount, validity, scope, and priority of the Senior Debt Claims.

KB/D294507v/F057049

In investigating and analyzing the Senior Debt Claims, the Committee collected and reviewed information and documents from several sources, including analysis of former transactions and documents received from the Debtors and CH Fitness. The Committee's investigation of the potential Lender Claims was completed prior to the court hearing on the Sale. As a result of its exhaustive investigation, the Committee believed that there was no basis for the assertion of any Lender Claims or any claims against CH Fitness and/or its affiliates. As such, the Committee did not object to the Credit Bid and the Committee, the Debtors, and CH Fitness negotiated the Sale Agreement whereby some consideration would be made available for unsecured creditors, notwithstanding the significant amounts remaining outstanding under the Prepetition Senior Credit Facility, which under ordinary circumstances would have received payment and distribution priority over such other unsecured claims under the Plan.

## K.    Avoidance Actions / Fraudulent Conveyances

The Committee is analyzing information regarding the possible bases for commencing Avoidance Actions. The amount recovered will depend on the defenses raised by defendants and the total amount of legal fees and costs incurred in pursuit of the actions. Any recoveries from Avoidance Actions will be used to pay Distributions to Unsecured Creditors under the Plan. The Debtors and the Committee reserve all rights with respect to the Avoidance Actions except as set forth herein and in the Plan.

KB/D294507v/F057049

# VI.   SUMMARY OF THE PLAN OF LIQUIDATION

Below is a summary of the Plan. Parties in interest are urged to review the Plan in its entirety to determine how it affects their rights as Creditors or Interest holders. This summary is qualified in its entirety by reference to the Plan.

The rationale underlying the treatment of Claims and Equity Interests under the Plan are not intended to, and shall not, waive, compromise or limit any rights, claims or causes of action in the event the Plan is not confirmed.

In general, a chapter 11 plan of liquidation (i) divides claims and equity interests into separate classes, (ii) specifies the property that each class is to receive under the plan, and (iii) contains other provisions necessary to implement the plan. Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "shareholders," are classified because creditors and shareholders may hold claims and equity interests in more than one class. Under section 1124 of the Bankruptcy Code, a class of claims is "impaired" under a plan unless the plan (i) leaves unaltered the legal, equitable, and contractual rights of each holder of a claim in such class, or (ii) to the extent defaults exist, provides for the cure of existing defaults, reinstatement of the maturity of claims in such class, compensates each holder of a claim in such class for any damages incurred as a result of reasonable reliance, and does not otherwise alter the legal equitable or contractual rights of each holder of a claim in such class.

The Plan provides for the liquidation of the Debtors' assets and the distribution to creditors in accordance with the provisions of the Bankruptcy Code through the Distribution Agent Agreement. The Plan effectuates a settlement among the Debtors, the Committee, and CH Fitness. Pursuant to Bankruptcy Rule 9019, the Sale Order, the Sale Agreement, and the Plan, in consideration of (i) CH Fitness waiving its Allowed Claim, receiving no additional distribution on account of its allowed claim (except as noted below), funding or maintaining $150,000 in cash Carve Out Funds with the Debtors to fund the Distribution Agent, paying Fee Claims, and voting in favor of the Plan, (ii) CH Fitness will receive a comprehensive release as set forth below and receive a distribution of all Cash remaining in the Estates other than what is necessary to provide the Carve Out Funds and pay Fee Claims.

The Debtors and the Committee believe that the Plan will provide all holders of Claims against the Debtors with greater recoveries than would be available if the Debtors' assets were liquidated in a proceeding under chapter 7 of the Bankruptcy Code and distributed by a chapter 7 trustee in accordance with the provisions of the Bankruptcy Code.

## A.   Grouping and Classification of Claims and Interests under the Plan

The Plan provides for the grouping and classification of Claims and Interests into separate Classes as follows:

### 1.   Administrative Expenses

Administrative Expenses are claims against the Debtors for any costs or expenses of the Chapter 11 Cases allowed under Bankruptcy Code sections 503(b) and 507(a), including all actual and necessary expenses related to preservation of the Debtors' estates, the operation of the Debtors' business, and all allowances of compensation or reimbursement of expenses of professionals retained by the Debtor to the extent permitted by the Bankruptcy Court. Under Bankruptcy Code section 1123(a)(1), Administrative Expenses are not classified.

22

KB/D294507v/F057049

All Allowed Administrative Expense Claims (other than Fee Claims), shall be paid in full within thirty (30) days after the Effective Date, or at such other date and upon such terms as may be agreed to by the holder, the Debtors and the Committee. In the event of any subsequent conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, all payments on account of Allowed Administrative Expenses shall be deemed to have been made in the ordinary course of the Debtors' business and shall not be deemed avoidable transfers under Bankruptcy Code section 547. Holders of Allowed Administrative Expenses shall not be entitled to vote on the Plan.

The Debtors estimate that on the Effective Date, allowed Administrative Expenses (other than Fee Claims), Priority Tax Claims, and Class 1 Claims are not expected to exceed $150,000 in the aggregate. Such claims and expected will be paid or reserved for, as the case may be, from Cash on hand.

Pursuant to the Final DIP Order, the Sale Agreement, and the Sale Order, CH Fitness shall pay Fee Claims full, in Cash, in an amount equal to such Allowed Claim through September 15, 2009. In addition, CH Fitness shall pay an amount up to $500,000 in Allowed Fee Claims accruing after September 15, 2009 through the Effective Date.

## 2. Allowed Priority Tax Claims

Allowed Priority Tax Claims are the Allowed Tax Claims of governmental units to the extent they are entitled to priority under Bankruptcy Code section 507(a)(8) as they are approved, allowed and ordered paid by the Bankruptcy Court. Under Bankruptcy Code section 1123(a)(1), Tax Claims are not classified. Allowed Priority Tax Claims shall be paid in full, in Cash after the payment of the Allowed Administration Expenses as soon as practicable after the Effective Date, but in no event later than thirty (30) days after the Effective Date. Holders of Priority Tax Claims shall not be entitled to vote on the Plan.

The Debtors estimate that on the Effective Date, Administrative Expenses (other than Fee Claims), Priority Tax Claims, and Class 1 Claims are not expected to exceed $150,000 in the aggregate. Such claims and expected will be paid or reserved for, as the case may be, from Cash on hand.

## 3. Allowed Priority Claims (Non-Tax) (Class 1)

Priority Claims are Claims against the Debtor entitled to priority in accordance with Bankruptcy Code section 507(a), including: (i) claims for certain accrued employee compensation; (ii) claims for contributions to employee benefit plans; and (iii) claims for certain deposits made in connection with the purchase, lease or rental of certain property or the purchase of certain services. Allowed Class 1 Claims will be paid in full, in Cash, after the payment of Allowed Administration Claims and Allowed Priority Tax Claims as soon as practicable after the Effective Date, but in no event later than the thirty (30) days after the Effective Date. In accordance with Bankruptcy Code section 1126(f), holders of Class 1 Claims shall not be entitled to vote on the Plan and shall be deemed to have accepted the Plan.

The Debtors estimate that on the Effective Date, Administrative Expenses (other than Fee Claims), Priority Tax Claims, and Class 1 Claims are not expected to exceed $150,000 in the aggregate. Such claims and expected will be paid or reserved for, as the case may be, from Cash on hand.

## 4. Class 2A CH Fitness Secured Claim

Class 2A is the Allowed Secured Claim of CH Fitness and is impaired and entitled to vote. The Allowed Amount of such claim is $21,617,696. Pursuant to Bankruptcy Rule 9019, the Sale Order, the Sale Agreement, and the Plan, (i) CH Fitness waiving its Allowed Claim, receiving no additional distribution on account of its allowed claim (except as noted below), funding or maintaining $150,000 in cash Carve Out

KB/D294507v/F057049

Funds with the Debtors to fund the Distribution Agent, paying Fee Claims, and voting in favor of the Plan, (ii) CH Fitness will receive a comprehensive release as set forth below and receive a distribution of all Cash remaining in the Estates other than what is necessary to provide the Carve Out Funds and pay Fee Claims.

### 5. Class 2B Other Secured Claims

Class 2B is comprised of Other Secured Claims against the Debtors. The Debtors do not believe that there will be any Allowed Other Secured Claims on the Effective Date. Class 2B is unimpaired under the Plan and is not entitled to vote. To the extent there were such claims, each holder of an Allowed Other Secured Claim will receive from the Distribution Agent treatment as necessary to satisfy section 1124 of the Bankruptcy Code.

### 6. Class 3 Allowed General Unsecured Claims

The Class 3 Claims are comprised of the Allowed General Unsecured Claims. Each holder of an Allowed General Unsecured Claim shall receive on each Distribution Date its Pro Rata Share of the Distributable Cash in the Claims Distribution Account, after payment of Administrative Claims, Allowed Priority Tax Claims and Allowed Priority (Non-Tax Claims) Claims. Class 3 is entitled to vote under the Plan.

### 7. Class 4 Interests

Class 4 is comprised of any Interests holders. Interest holders include all instruments evidencing an ownership interest in the Debtors, whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests, all as of the Effective Date. Class 4 also includes any equity interest of AG Super Fund received in connection with the cancellation and contribution of the Second Lien Notes, as well as all equity interests disclosed in the Parent's list of equity security holders under Bankruptcy Rule 1007.

Class 4 is impaired and shall receive no Cash or other property under the Plan. Class 4 interests shall be cancelled as of the Effective Date. Class 4 is not entitled to vote and shall be deemed to have rejected the Plan.

### B. Claims and Interests Not Impaired Under the Plan

The term "impaired" as used herein has the same meaning as it has pursuant to Bankruptcy Code section 1124.

Holders of Administrative Expenses and Priority Tax Claims are not impaired and shall be paid in full, in Cash, as soon as practicable after the Effective Date but no later than: (i) thirty (30) days after the Effective Date of the Plan; and (ii) ten (10) days after entry of a Final Order of the Court allowing such Claim.

Class 1 Priority Non-Tax Claims are not impaired and shall be paid in full, in Cash as soon as practicable after the Effective Date but no later than thirty (30) days after the Effective Date of the Plan. Class 1 claims are deemed unimpaired and shall be deemed to have accepted the Plan.

Class 2B Other Allowed Secured Claims are not impaired and shall receive treatment by the Distribution Agent in accordance with Bankruptcy Code section 1124. Class 2B Claims are deemed unimpaired and shall be deemed to have accepted the Plan.

KB/D294507v/F057049

## C.     Claims and Interests Impaired Under the Plan

Claims in Class 2A and Class3 are impaired under the Plan, and Class 2A and Class 3 are entitled to vote on the Plan because the Plan does not provide payment in full to holders of those Claims on the Effective Date of the Plan.  Class 4 is impaired under the Plan and is deemed to have rejected the Plan because holders of Interests in Class 4 will receive no distribution under the Plan.

## VII.     MEANS OF EXECUTION OF THE PLAN

As of the Effective Date, pursuant to provisions of Bankruptcy Code sections 1141(b) and (c), all property and assets of the Debtors, including the Avoidance Actions, shall be transferred to and shall vest in the Post Effective Date Debtor free and clear of all Liens, Claims and Interests, except as otherwise expressly provided in this Plan and the Confirmation Order.

On the Effective Date, the Distribution Agent shall be appointed and shall succeed to all the powers and rights that would be held by the Debtors' officers, directors and shareholders, the Post Confirmation Debtors (other than the Post Effective Date Debtor) shall be dissolved, and the Post Effective Date Debtor shall be authorized to be (and, upon conclusion of the Wind-down of its affairs, shall be) dissolved by the Distribution Agent. The Distribution Agent and her professionals shall be paid fees and expenses incurred in connection with their post-Effective Date services without further order of the Bankruptcy Court in accordance with the Plan.

Within two (2) business days following entry of the Confirmation Order, the Debtors shall transfer the Carve-Out Funds into the Wind-down Account.  The Carve-Out Funds consist of the $150,000 in Cash that CH Fitness has agreed to fund the Plan.

All property, cash and the proceeds of the Wind-down, including recoveries or settlements on account of the Avoidance Actions, shall be transferred to the Distribution Agent to be deposited into the Distribution Account for payments to be made in accordance with the Plan.  All Cash transferred to the Distribution Agent shall be invested in accordance with Bankruptcy Code section 345, or otherwise authorized by the Bankruptcy Court, and distributed by the Distribution Agent pursuant to the terms of the Plan.

## VIII.     DISTRIBUTIONS TO CLAIMANTS

The Distribution Agent shall make the Distributions on account of Allowed Claims from the Distribution Account and the Disputed Claims Reserve in accordance with the provisions of this Plan.  On or as of the Effective Date, the Distribution Account shall be established for the purpose of paying General Unsecured Claims.

The Distribution Account shall be a segregated, interest-bearing account of the Post Effective Date Debtor under the control of the Distribution Agent.  The Debtors shall deposit all Cash, including the Carve-Out Funds, and any other amounts available to fund the other payments required under the Plan, into the Distribution Account.

The balance of the funds in the Distribution Account shall be deemed to be Distributable Cash.  All Distributions to holders of Allowed General Unsecured Claims shall be made solely from the Distribution Account.  With respect to Disputed Claims which become Allowed Claims, the Distribution Agent shall make Distributions from the Disputed Claims Reserves in accordance with the Plan within ten (10) days after the entry of a Final Order determining any Disputed Claim to be an Allowed Claim.

KB/D294507v/F057049

## IX.  IMPLEMENTATION OF THE PLAN

### A.  Revesting of Assets and Appointment of Distribution Agent

As discussed above, on the Effective Date, pursuant to provisions of Bankruptcy Code sections 1141(b) and (c), all property and assets of the Debtors, including the Avoidance Actions, shall be transferred to and shall vest in the Post Effective Date Debtor free and clear of all Liens, Claims and Interests, except as otherwise expressly provided in the Plan and the Confirmation Order.  The Distribution Agent shall be appointed and shall succeed to all the powers and rights that would be held by the Debtors' officers, directors and shareholders.  The Distribution Agent shall make the Distributions on account of Allowed Claims from the Distribution Account and the Disputed Claims Reserve in accordance with the provisions of the Plan. Except as provided in the Plan and the Sale Order, the Plan preserves all of the Debtors' rights in respect of all Avoidance Actions and causes of action, transfers the Debtors' rights in respect of such Avoidance Actions and causes of action to the Post Confirmation Debtors, the Post Effective Date, and the Distribution Agent, and empowers the such parties on behalf of the Plan's beneficiaries to investigate, prosecute, collect, and/or settle the such Avoidance Actions and causes of action as deemed appropriate.

### B.  Settlement of Claims

Pursuant to Bankruptcy Rule 9019, the Sale Order, and the Sale Agreement, in consideration of (i) CH Fitness waiving its Allowed Claim, receiving no additional distribution on account of its allowed claim (except as noted below), funding or leaving $150,000 in cash Carve Out Funds with the Debtors to fund the Distribution Agent, paying Fee Claims, and voting in favor of the Plan, (ii) CH Fitness will receive a comprehensive release as set forth below and receive a distribution of all Cash remaining in the Estates other than what is necessary to provide the Carve Out Funds and pay Fee Claims.

In addition, in consideration for the classification, distribution, resolution of intercompany claims, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims or controversies resolved pursuant to the Plan.  All Plan distributions made to creditors holding Allowed Claims in any class are intended to be and shall be final.

### C.  Substantive Consolidation

. The Plan provides for substantive consolidation of the Debtors' Estates in all respects, including for purposes of voting, confirmation, and making distributions to the holders of Allowed Claims under the Plan. On the Effective Date: (i) all guarantees by any Debtor of the payment, performance or collection by another Debtor with respect to Claims against such second Debtor, and all Claims based on such guarantees, shall be deemed eliminated, cancelled, released and of no further force and effect; (ii) any obligation of any Debtor and all guarantees by another Debtor with respect to Claims of the first Debtor shall be treated as a single obligation; (iii) each Claim against any Debtor shall be deemed to be against the consolidated Debtors and shall be deemed a single Claim against, and a single obligation of, the consolidated Debtors; (iv) all Debtor Inter-Company Claims shall be deemed eliminated as a result of the substantive consolidation of the Debtors, and therefore holders thereof shall not be entitled to vote on the Plan, or receive any Distributions or other allocations of value under the Plan; and (v) the Distribution Agent shall promptly move to close each of the Debtors' cases other than that of AGT Wind Down Acquisition LLC.  As a result of the substantive consolidation of the Debtors, after the Effective Date, the Post Confirmation Debtors, which shall have been consolidated into the Post Effective Date Debtor, shall be considered a single entity for the purpose of paying fees under 28 U.S.C. § 1930 on the Distributions under the Plan and disbursements in and outside of the ordinary course of business, until the entry of a Final Order closing, dismissing, or converting the bankruptcy

KB/D294507v/F057049

case of AGT Wind Down Acquisition LLC. In addition, upon the occurrence of the Effective Date, each Post Confirmation Debtor other than the Post Effective Date Debtor shall be deemed automatically dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of each Debtor, including without any requirement of further action by the stockholders, members, or directors (or other governing body) of the Debtors; provided, however, that each Debtor may file with the office of the Secretary of State or other appropriate office for the state of its organization a certificate of cancellation or dissolution, or, alternatively, it may be merged with and into another Debtor and so file an appropriate certificate of merger.

Substantive consolidation of the estates of multiple debtors in bankruptcy effectuates a combination of the assets and liabilities of the involved debtors for certain purposes. The common effect of consolidation are (i) the pooling of assets of, and claims against, the consolidated debtors, (ii) satisfying the liabilities of the consolidated debtors from a common fund; and (iii) combining the creditors of the debtors for the purposes of voting on a chapter 11 plan.

Substantive consolidation of multiple debtors under a plan is permitted by Bankruptcy Code section 1123(a)(5)(C). *See e.g., In re Stone & Webster, Inc.,* 286 B.R. 532,546 (Bankr. D. Del. 2002)("§1123(a)(5)(C) clearly authorizes a bankruptcy court to confirm a chapter 11 plan containing a provision that substantively consolidates the estates of two or more debtors."); *Eastgroup Props v. S. Motel Ass'n , Ltd.,* 953 F.2d 245 (11th Cir. 1991).

The United States Court of Appeals for the Second Circuit, the circuit in which the Chapter 11 Cases are pending, has articulated a test for evaluating a request for substantive consolidation. *See United Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.),* 860 F.2d 515 (2d Cir. 1988). The test, as formulated by the Second Circuit, considers "(i) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit ... or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors." *Id.* at 518. If either factor is satisfied, substantive consolidation is appropriate. In respect of the second factor, entanglement of the debtors "can justify substantive consolidation only where 'the time and expense necessary even to attempt to unscramble [the commingled affairs is] so substantial as to threaten the realization of any net assets for all the creditors,' ... or where no accurate identification and allocation of assets is possible. In such circumstances, all creditors are better off with substantive consolidation." *Id.* at 519.

The Debtors and the Committee contend that proper grounds exist to substantively consolidate the Debtors based on the fact that the financial affairs of the Debtors cannot be accurately separated. Pursuant to the Plan, entry of the Confirmation Order shall constitute the approval, pursuant to Bankruptcy Code section 105(a), effective as of the Effective Date, of the substantive consolidation of the Chapter 11 Cases including for the purposes of voting, confirmation and distribution as provided in the Plan. On and after the Effective Date: (i) no distributions shall be made under the Plan on account of Inter-Company Claims among the Debtors except at the discretion of the Distribution Agent; (ii) all guaranties by any of the Debtors of the obligations of any other Debtor arising prior to the Effective Date shall be deemed eliminated so that any Claim against any Debtor and any guaranty thereof executed by any other Debtor and any joint and several liability of any of the Debtors shall be deemed to be one obligation of the deemed consolidated Debtors; and (iii) each and every Claim filed or to be filed in the Chapter 11 Cases shall be deemed filed against the consolidated Debtors and shall be deemed one Claim against and obligation of the deemed consolidated Debtors. **The Debtors and the Committee believe that no creditor will receive a recovery inferior to that which it would receive if the Debtors proposed separate plans for each Debtor.** If any party in interest challenges the proposed substantive consolidation, the Debtors and the Committee reserve the right to establish, at the Confirmation Hearing, the ability to confirm the Plan on an entity-by entity basis, or make the showing that the Debtors can be substantively consolidated under applicable law.

27

### D. Dissolution of Creditors' Committee

Upon the Effective Date, the Committee will cease to exist, except for the purposes of seeking Fee Claims and reimbursement of the reasonable expenses of the members of the Committee, and for the purposes set forth in the Plan.

### E. Transfer of Cash to Fund the Plan

The Distribution Agent will establish and maintain the Wind-down Account, Distribution Account and such other accounts as are deemed necessary to satisfy the requirements of this Plan. The Funds in the Wind-down Account shall be used to pay the Approved Expenses of the Debtors' estate in accordance with the Budget, including the fees and expenses of the Distribution Agent and its professionals.

### F. Corporate Action

In addition to the dissolution of the Post Confirmation Debtors (as discussed above), upon final administration of the bankruptcy case of the Post Effective Date Debtor, the Distribution Agent shall dissolve the Post Effective Date Debtor.

### G. Winding Up Affairs

Following the Effective Date, the Distribution Agent shall take the actions necessary to accomplish the Wind-down of the Estates and pay the expenses of the Post Effective Date Debtor in accordance with the Budget. On and after the Effective Date, the Distribution Agent may, in the name of the Debtors or Post Effective Date Debtor, take such actions without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than any restrictions expressly imposed by the Budget, the Plan, or the Confirmation Order.

## X. EXECUTORY CONTRACTS AND LEASES

Any executory contract or unexpired lease of the Debtors which has not been assumed or rejected by Final Order of the Bankruptcy Court, or which is not the subject of a pending motion to assume on the Confirmation Date, shall be deemed rejected by the Debtors on the Effective Date.

Any entity with a Claim that arises from the rejection of an executory contract or unexpired lease must file its Claim within thirty (30) days after the earlier of the date of the order rejecting the executory contract or unexpired lease and the Confirmation Date, and shall have the same rights as a Class 3 Claimant to the extent such Claim becomes an Allowed Unsecured Claim. Nothing in this Statement, the Plan, or the Confirmation Order would modify the Prepetition Bar Date Order or the Administrative Expense Bar Date Order.

## XI. DISPUTED CLAIM RESOLUTION

### A. No Distribution Pending Allowance

Notwithstanding any other provision of the Plan, no Cash or other property shall be distributed under the Plan on account of any Disputed Claim, unless and until such Claim becomes an Allowed Claim.

KB/D294507v/F057049

No Claim (other than a Fee Claim) shall be an Allowed Claim if the holder of such Claim has failed to timely file a proof of claim or proof of administrative claim, as applicable.

**B.    Resolution of Disputed Claims**

After the Effective Date, unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the Post Effective Debtor and/or the Distribution Agent shall have the exclusive right to make and file objections to Claims and shall serve a copy of each objection upon the holder of the Claim to which the objection is made as soon as practicable, but in no event later than the Objections Bar Date. From and after the Confirmation Date, all objections shall be litigated to a Final Order except to the extent the Distribution Agent elects to withdraw any claim objection or the Distribution Agent and the claimant elect to compromise, settle or otherwise resolve any claim objection, in which event they may settle, compromise or otherwise resolve any Disputed Claim without approval of the Bankruptcy Court. A Disputed Claim as to which a creditor has filed a proof of claim or proof of administrative claim, but to which no objection is filed by the Objections Bar Date, shall become an Allowed Claim.

**C.    Disputed Claims Reserve**

The Distribution Agent shall establish the Disputed Claims Reserves under the Plan which will be used to pay Distributed Claims that become Allowed Claims.

## XII.    DUTIES AND RIGHTS OF DISTRIBUTION AGENT

**A.    Nomination of Distribution Agent**

Marianne O'Toole shall be the Distribution Agent. The Distribution Agent's appointment shall be effective upon the Effective Date. In general, the Distribution Agent shall act for the Post Effective Date Debtor in a fiduciary capacity as applicable to a board of directors, subject to the provisions of the Plan and the Distribution Agent Agreement. In the event that the appointment of a successor Distribution Agent becomes necessary, a successor Distribution Agent shall be appointed by SilvermanAcampora, and the U.S. Trustee shall be notified in writing of the identity and address of the new Distribution Agent. The Distribution Agent's compensation shall be fixed in an agreement to be entered into between the Distribution Agent and the Committee. The Distribution Agent shall obtain and maintain a surety bond in an amount equal to at least 110% of the funds held by the Distribution Agent. The surety bond shall insure the Distribution Agent's performance under the Plan.

**B.    Duties and Rights of Distribution Agent**

Subject to the Budget, the Distribution Agent shall open and maintain, in accordance with the Plan, the Wind-down Account, the Distribution Account and the Disputed Claims Reserves, into which all Cash shall be deposited in accordance with this Plan. Pursuant to the Plan, the Distribution Agent shall distribute the consideration payable to the holders of Allowed Claims on the dates set forth in the Plan and, to the extent that no specific date has been set forth in the Plan, Distributions shall be made at such times as the Distribution Agent deems appropriate in her sole discretion.

The duties and powers of the Distribution Agent will include the following:

(i)    To maintain accounts, make Distributions and take other actions consistent with the Plan, including the establishment, adjustment and maintenance of appropriate reserves, in the name of the Post Effective Date Debtor or the Distribution Agent, even in the event of the

KB/D294507v/F057049

dissolution of the Debtors.

(ii)    Subject to the applicable provisions of the Plan, to collect and liquidate all assets of the Debtors' estates pursuant to the Plan and to Wind-down the affairs of the Debtors.

(iii)   To pay from the Wind-down Account, the Distribution Agent's compensation and the fees and expenses incurred by the Distribution Agent on or after the Effective Date for her professionals, disbursements and expenses incident to the Wind-down of the Debtors' affairs and implementation of the Plan without prior Bankruptcy Court approval.

(iv)    To pay the fees and charges assessed against the Debtors' estates under 28 U.S.C. § 1930 and to file periodic post-confirmation reports.

(v)     To pay the costs of holding and liquidating any non-Cash property, including but not limited to taxes, insurance proceeds, rent, wages and professionals' fees from the Wind-down Account, and shall pay Allowed Administrative Expense Claims, Allowed Priority Claims and Allowed Priority Tax Claims from available Cash.

(vi)    To take all other actions consistent with the provisions of the Plan which the Distribution Agent deems reasonably necessary with respect to administering the Plan.

(vii)   To make all Distributions to holders of Allowed Claims provided for or contemplated by the Plan.

(viii)  To invest Cash in accordance with Bankruptcy Code section 345 or as otherwise permitted by a Final Order of the Court.

(ix)    To enter into any agreement or execute any document required by or consistent with the Plan.

(x)     To abandon in any commercially reasonable manner, including abandonment or donation to a charitable organization of her choice, any asset that is of no material benefit to the estates.

(xi)    To purchase and carry all insurance policies and pay all insurance premiums and costs necessary or advisable in her sole discretion and to cancel/reduce all insurance and recover any cash surrender value or pre-paid premiums on any insurance policies.

(xii)   To implement and/or enforce all provisions of the Plan.

(xiii)  To administer the Wind-down of the Debtors including but not limited to, causing the dissolution of the Debtors and closing of the Chapter 11 Cases.

(xiv)   To cause to be prepared and filed all appropriate federal, state and local tax returns for the Debtors.

(xv)    To object to allowance of Claims pursuant to the terms of the Plan.

(xvi)   To investigate, analyze, prosecute and otherwise administer the Avoidance Actions.

(xvii)  To compromise and settle Claims, and Avoidance Actions with approval of the

KB/D294507v/F057049

Bankruptcy Court or as otherwise set forth in the Confirmation Order.

**(xviii)**  To retain and employ such professionals, agents, consultants and advisors as necessary to perform her duties under the Plan.

**(xix)**  To exercise such other powers as may be vested in the Plan, the Confirmation Order or further order of the Bankruptcy Court.

The Distribution Agent shall file with the Court on a quarterly basis, a status report of the Wind-Down and the status of the Avoidance Actions.

### C.  No Agency Relationship, Indemnification and Insurance

The Distribution Agent shall not be deemed to be the agent for any of Claim holders in connection with the funds held or the Cash Distributed pursuant to the Plan. The Distribution Agent shall not be liable for any mistake of fact or law or error of judgment or any act or omission of any kind unless it constitutes gross negligence or willful misconduct or breach of fiduciary duty on the part of the Distribution Agent. The Distribution Agent shall be indemnified and held harmless, including the cost of defending such claims and the attorneys' fees in seeking indemnification, by the Post Effective Date Debtor against any and all claims arising out of her duties under this Plan, except to the extent her actions constitute gross negligence or willful misconduct or breach of fiduciary duty. The Distribution Agent may obtain, at the expense of the estate, commercially reasonable liability or other appropriate insurance with respect to the estate's indemnification of the Distribution Agent. The Distribution Agent may conclusively rely, and shall be fully protected personally in acting upon the advice of her professionals and any statement, instrument, opinion, report, notice, request, consent, order, or other instrument or document which she believes to be genuine. The Distribution Agent may rely upon information previously generated by the Debtors and such information provided to them by former employees and professionals of the Debtors.

## XIII.  DISTRIBUTION TO THE CLAIMANTS

### A.  Delivery of Distributions

#### 1.  Undeliverable Distributions.

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the holders of Allowed Claims shall be made by the Distribution Agent at (a) the address of each holder as set forth in the Schedules, unless superseded by the address set forth on a proof of claim filed by a claimant or (b) the last known address of the claimant if no proof of claim is filed or if the Debtors of the Distribution Agent have been notified in writing of a change of address. If any Distribution is returned as undeliverable, the Distribution Agent may, in her discretion, make such efforts to determine the current address of the holder of the Claim with respect to which the Distribution was made as the Distribution Agent deems appropriate, but no Distribution to any holder shall be made unless and until the Distribution Agent has determined the then-current address of the holder of such Allowed Claims, at which time the Distribution to such holder shall be made to the holder without interest. Amounts in respect of any undeliverable Distributions made by the Distribution Agent shall be returned to, and held in trust by, the Distribution Agent, until the Distributions are claimed or are deemed to be Unclaimed Property upon the expiration of three (3) months from the return of the undeliverable Distribution. The Distribution Agent shall have the discretion to determine how to make Distributions in the most efficient and cost-effective manner possible; *provided, however*, that the Distribution Agent's discretion may not be exercised in a manner inconsistent with any express requirements of the Plan or the Distribution Agent Agreement.

KB/D294507v/F057049

**B.      Record Date for Distributions**

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the date of the entry of the Confirmation Order will be treated as the holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the date of the entry of the Confirmation Order. The Post-Confirmation Debtors, the Post Effective Date Debtor, and the Distribution Agent shall have no obligation to recognize any transfer of any Claim occurring after the date of the entry of the Confirmation Order. In making any Distribution with respect to any Claim, the Post –Confirmation Debtors, the Post Effective Date Debtor, and the Distribution Agent shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Person that is listed on the proof of claim filed with respect thereto or on the Schedules as the holder thereof as of the close of business on the date of the entry of the Confirmation Order and upon such other evidence or record of transfer or assignment that are known to the Post-Confirmation Debtors or the Post Effective Date Debtor as of the date of the entry of the Confirmation Order.

**C.      Distributions to Holders of Claims—Generally**

**1.      Distributions on Account of Allowed Claims Only**

Except as otherwise provided in the Plan, Disputed Claims and Interests shall not be entitled to any Distribution until such Disputed Claim or Interest becomes an Allowed Claim or Interest.

**2.      Method of Cash Distributions**

Any Cash payment to be made pursuant to the Plan will be in U.S. dollars and may be made by draft, check, wire transfer, or as otherwise required or provided in any relevant agreement or applicable law.

**3.      Distributions on Non-Business Days**

Any payment or Distribution due on a day other than a Business Day may be made, without interest, on the next Business Day.

**4.      No Distribution in Excess of Allowed Amount of Claim**

Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall receive in respect of such Claim any Distribution (of a value set forth in the Plan) in excess of the Allowed amount of such Claim.

**5.      Interest on Claims.**

Except as specifically provided for in the Plan or the Confirmation Order, interest shall not accrue on Claims and no holder of a Claim shall be entitled to interest accruing on or after the Commencement Date on any Claim. Interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Commencement Date to the date a final Distribution is made thereon if and after that Disputed Claim becomes an Allowed Claim. Except as expressly provided herein or in a Final Order of the Bankruptcy Court, no prepetition Claim shall be Allowed to the extent that it is for postpetition interest or other similar charges.

**6.      Disputed Payments**

KB/D294507v/F057049

If any dispute arises as to the identity of a holder of an Allowed Claim who is to receive any Distribution, the Distribution Agent may, in lieu of making such Distribution to such Person, make such Distribution into an escrow account or hold such Distribution in reserve until the disposition thereof shall be determined by Final Order of the Bankruptcy Court or by written agreement among the interested parties to such dispute.

### 7. Withholding Taxes

Any federal or state withholding taxes or other amounts required to be withheld under any applicable law shall be deducted and withheld from any Distributions made under the Plan. All Persons holding Claims shall be required to provide any information necessary to effect the withholding of taxes relating to Distributions made under the Plan. The Distribution Agent may withhold the entire Distribution due to any holder of an Allowed Claim until such time as such holder provides the necessary information to comply with any withholding requirements of any governmental unit. If the holder of an Allowed Claim fails to provide the information necessary to comply with any withholding requirements of any governmental unit within six (6) months from the date of first notification to the holder of the need for such information or for the Cash necessary to comply with any applicable withholding requirements, then such holder's Distribution shall be treated as Unclaimed Property herein or the amount required to be withheld may be so withheld and turned over to the applicable authority.

### 8. Time Bar to Cash Payments by Check

Checks issued by the Post Effective Date Debtor or the Distribution Agent on account of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance of the check. Requests for the reissuance of any check that becomes null and void pursuant to this Section may be made directly to the Distribution Agent by the holder of the Allowed Claim to whom the check was originally issued. Any Claim in respect of such voided check must be made in writing on or before the later of the first anniversary of the Effective Date or the six (6) month anniversary of the date on which the Distribution was made. After that date, all Claims in respect of void checks shall be discharged and forever barred and the proceeds of those checks shall be deemed Unclaimed Property in accordance with Bankruptcy Code section 347(b) and be distributed as provided in the Plan.

### 9. No Payments of Fractional Dollars

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional dollars shall be made pursuant to the Plan. Whenever any payment of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding down of such fraction to the nearest whole dollar.

### 10. Setoff and Recoupment

The Post Effective Date Debtor or the Distribution Agent may, but shall not be required to, setoff against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect of any claim, any claims or defenses that any of the Debtors, the Estates, or the Distribution Agent may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors, the Estates, the Post-Confirmation Debtors, the Post Effective Date Debtor or the Distribution Agent of any right of setoff, recoupment claims, rights or Avoidance Actions that the Debtors, the Estates, the Distribution Agent or the Distribution Agent or any of their successors may possess against the holder of a Claim.

### D. Unclaimed Property

KB/D294507v/F057049

1.    **Escrow of Unclaimed Property**

Subject to Article XII hereof, the Post Effective Date Debtor shall hold all Unclaimed Property (and all interest, dividends, and other distributions thereon), for the benefit of the holders of Claims entitled thereto under the terms of the Plan.

2.    **Distribution of Unclaimed Property**

At the end of one year following the relevant Distribution Date of Cash or other property distributed under the Plan, the holders of Allowed Claims entitled to Unclaimed Property held pursuant to this Section shall be deemed to have forfeited their rights to such property, whereupon all right, title and interest in and to such property shall immediately and irrevocably revest in the Post Effective Date Debtor, for deposit in (A) the Distribution Account, in the case of Unclaimed Property related to Allowed General Unsecured Claims, or (B) the Wind-down Account, in the case of all other Unclaimed Property.

At the end of 120 days following a Distribution Date, all unclaimed Distributions together with the interest thereon, shall be deposited into the Wind-down Account or the Distribution Account for distribution in accordance with the Plan.

## XIV.    **RETENTION OF JURISDICTION**

The Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases for the purposes set forth in Bankruptcy Code section 1127(b), and, including but not limited to: the Distribution Agent's prosecution of Avoidance Actions or any other litigation; to hear and determine all Avoidance Actions and any disputes concerning the classification, the allowance or disallowance of any Claim; the resolution of any disputes concerning any reserve established for Disputed Claims, the determination of all disputed issues relating to a security or ownership interest in any property of the Debtors' Estates or in any proceeds thereof; to hear and determine all Claims arising out of any agreement entered into by the Debtors after the Commencement Date; to recover all assets and property of the Debtors wherever located; to alter, modify and amend the Plan; to hear and determine such other matters as may be provided for in the Confirmation Order; to hear and determine all applications for compensation of professionals for services rendered and expenses incurred through the Confirmation Date; to hear and determine any and all pending applications, adversary proceedings, contested matters and litigated matters; to enter orders which are necessary or appropriate to carry out the provisions of the Plan, including orders interpreting the provisions of the Plan; to enter a Final Order or decree concluding the Debtors' Chapter 11 Cases; and to determine such other matters as may be provided for in the Confirmation Order or, as may be authorized under the provisions of the Bankruptcy Code.

## XV.    **EFFECT OF CONFIRMATION**

### A.    **Conditions Precedent to the Effective Date**

The following are the conditions precedent to the Effective Date of the Plan:

1.    the Bankruptcy Court shall have entered the Confirmation Order confirming the Plan, in form and substance reasonably satisfactory to the Debtors, the Committee, and CH Fitness;

KB/D294507v/F057049

2. the Distribution Agent shall have received the Carve-Out Funds and Cash to pay the Fee Claims in accordance with the Plan;

3. the Bankruptcy Court shall have approved the Distribution Agreement; and

4. the Debtors' estates shall have sufficient Cash to pay or reserve for Allowed Administrative Expenses, Allowed Priority (Non-Tax) Claims and Allowed Priority Tax Claims.

## B. Discharge, Injunctions and Releases

1. *Pursuant to Bankruptcy Code section 1141(d)(3), Confirmation will not discharge Claims against the Debtors; provided, however, that no Holder of a Claim against any Debtor may, on account of such Claim, seek or receive any payment or other Distribution from, or seek recourse against, any Debtor, Post Confirmation Debtors, or the Post Effective Date Debtor or each of their respective successors or their respective property, except as expressly provided in the Plan. Accordingly, except as otherwise provided in the Plan, the Confirmation Order shall provide, among other things, that from and after the Confirmation Date, all Persons who have held, hold, or may hold Claims against or Interests in the Debtors are (i) permanently enjoined from taking the following actions against the Estate(s) of the Debtors or the Released Parties, or any of their property on account of such Claims or Interests and (ii) preliminarily enjoined from taking any of the following actions against any of the Released Parties, or their property on account of such Claims or Interest: (A) commencing or continuing, in any manner or in any place, any action or other proceeding; (B) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (C) creating, perfecting, or enforcing any lien or encumbrance; and (D) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained in the Plan shall preclude such Persons from exercising their rights pursuant to and consistent with the terms of the Plan. By accepting Distributions pursuant to the Plan, each Holder of an Allowed Claim or an Allowed Interest shall be deemed to have specifically consent to the injunctions set forth in this Section.*

2. *Pursuant to Bankruptcy Code section 1123(b), and except as otherwise specifically provided in the Plan, upon the Effective Date, each of the Debtors shall release unconditionally, and hereby is deemed to forever release unconditionally the Released Parties which include (i) the Committee, solely in their respective capacities as members or representatives of the Committee, each member of the Committee: (ii) the Distribution Agent; (iii) CH Fitness; (iv) AG Parties; (iv) Angelo Gordon & Co., L.P.; (iv) each of their respective affiliates, agents, directors, officers, advisors, accountants, investment bankers, consultants, attorneys and other representatives of any of the foregoing or of the Debtors (but in respect of the Debtors' officers and directors, only those officers or directors as of the Commencement Date), solely in their respective capacities as such, from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (other than the right to enforce the performance of their respective obligations, if any, to the Debtors or the Post Confirmation Debtors or the Post Effective Date Debtor under the Plan, and the contracts, instruments, releases and other agreements delivered under the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the Plan or the Disclosure Statement, other than Claims or liabilities arising out of or relating to any act or omission that constitutes a failure to perform the duty to act in good faith and where such failure to perform constitutes willful misconduct, gross negligence or fraud.*

3. *Persons and Entities Not Released by the Debtors.* The Released Parties shall not include the persons and entities listed on the Release Exclusion Schedule. In addition, the Debtors reserve any and all claims they may have in accordance with any reservation of rights in any order of the Court in the

KB/D294507v/F057049

Debtors' Chapter 11 Cases, are not releasing any person or entity and their respective affiliates, assigns, agents, directors, officers, advisors, accountants, investment bankers, consultants, attorneys and other representatives of any of the foregoing or of the Debtors from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the Plan or the Statement.

        **4.** *The Confirmation Order will permanently enjoin the commencement or prosecution by any entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released pursuant to the Plan.*

        **5.** Except as otherwise specifically provided in the Plan, to the maximum extent permitted by the Bankruptcy Code and applicable law, none of Released Parties, nor any of their respective members, officers, directors, shareholders, employees, advisors, attorneys or agents acting in such capacity on or after the Commencement Date, shall have or incur any liability to, or be subject to any right of action by, any Holder of a Claim or an Interest, or (with respect to such Claims or Interests) any of their respective agents, affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Debtors' Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct or gross negligence (the "Precluded Claims"), and in all respects shall be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under the Plan.

        **6.** *Except as otherwise specifically provided in the Plan, on the Effective Date, each Person (excluding any of the Debtors) that votes to accept the Plan shall release unconditionally, and hereby is deemed to forever release unconditionally the Released Parties and each of their respective agents, advisors, accountants, investment bankers, consultants, attorneys and other representatives of any of the foregoing or of the Debtors, solely in their respective capacities as such, from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (other than the right to enforce the performance of their respective obligations, if any, to the Debtors or the Post Confirmation Debtors or the Post Effective Date Debtor under the Plan and the contracts, instruments, releases and other agreements delivered under the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the Plan or the Disclosure Statement other than Claims or liabilities arising out of or relating to any act or omission that constitutes a failure to perform the duty to act in good faith and where such failure to perform constitutes a willful misconduct, gross negligence, or fraud; provided, that Section 13.07 of the Plan shall not release any Person from any Claim or cause of action existing as of the Effective Date, based on (x) the environmental laws of the United States or any domestic state, city or municipality or (y) any criminal laws of the United States or any domestic state, city or municipality.*

        **7.** *Except as otherwise provided in the Plan, the Confirmation Order shall provide, among other things, that from and after the Confirmation Date all Persons who have held, hold or may hold Claims against or Interests in the Debtors are (i) permanently enjoined from taking any of the following actions against the Released Parties, or any of their property on account of any such Claims, Interests or Precluded Claims and (ii) permanently enjoined from taking any of the following actions against any of the Released Parties or their property on account of such Claims, Interests or Precluded Claims: (A) commencing or continuing, in any manner or in any place, any action or other proceeding; (B) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (C) creating, perfecting or enforcing any lien or encumbrance; (D) asserting a setoff, right of subrogation or recoupment*

KB/D294507v/F057049

*of any kind against any debt, liability or obligation due to the Debtors; and (E) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan. By accepting Distributions pursuant to the Plan, each Holder of an Allowed Claim receiving any Distribution pursuant to the Plan will be deemed to have specifically consented to the injunctions set forth in Article XIII of the Plan.*

        **8.**      All injunctions or stays provided for in the Chapter 11 Cases under Bankruptcy Code section 105 or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until all property of the Estates of the Post Effective Date Debtor has been distributed, the Post Effective Date Debtors has been dissolved, the Distribution Agreement has terminated and the Bankruptcy Court has entered an order closing the Chapter 11 Cases; *provided, however,* that any injunction that by its terms is permanent or otherwise is intended to survive the Effective Date and Distributions hereunder (whether by law or pursuant to order of the Court) shall be continued without modification, notwithstanding anything to the contrary in the Plan.

        **9.**      Nothing in the Plan shall (i) be construed to exculpate any Person or entity from fraud, gross negligence, willful misconduct, malpractice, criminal conduct, ultra vires acts, misuse of confidential information which causes damages, (ii) limit the liability of the professionals of the Debtors, the Committee, the Post Confirmation Debtors, or the Post Effective Date Debtor to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility.

        **10.**     Nothing in the Plan shall effect a release in favor of any Person with respect to any debt owed to the United States Government, any state, city or municipality for any liability of such Person arising under (i) the Internal Revenue Code, or any state, city or municipal tax code, (ii) the environmental laws of the United States, any state, city or municipality or (iii) any criminal laws of the United States, any state, city or municipality.

        **11.**     The entry of the Confirmation Order shall constitute the determination by the Bankruptcy Court that the Released Parties have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code, pursuant to, among others, Bankruptcy Code sections 1125(e) and 1129(a)(3), with respect to acts taken in connection with the Chapter 11 Cases, including the Plan and Disclosure Statement.

## XVI.   <u>MISCELLANEOUS PROVISIONS</u>

**A.**    **Notices.**

    Notices shall be deemed given when received. All notices, requests or demands described in or required to be made in accordance with the Plan shall be in writing and shall be delivered by overnight mail and email transmission as follows:

        **1.**     If to the Debtors:

             Dechert LLP
             1095 Avenue of the Americas
             New York, New York 10036
             Attention: Shmuel Vasser
             Shmuel.Vasser@dechert.com

KB/D294507v/F057049

2.       If to the Committee:

> SilvermanAcampora LLP
> 100 Jericho Quadrangle - Suite 300
> Jericho, New York 11753
> Attention: Ronald J. Friedman
> rfriedman@silvermanacampora.com

3.       If to AG Super Fund or CH Fitness:

> Akin Gump Strauss Hauer Feld LLP
> One Bryant Park
> New York, New York 10036
> Attention: Brian Geldert
> bgeldert@akingump.com

4.       If to the Distribution Agent:

> Marianne O'Toole
> 20 Valley Road, Suite One
> Katonah, New York 10536
> motoole@otoolegroup.com

Notices given to a holder of a Claim or Interest shall be given using the address set forth in the proof of Claim or proof of Interest filed with and allowed by the Court, or, if none, at the address set forth in the Schedules prepared and filed by the Debtors with the Bankruptcy Court pursuant to Bankruptcy Rule 1007(b).

### B.     Change of Address

Any of the parties identified in section 15.02 of the Plan may change the address at which it is to receive notices under the Plan by sending written notice pursuant to the provisions of this Section to the Committee and the Distribution Agent.

### C.     Modification of the Plan

The Debtors and the Committee reserve the right, in accordance with the Bankruptcy Code to amend or modify the Plan prior to the Confirmation Date or as soon as practicable thereafter. After the Confirmation Date, the Distribution Agent may, upon order of the Court and after giving notice to the Committee and the U.S. Trustee, in accordance with Bankruptcy Code section 1127(b), remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purposes and intent of the Plan.

### D.     Reservation of Rights

Nothing contained herein shall prohibit the Debtors, the Committee, the Distribution Agent, the Post Confirmation Debtors, or the Post Effective Date Debtor, from prosecuting or defending any of the rights or claims held by the Debtors' Estates, including without limitation, rights and claims in respect of the Avoidance Actions.

### E.     Payment Dates

KB/D294507v/F057049

If payments or Distributions are due to be made under the Plan on a day other than a Business Day, such payment or Distribution shall instead be made, without interest, on the first Business Day immediately following the due date. Payment shall be considered timely upon the mailing of the check representing the payment, not the day it is received.

**F.      Severability**

Should any provision in the Plan be determined to be unenforceable, that determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the Plan.

**G.      Successors and Assigns**

The rights and obligations of any entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of that entity.

**H.      Governing Law**

Except to the extent that the Bankruptcy Code is applicable, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York.

**I.      Withholding Taxes**

The Distribution Agent and the Post Effective Date Debtor shall be entitled to deduct any federal or state withholding taxes from any Distribution made in respect of the Plan.

## XVII.  ALTERNATIVES TO THE PLAN

The Plan reflects substantial arms length negotiations among the Debtors, the Committee, and CH Fitness. The Debtors and the Committee have determined that the Plan is the most practical means of providing maximum recoveries to the creditors. An alternative to the Plan which has been considered and evaluated by the Debtors and the Committee during the course of the Chapter 11 Cases is a liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code. After thorough consideration of this alternative, the Debtors have concluded that the Plan, in comparison, provides a greater recovery to creditors on a more expeditious timetable, and in a manner that minimizes inherent risks in any other course of action available to the Debtors. Importantly, under a chapter 7 liquidation, CH Fitness would not have made funds available to fund the Carve-Out Funds and creditors would share any proceeds from Avoidance Actions ratably with CH Fitness on account of the CH Fitness Deficiency Claim.

**A.      Liquidation Under Chapter 7 of the Bankruptcy Code**

If the Plan of the Debtors cannot be confirmed under section 1129(a) of the Bankruptcy Code, these Chapter 11 Cases will be converted to a case under chapter 7 of the Bankruptcy Code, in which case, a trustee would be elected or appointed to liquidate any remaining assets of the Debtors for distribution to creditors pursuant to chapter 7 of the Bankruptcy Code. If a trustee is appointed and the remaining assets of the Debtors are liquidated under chapter 7 of the Bankruptcy Code, the Debtors and the Committee believe that all creditors holding Allowed Administrative Expense Claims, Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims and General Unsecured Claims may receive distributions of a lesser value, or no distributions at all, on account of their Allowed Claims and likely would have to wait a longer period of time to receive such distributions than they would under the Plan. In fact, in the event of a liquidation under

KB/D294507v1/F057049

chapter 7 of the Bankruptcy Code, the Debtors and the Committee believe that all of the proceeds of such liquidation would be, at a minimum, shared ratably with CH Fitness in connection with distributions to holders of General Unsecured Claims. In addition, a chapter 7 trustee, who would lack the Debtors' knowledge of its affairs, would be required to invest substantial time and resources to investigate the facts underlying the multitude of Claims filed against the Estates.

## B.    Alternative Chapter 11 Plan

If the Plan is not confirmed, a party in interest could attempt to formulate an alternative chapter 11 plan that might provide for the liquidation of the Debtors' assets other than as provided in the Plan. The Debtors believe such a possibility to be highly unlikely, and they further believe that any alternative chapter 11 plan would not include the funding by CH Fitness for the Wind-Down. Any attempt to formulate an alternative chapter 11 plan would further delay the process for the creditors, due to the incurrence of additional administrative expenses during such period of delay, may provide for smaller distributions to holders of Allowed Claims than are currently provided for in the Plan. Accordingly, the Debtors believe that the Plan will enable all creditors entitled to distributions to realize the greatest possible recovery on its respective Claims with the least possible delay.

## C.    Certain Risk Factors

In the event that the Plan is not confirmed or the Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code, the Debtors and the Committee believe that such action or inaction, as the case may be, will cause the Debtors to incur substantial expenses and otherwise serve only to negatively affect creditors' potential recoveries on its Claims. In addition, there can be no assurances that holders of General Unsecured Claims will not object to the treatment afforded to such holders pursuant to the Plan. If the Debtors are not able to resolve objections to the Plan, the Debtors may not be able to confirm the Plan.

Importantly, the Debtors are in the process of resolving disputed administrative expense and priority claims asserted against their estates. To the extent that such claims exceed $150,000 (i.e., the Carve Out Funds for the Wind-Down), the Effective Date may be delayed significantly or not occur at all.

## XVIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS OF CLAIMS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY THE DEBTORS OR HOLDERS OF CLAIMS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS OF CLAIMS UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS BEING USED IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

The following discussion summarizes certain anticipated U.S. federal income tax consequences of the transactions proposed by the Plan that are applicable to the Debtors and holders of Claims who are entitled to vote to confirm or reject the Plan. This summary is provided for informational purposes only and is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), treasury regulations promulgated thereunder, judicial authorities, and current administrative rulings and practice, all as in effect as of the date hereof and all of which are subject to change or differing interpretations, possibly with retroactive effect.

KB/D294507v/F057049

This summary does not address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to a particular holder of a Claim in light of its particular facts and circumstances or to certain types of holders of Claims subject to special treatment under the Tax Code (for example, non-U.S. taxpayers, financial institutions, broker-dealers, life insurance companies, cooperatives, tax-exempt organizations, persons whose functional currency is not the U.S. dollar, and holders' claims that are, or hold Claims through, a partnership or other pass-through entity). This summary does not discuss any aspects of state, local or non-U.S. taxation or U.S. federal taxation other than income taxation. Furthermore, this summary does not address the U.S. federal income tax consequences applicable to "Non-U.S. Holders" of Claims (as defined below) or to holders that are not entitled to vote to confirm or reject the Plan.

A substantial amount of time may elapse between the date of the Disclosure Statement and the receipt of a final distribution under the Plan. Events subsequent to the date of the Disclosure Statement, such as additional tax legislation, court decisions, or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder. No ruling has been or will be sought from the Internal Revenue Service ("IRS") with respect to any of the tax aspects of the Plan and no opinion of counsel has been or will be obtained by the Debtors with respect thereto. No representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan to the Debtors or any holder of a Claim. This discussion is not binding upon the IRS or other taxing authorities. No assurance can be given that the IRS or another authority would not assert, or that a court would not sustain, a different position from any discussed herein. Accordingly, each holder of a Claim is strongly urged to consult its tax advisor regarding the federal, state, local, and non-U.S. tax consequences of the Plan to such holder.

THE DISCUSSION SET FORTH BELOW IS INCLUDED FOR GENERAL INFORMATION ONLY. THE DEBTORS, THE COMMITTEE, THEIR COUNSEL, AND FINANCIAL ADVISORS ARE NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN, WITH RESPECT TO THE DEBTORS, HOLDERS OF CLAIMS OR HOLDERS OF EQUITY INTERESTS, NOR ARE THEY RENDERING ANY FORM OF LEGAL OPINION OR TAX ADVICE ON SUCH TAX CONSEQUENCES. THE TAX LAWS APPLICABLE TO CORPORATIONS OR LIMITED LIABILITY COMPANIES IN BANKRUPTCY ARE EXTREMELY COMPLEX, AND THE FOLLOWING SUMMARY IS NOT EXHAUSTIVE. HOLDERS OF CLAIMS AND HOLDERS OF EQUITY INTERESTS ARE STRONGLY URGED TO CONSULT THEIR TAX ADVISORS REGARDING TAX CONSEQUENCES OF THE PLAN, INCLUDING FEDERAL, FOREIGN, STATE, AND LOCAL TAX CONSEQUENCES.

## A. Certain U.S. Federal Income Tax Consequences to the Debtors

AGT Acquisition Wind Down LLC (f/k/a AGT Crunch Acquisition LLC) ("AGT Crunch") has previously elected to be taxed as a corporation for U.S. federal income tax purposes. All of the other Debtors are single member LLC's that are owned directly or indirectly by AGT Crunch and are treated as entities disregarded from their owner for U.S. federal income tax purposes. As a consequence, for U.S. federal income tax purposes all of the Debtors are treated as a single corporation.

### 1. Treatment of Sale of Debtors' Assets as a Tax-Free Reorganization.

On September 15, 2009, the Debtors sold substantially all of their assets to CH Fitness pursuant to the Sale Agreement and the Sale Order. See "V. The Debtors' Chapter 11 Cases – E. The 'Main Sale' of Substantially All of the Debtors' Assets," above. Pursuant to the Sale Agreement, such sale is intended to qualify for U.S. federal income tax purposes as a tax-free "G" reorganization for the Debtors.

If the sale constitutes a "G" reorganization, the transferor recognizes no gain or loss for U.S federal income tax purposes upon the transfer of its assets to the acquirer in exchange for stock of the acquirer or on

41

the distribution of the stock acquired to its creditors. In addition, the transferor's tax attributes, such as any NOL carryforwards as of the end of the date of transfer, will transfer to the acquirer. If the transferor distributes any property not transferred to the acquirer to its creditors, the transferor will recognize gain or loss with respect to the property so distributed. Accordingly, assuming that the sale of the Debtors' assets to CH Fitness qualified as a "G" reorganization: (i) the Debtors recognized no gain or loss upon the transfer of their assets to CH Fitness, and (ii) all of the Debtors' tax attributes through September 15, 2009 transferred to CH Fitness as of the end of that day.

Were the sale of the Debtors' assets to CH Fitness not to qualify as a "G" reorganization, the Debtors would have recognized gain or loss with respect to their assets transferred, and any NOL carryforwards and other tax attributes would have been retained by the Debtors. The following discussion assumes that the sale of the Debtors' assets to CH Fitness qualified as a "G" reorganization.

## 2. Cancellation of Indebtedness

Cancellation of indebtedness ("COD") income is the amount by which indebtedness discharged (reduced by any unamortized original issue discount) exceeds the amount of cash and the fair market value of any consideration given in exchange therefor. Certain statutory or judicial exceptions can apply to exclude or limit the amount of COD realized upon the discharge of indebtedness (such as where the payment of the cancelled debt would have given rise to a tax deduction not previously claimed). Although any COD realized by the Debtors will be excluded from their taxable income for U.S. federal income tax purposes under a special bankruptcy exception contained in the Tax Code, the Tax Code provides that a debtor in a bankruptcy case generally must reduce certain of its tax attributes, such as NOL carryforwards and current year NOLs, capital loss carryforwards, tax credits, and the tax basis in assets, by the amount of the COD income excluded from taxable income. If the amount of COD income exceeds the tax attributes available for reduction, there are no U.S federal income tax consequences associated with such COD income. However, because any reduction in tax attributes in respect of excluded COD income does not occur until after the computation of income tax for the taxable year in which the COD is incurred, the resulting COD will not impair the Debtors' ability to use their tax attributes (to the extent otherwise available) to reduce their tax liability, if any, otherwise resulting from the implementation of the Plan.

In connection with the implementation of the Plan, it is expected that the Debtors will incur a significant amount of COD income for U.S. federal income tax purposes.

## 3. Limitations on NOL Carryforwards and Other Tax Attributes

Under section 382 of the Tax Code, if a corporation undergoes an "ownership change," the amount of its pre-change losses (including certain losses or deductions that are "built-in," i.e., economically accrued but unrecognized as of the date of the ownership change) that may be utilized to offset future taxable income generally are subject to an annual limitation. In addition, under certain circumstances, a special exception can apply where the corporation undergoes an ownership change pursuant to a confirmed chapter 11 plan.

Pursuant to the Plan, all existing Interests will be canceled on the Effective Date, and the Distribution Agent shall be appointed and shall succeed to all the powers and rights that would be held by the Debtors' officers, directors and shareholders and the Post-Confirmation Debtors shall be authorized to be (and, upon conclusion of the Wind-down of their affairs, shall be) dissolved by the Distribution Agent. The Debtors currently intend to take the position that no "ownership change" of the Debtors will occur as a result of the implementation of the Plan. There is no assurance, however, that the IRS would not take a contrary position. In the event that the Debtors were considered to undergo an ownership change as of the Effective Date, it is possible that all or a portion of the Debtors' NOLs as of such date (which would only include any losses incurred since September 15, 2009, as discussed in paragraph 1 above) would be effectively eliminated.

KB/D294507v/F057049

### 4. Priority of Tax Claims

Federal income taxes, like many other taxes, are priority Claims. Accordingly, such Claims must be satisfied before most other Claims may be paid. If the Debtors do not have sufficient NOLs and NOL carryovers available to offset their taxable income (including income, if any, from the transactions pursuant to the Plan), any such income generally will be subject to income taxation, materially reducing any recovery to holders of more junior Claims. In addition, a corporation may incur alternative minimum tax ("AMT") liability even where NOL carryovers and other tax attributes are sufficient to eliminate its taxable income as computed under the regular corporate income tax. In general, an AMT is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might able to offset all of its taxable income for regular tax purposes by available NOL carry-forwards, only 90% of a corporation's taxable income from AMT purposes may be offset by available NOL carry-forwards (as computed for AMT purposes). The Debtors do not expect to have any NOLs or NOL carryovers as of the Effective Date. The Debtors do not expect to have net taxable income for the tax year in which the Effective Date occurs. The Debtors do not expect to have AMT liability for the tax year in which the Effective Date occurs.

### B. Certain U.S. Federal Income Tax Consequences to U.S. Holders of Claims

For purposes of the following discussion, a "U.S. Holder" is a holder of a Claim that is (1) a citizen or individual resident of the U.S., (2) a corporation created or organized in the U.S or under the laws of the U.S. or any political subdivision thereof, (3) an estate the income of which is subject to federal income taxation regardless of its source, or (4) a trust if (i) a court within the U.S. is able to exercise primary supervision over the administration of the trust and one or more U.S. fiduciaries have the authority to control all substantial decisions of the trust or (ii) the trust was in existence on August 20, 1996 and properly elected to be treated as a U.S. person. A "Non U.S. Holder" is a holder of a Claim (other than an entity treated as a partnership or other flow-through entity and its beneficial owners) that is not a U.S. Holder.

The U.S. federal income tax treatment of a partner or other beneficial owner in a partnership or other flow-through entity generally will depend on the status of the partner and the activities of such partnership. Partners and partnerships (including beneficial owners of pass-through entities and such entities themselves) should consult their own tax advisors as to the particular U.S. federal income tax consequences applicable to them.

The U.S. federal income tax consequences of the Plan to U.S. Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for or by the Plan generally will depend upon, among other things, (i) the manner in which a holder acquired a Claim; (ii) the length of time a Claim has been held; (iii) whether the Claim was acquired at a discount; (iv) whether the holder has taken a bad debt deduction in the current or prior years; (v) whether the holder has previously included accrued but unpaid interest with respect to a Claim; (vi) the holder's method of tax accounting; (vii) whether the holder will realize foreign currency exchange gain or loss with respect to a Claim; (viii) whether a Claim is an installment obligation for federal income tax purposes; and (ix) whether the transaction is treated as a "closed transaction" or an "open transaction." Therefore, holders of Claims are urged to consult their tax advisors for information that may be relevant to their particular situation and circumstances and the particular tax consequences to such holders as a result thereof.

### 1. General

KB/D294507v/F057049

Any gain or loss with respect to the receipt of Cash in respect of a Claim pursuant to the Plan generally will be treated as capital gain or loss or ordinary income or deduction. Capital losses may generally offset only capital gains, although individuals may, to a limited extent, offset ordinary income with capital losses. In addition, holders of Claims may be subject to other special tax rules that affect the character, timing and amount of any income, gain, loss or deduction. Accordingly, holders are urged to consult their own tax advisors regarding the tax consequences of the Plan to them.

In general, and except as described below under the caption "Accrued but Unpaid Interest," each U.S. Holder that is entitled to receive distributions on but not after the Distribution Date will recognize taxable gain, income, loss or deduction for U.S. federal income tax purposes when Cash distributions are received or deemed received (in accordance with the holder's regular method of tax accounting) in an amount equal to the difference, if any, between (1) the amount of such Cash distributions and (2) the holder's adjusted tax basis in its Claim.

### 2. Post-Effective Date Cash Distributions

Because certain holders of Claims may receive Cash distributions subsequent to the Effective Date of the Plan, the imputed interest provisions of the Tax Code may apply to treat a portion of the subsequent distributions as imputed interest. Additionally, because holders of Claims may receive distributions with respect to a Claim in a taxable year or years following the year of the initial distribution, any loss and a portion of any gain realized by the holder may be deferred. All holders of Claims are urged to consult their tax advisors regarding the possible application of (or the ability to elect out of) the "installment method" of reporting with respect to their Claims.

### 3. Accrued but Unpaid Interest

To the extent that any Claim entitled to a distribution under the Plan is treated as a debt instrument for U.S. federal income tax purposes and comprises principal and accrued but unpaid interest thereon, the Debtors and the Post Confirmation Debtors intend to take the position that, for U.S. federal income tax purposes, the distribution will be allocated first to the principal amount of the Claim and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest. No assurances can be given that the IRS would not take a contrary position. If, contrary to the Debtor's and Post Confirmation Debtors' intended position, such a distribution were treated as being allocated first to accrued but unpaid interest, a holder of a Claim would first realize ordinary income with respect to the distribution in an amount equal to the accrued but unpaid interest not already taken into income under the holder's method of accounting, regardless of whether the holder otherwise realizes a loss as a result of the Plan.

### 4. Market Discount

If a Claim is treated as a debt instrument for U.S. federal income tax purposes and the holder acquired the Claim after its original issuance at a "market discount" (generally defined as the amount, if any, by which the debt obligation's adjusted issue price exceeds the holder's tax basis in a debt obligation immediately after its acquisition, subject to a de minimis exception), the holder of the Claim generally will be required to treat any gain recognized pursuant to the Plan as ordinary income to the extent of the market discount accrued during the holder's period of ownership, unless the holder elected to include the market discount in income as it accrued. All holders of Claims are urged to consult their tax advisors regarding the possible application of the "market discount" rules with respect their Claims.

### 5. Information Reporting and Backup Withholding

KB/D294507v/F057049

Certain payments, including payments in respect of Claims pursuant to the Plan, are generally subject to information reporting to the IRS. Moreover, such reportable payments may be subject to backup withholding at a rate of 28% unless the holder (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (ii) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against your United States federal income tax liability provided the required information is furnished to the IRS.

6.     **Importance of Obtaining Professional Tax Assistance**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## XIX.     CONFIRMATION OF THE PLAN

The Court will confirm the Plan only if all of the requirements of Bankruptcy Code section 1129 are met. Among the requirements for confirmation are that the Plan is (i) accepted by all impaired classes of Claims entitled to vote or, if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class and as to the impaired Classes of Claims that are deemed to reject the Plan, (ii) feasible, and (iii) in the "best interests" of the holders of Claims impaired under the Plan.

A.     **Acceptance of the Plan**

The Bankruptcy Code defines acceptance of a chapter 11 plan by a class of creditors as acceptance by creditors holding two-thirds (2/3) in dollar amount and a majority in number of the claims in such class (other than any such creditor designated under section 1126(e) of the Bankruptcy Code), but for that purpose counts only those creditors that actually cast ballots. Holders of claims that fail to vote are not counted as either accepting or rejecting a plan.

B.     **Best Interests Test**

The Bankruptcy Code provides that the Plan will not be confirmed, regardless of whether or not anyone objects to confirmation, unless the Court finds that the Plan is in the "best interests" of all Classes of Claims which are impaired. The "best interests" test will be satisfied by a finding of the Court that either (1) all holders of impaired Claims have accepted the Plan or (2) the Plan will provide such a holder that has not accepted the Plan with a recovery at least equal in value to the recovery such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

KB/D294507v/F057049

THE DEBTORS AND THE COMMITTEE BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF EACH CLASS OF CLAIMS WHICH IS IMPAIRED UNDER THE PLAN.

The starting point in determining whether the Plan meets the "best interests" test is a determination of the amount of proceeds that would be generated from the liquidation of the Debtors' assets in the context of a chapter 7 liquidation. Such value must then be reduced by the costs of such liquidation, including costs incurred during the Chapter 11 Cases and allowed under chapter 7 of the Bankruptcy Code (such as professionals' fees and expenses), a chapter 7 trustee's fees, and the fees and expenses of professionals retained by a trustee. The potential chapter 7 liquidation distribution in respect of each Class must be further reduced by costs imposed by the delay caused by conversion to chapter 7. The net present value of a hypothetical chapter 7 liquidation distribution in respect of an impaired Class is then compared to the recovery in respect of such Class provided for in the Plan.

With respect to holders of General Unsecured Claims, the Debtors and the Committee have concluded that the Plan will provide holders of General Unsecured Claims with a recovery at least equal in value to the recovery such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code

Based on the fact that substantially all of the Debtors' assets were sold during the pendency of the Chapter 11 Cases, and the litigation to recover Avoidance Actions which the Distribution Agent will pursue is identical to the litigation a chapter 7 trustee would pursue, Creditors will receive at least as much under the Plan compared to a chapter 7 case. Importantly, the Plan provides that CH Fitness will contribute the Carve-Out Funds to the Plan for the benefit of Creditors of the Debtor and holders of Administrative Expense claims. The Carve-Out Funds would not be available to Unsecured Creditors in a chapter 7 case and, therefore, the Debtors and the Committee believe that the Plan provides greater value to Unsecured Creditors compared to what they would receive in a chapter 7 case. The Plan has the additional benefit of avoiding the fees and commissions of a chapter 7 trustee which would reduce recoveries for creditors.

## C. Feasibility of the Plan

Bankruptcy Code section 1129(a)(11) provides that a chapter 11 plan may be confirmed only if the Court finds that such plan is feasible. A feasible plan is one which will not lead to a need for further reorganization or liquidation of the Debtors. Since the Plan provides for the liquidation of the Debtors, the Court will find that the Plan is feasible if it determines that the Debtors will be able to satisfy the conditions precedent to the Effective Date and that the Plan Administrator will have sufficient funds to meet all post-Confirmation Date obligations to pay for the costs of administering and fully consummating the Plan and closing the Chapter 11 Case. The Debtors and the Committee believe that the Plan satisfies the financial feasibility requirement imposed by the Bankruptcy Code because the Debtors have already liquidated substantially all of their assets and the Debtors have sufficient cash to satisfy in full Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Priority (Non-Tax Claims). In the event the Plan is confirmed, but the estates do not have sufficient cash on hand to pay such claims in full, the Committee shall pursue Avoidance Actions on behalf of the estates until the Debtors' estates have sufficient cash on hand to pay such claims and for the Effective Date to occur.

## D. Classification of Claims Under the Plan

The Debtors believes that the Plan meets the classification requirements of the Bankruptcy Code which requires that a plan of reorganization place each claim into a class with other claims that are "substantially similar." The Plan establishes classes of Claims as required by the Bankruptcy Code and summarized above. Administrative Expense Claims and Priority Tax Claims are not classified.

## E. Confirmation of the Plan over the Class 4 Deemed Rejection

KB/D294507v/F057049

The Bankruptcy Code contains provisions for confirmation of a plan even if it is not accepted by all impaired classes of claims or interests, as long as it is accepted by at least one impaired class of claims without counting the vote of any insider. This is referred to colloquially as "Cram Down."

The Plan may be confirmed under the so-called "cramdown" provisions set forth in section 1129(b) of the Bankruptcy Code if, in addition to satisfying the other requirements for confirmation (including the acceptance of one class of impaired claims without counting the votes of any insider), the Plan is determined to be "fair and equitable" and "does not discriminate unfairly" with respect to each class of Claims that has not accepted the Plan.

Under the Bankruptcy Code, "fair and equitable" has different meanings for secured and unsecured claims. With respect to a secured claim, "fair and equitable" means (i) the impaired secured creditor retains its liens to the extent of its allowed claim and receives deferred cash payments at least equal in value to the allowed amount of its claim with a present value as of the effective date of the plan at least equal in value to such creditor's interest in the Debtors' interest in the property securing its claim, (ii) if property subject to the lien of the impaired secured creditor is sold free and clear of that lien, the lien attaches to the proceeds of the sale, and such lien proceeds are treated in accordance with clause (i) or (iii) of this paragraph, or (iii) the impaired secured creditor realizes the "indubitable equivalent" of its claim under the plan.

With respect to an unsecured claim, the "fair and equitable" standard, also known as the "absolute priority rule," requires that a dissenting class receive full compensation for its Allowed Claim before any junior class receives or retains any property under the Plan. If the holders of any impaired class vote to reject the Plan, the Plan may be confirmed under section 1129(b) of the Bankruptcy Code if all holders of Claims junior to those of the impaired class do not receive or retain any property under the Plan.

Under the Plan, there will be only two classes entitled to vote and potentially accept the plan: Class 2A and Class 3. Class 2A is comprised of the CH Fitness Deficiency Claim of CH Fitness. Because CH Fitness is an insider of the Debtors, the acceptance of Class 2A of the Plan does not satisfy the requirement that at lease one non-insider class of Claims accept the Plan for purposes of cram down. Because Class 3 is the only other impaired class entitled to vote on the Plan that contains non-insider creditors, for the Debtors to confirm the Plan using "cram down" under Bankruptcy Code section 1129(b), Class 3 must accept the Plan.

If Class 3 votes to accept the Plan, the Debtors will use the cram down procedure to confirm the Plan over the deemed rejection of Class 4. The Debtors and the Committee believe that the Plan can be confirmed over the deemed rejection of Class 4 because (i) no class junior to Classes 4 is receiving or retaining any property under the Plan (because there is no such class under the Plan), (ii) no class of equal rank to Class 4 is being afforded better treatment than Class 4 and (iii) the interests held by Class 4 are valueless. Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any impaired Class of Claims or Interests and is fair and equitable with respect to each such Class.

IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE CONFIRMATION HEARING, THE DEBTORS WILL ASK THE COURT TO RULE THAT THE PLAN MAY BE CONFIRMED ON THE GROUND THAT THE SECTION 1129(b) REQUIREMENTS HAVE BEEN SATISFIED.

F.    **Confirmation Hearing**

Bankruptcy Code section 1128(g) requires the Court, after notice, to hold a hearing on confirmation of the Plan (the "Confirmation Hearing"). Section 1128(b) provides that any party in interest may object to confirmation of a plan.

KB/D294507v/F057049

By order of the Court dated [____], 2010, the Confirmation Hearing has been scheduled for [___], 2009 at [__] a.m. (prevailing Eastern time) before the Honorable Robert E. Gerber, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10004. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjourned hearing. Any objection to confirmation of the Plan must (a) be in writing, (b) state the name and address of the objecting party and the amount and nature of the claim or interest of such party, (c) state with particularity the basis and nature of any objection or proposed modification, and (d) be filed with the Clerk of the Court, with a copy delivered to chambers, and served so that they are received on or before [____], 2010 at 4:00 p.m. (prevailing Eastern time), upon (i) Dechert LLP, 1095 Avenue of the Americas, New York, New York 10036 Attn: Shmuel Vasser and Davin Hall, (ii) SilvermanAcampora LLP, 100 Jericho Quadrangle, Suite 300, Jericho, New York 11753, Attn: Ronald J. Friedman and Katina Brountzas and (iii) the Office of the Untied States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. Unless an objection to confirmation is timely served and filed, it will not be considered by the Bankruptcy Court.

At the Confirmation Hearing, the Bankruptcy Court must determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied and, upon demonstration of such compliance, the Bankruptcy Court will enter the Confirmation Order.

KB/D294507v/F057049

## CONCLUSION

The Debtors and the Committee believe that confirmation and implementation of the Plan is in the best interests of the Debtors' estates and the Debtors' creditors. The Debtors and the Committee recommend that creditors entitled to vote should vote to approve the Plan.

Dated:  February 8, 2010

AGT WIND-DOWN ACQUISITION, LLC
and its affiliated debtors and debtors in possession

By:   /s/ Andrew P. Hines
      Andrew P. Hines
      Chief Restructuring Officer


OFFICIAL COMMITTEE OF UNSECURED CREDITORS

By:   /s/ David M. Susswein
      David M. Susswein for 25 Broadway Sublandlord LLC
      Chairman


DECHERT LLP
Counsel to the Debtors and Debtors in
Possession
1095 Avenue of the Americas
New York, New York 10036
(212) 698-3500
Shmuel Vasser
Davin J. Hall

SILVERMANACAMPORA LLP
Counsel to the Official Committee of
Unsecured Creditors
100 Jericho Quadrangle - Suite 300
Jericho, New York 11753
(516) 479-6300
Ronald J. Friedman
Adam L. Rosen
Katina Brountzas

KB/D294507v/F057049